**Page 1**

```
                    UNITED STATES DISTRICT COURT
                     DISTRICT OF SOUTH DAKOTA
                        SOUTHERN DIVISION
= = = = = = = = = = = = = = = = = = = = = = = = = = = = =

SIOUX STEEL COMPANY,
a South Dakota corporation,

            Plaintiff,
vs.                                             Civ. 15-4136

KC ENGINEERING, P.C., an Iowa
corporation,

            Defendant.

= = = = = = = = = = = = = = = = = = = = = = = = = = = = =

            Deposition of:   CHAD KRAMER, PE
                      Date:  September 29, 2016
                      Time:  9:03 a.m.

= = = = = = = = = = = = = = = = = = = = = = = = = = = = =

                          APPEARANCES
Mr. G. Verne Goodsell
Goodsell Quinn, LLP
Rapid City, South Dakota

and

Ms. Amy Ellis
Sioux Steel Company General Counsel
Sioux Falls, South Dakota

       Attorneys for the Plaintiff

Mr. Michael F. Tobin
Boyce Law Firm, LLP
Sioux Falls, South Dakota

       Attorney for the Defendant

ALSO PRESENT:      Jason O'Mara, KC Engineering

REPORTED BY:       Audrey M. Barbush, RPR
```

**Page 2**

```
 1                   I N D E X
 2  Examination:                                    Page
 3  By Mr. Tobin                                       4
 4  Exhibit Nos.:                                   Page
 5  Exhibit 5 - Design file, PLF 1363-1385            15
 6  Exhibit 6 - Weekly Engineering Report, 7-20-12
 7             PLF 1089                               26
 8  Exhibit 7 - KC Engineering Proposal, 7-30-12
 9             KC 81-82                               33
10  Exhibit 8 - Weekly Engineering Report, 8-10-12
11             PLF 1079-1080                          38
12  Exhibit 9 - KC Engineering Analysis, 8-28-12
13             PLF 3-32                               44
14                      -oOo-
15     (The original transcript was provided to Mr. Tobin.)
16                      -oOo-
```

**Page 3**

1         S T I P U L A T I O N
2    It is hereby stipulated and agreed, by and between the
3 above-named parties through their attorneys of record, whose
4 appearances have been hereinabove noted, that the deposition
5 of CHAD KRAMER, PE, may be taken at this time and place;
6 that is, at the offices of Boyce Law Firm, LLP, 300 South
7 Main Avenue, Sioux Falls, South Dakota, on the 29th day of
8 September, 2016, commencing at the hour of 9:03 a.m.; said
9 deposition taken before Audrey M. Barbush, a Registered
10 Professional Reporter and Notary Public within and for the
11 State of South Dakota; said deposition taken for the purpose
12 of discovery or for use at trial or for each of said
13 purposes, and said deposition is taken in accordance with
14 the applicable Rules of Civil Procedure as if taken pursuant
15 to written notice.  Objections, except as to the form of the
16 question, are reserved until the time of trial.  Insofar as
17 counsel are concerned, the reading and signing of the
18 transcript by the witness is not waived.
19               -oOo-
20
21
22
23        CHAD KRAMER, PE,
24 called as a witness, having been first duly sworn,
25 testified as follows:

**Page 4**

1        EXAMINATION
2 BY MR. TOBIN:
3  Q   Good morning, Chad.
4  A   Good morning.
5  Q   We just met.  My name is Mike Tobin, and you understand
6      that I represent KC Engineering in this lawsuit brought
7      by Sioux Steel?
8  A   Yes.
9  Q   I don't believe we've ever met before.
10  A   We have not.
11  Q   I'm going to guess that you went over some of this with
12      the attorneys, but just as a reminder:
13       If I ask a question that you don't understand,
14      will you please stop me and let me know?
15  A   Yes.
16  Q   Because I want to make sure that any answer you give,
17      you understand the question when you give that answer.
18      Okay?
19  A   Understood.
20  Q   And then let's both try not to talk over each other,
21      and I need to do that as well.  The court reporter
22      appreciates if she only takes down one thing at a time.
23      So if I start to talk before you're done giving an
24      answer, you can put your hand up or otherwise let me
25      know, and I'll let you finish your answer.  Okay?

Sioux Steel Company v.  
KC Engineering, P.C.

Chad Kramer, PE  
September 29, 2016

Page 9

1  And I forgot the gentleman's name who is now  
2  there.  
3  A  Curtis.  
4  Q  -- Curtis?  
5  A  Yes.  
6  Q  We're here to talk about a hopper bin that collapsed in  
7  Mexico in February of '15, correct?  
8  A  Yes.  
9  Q  Did -- and we're going to get into it in a lot of  
10  detail, but did either of those other engineers that  
11  you just mentioned, did they play any role in the  
12  design or development of the hopper bin we're here to  
13  talk about?  
14  A  They did not.  
15  Q  They did no work, no calculations, no review of any  
16  kind?  
17  A  No.  
18  Q  Other than KC Engineering, did any other outside  
19  entity, whether that's a person or a company, have any  
20  role from a design perspective for that hopper bin?  
21  A  No.  
22  Q  Is it accurate that you designed the hopper bin at  
23  issue?  
24  A  Yes.  
25  Q  It's my understanding that these hopper bins were  

Page 10

1  something new for Sioux Steel back in kind of the 2012  
2  time frame.  Is that an accurate statement?  
3  A  Yes.  
4  Q  What was the genesis, if you know, for why Sioux Steel  
5  wanted to go into that market of the hopper bins?  
6  A  They wanted to expand their product line to compete  
7  with others in the industry who manufactured hoppers.  
8  Q  Who back in 2012 would have had a decent share of the  
9  market for hopper bins?  Who were the main competitors?  
10 A  The big ones I suppose would be Sukup, Brock, GSI,  
11  Behlen, Chief...  
12  I mean everybody had a line of hopper bins.  
13 Q  Prior to the development of the hopper bin at issue in  
14  2012, did Sioux Steel otherwise, to your knowledge,  
15  market, manufacture, and sell storage facilities for  
16  soy meal?  
17 A  No.  
18 Q  When you were designing the hopper bin that's at issue  
19  in this case, were you contemplating that soy meal  
20  would be used in it?  
21 A  We utilized a bulk density for our design that would be  
22  for multiple commodities.  
23 Q  But was soy meal ever contemplated by you as being used  
24  in those bins?  
25 A  Soy meal wasn't specifically discussed.  

Page 11

1  Q  From an engineering perspective you'll agree with me  
2  that soy meal is a -- it's a different animal, so to  
3  speak, than a free-flowing grain?  
4  A  Not necessarily.  
5  Q  Why do you say that?  
6  A  It's a processed commodity.  So it is not necessarily a  
7  free-flowing grain, but it's subject to the same  
8  dynamic flow conditions that other grains would be  
9  subject to in a hopper, and those dynamic flow  
10  conditions are accounted for with the same overpressure  
11  factor that's applied to static load cases.  
12 Q  So if I'm understanding that correctly, if you're  
13  designing a hopper bin for soy meal, you would use the  
14  same parameters as you would for any other free-flowing  
15  commodity?  
16 A  The same math is used, yes.  
17 Q  And I believe from some of the experts in this case  
18  they've identified that the overpressure factor is a  
19  1.4?  
20 A  Yes.  
21 Q  And you would use that whether it's soy meal or a  
22  free-flowing grain?  
23 A  Yes.  
24 Q  But to go back to my initial point, when you were  
25  designing these bins in -- I keep saying 2012.  Does  

Page 12

1  that jibe with your memory that the hopper bins at  
2  issue kind of got going in 2012?  
3  A  Yes.  
4  Q  But soy meal was not a particular thing you had in mind  
5  when you were doing the design for these hopper bins?  
6  A  Soy meal was not specifically discussed.  
7  Q  And it sounds like from your previous answer soy meal  
8  was not something that Sioux Steel was otherwise in the  
9  market of anyway.  
10 A  Not to my knowledge.  
11 Q  Have you personally ever designed any sort of a  
12  structure -- a silo, a bin, anything -- for the storage  
13  of soy meal?  
14 A  I have not.  
15 Q  To your knowledge today does Sioux Steel manufacture or  
16  sell any sort of storage device for soy meal?  
17 A  Not specifically for soy meal.  
18 Q  To your knowledge who was the driving force in wanting  
19  to do these hopper bins and expand into that potential  
20  market?  
21 A  It was a sales request.  
22 Q  Do you recall from who specifically or --  
23 A  I do not.  
24 Q  And when you say a sales request, was it -- what I'm  
25  trying to get a sense of:  Was this something on a  

Min-U-Script®   Paramount Reporting ~ Audrey M. Barbush, RPR   (3) Pages 9 - 12  
605.321.3539 ~ audrey@paramountreporting.com

EXHIBIT A

Page 17

1  A  Yes.
2  Q  And not all pages in Exhibit 5 have a date on them, but
3     would it be fair as a ballpark that most of this
4     design, if not all of it, would have been done in that
5     February of 2012 time frame?
6  A  Yes.
7  Q  And all the work represented in Exhibit 5 is yours?
8  A  Yes.
9  Q  If you can turn to the third page -- and at the bottom
10    that is 1365 -- on the bottom half there's a notation
11    and then a diagram about grain load on hopper panels?
12 A  Yes.
13 Q  Do you see that?
14 A  Yes.
15 Q  And then there is a -- I don't know the shape, but you
16    then have a diagram of a panel that would be in the
17    hopper cone, correct?
18 A  Yes.
19 Q  And as I understand, at that point you are calculating
20    the various loads and forces and stresses that are
21    going to be on those panels at the bottom of the
22    hopper?
23 A  Yes.
24 Q  And you're going to calculate the loads for the
25    vertical seams as well as the horizontal seams?

Page 18

1  A  Yes.
2  Q  And the vertical seem, is that represented by the
3     notation Nn -- or is that an Nh?
4  A  It's an m and an h.
5  Q  So the capital N lowercase h, that is the figure for
6     the stresses on the vertical seams?
7  A  Yes.
8  Q  And in your diagram you represent the vertical seam as
9     having a single row of bolts, correct?
10 A  Yes.
11 Q  And your horizontal seam has three rows of bolts, at
12    the top anyway?
13 A  At the top of the panel, yes.
14 Q  And at the bottom does it have two rows?
15 A  Yes.
16 Q  Then if you go to the next page, 1366, at the top of
17    that page there is a blowup, if you will, in your
18    handwriting for particularly the vertical seam?
19 A  Yes.
20 Q  And again the vertical seam is represented by one row
21    of bolts?
22 A  Yes.
23 Q  Do you know why you have one row of bolts for the
24    vertical seam but multiple rows of bolts for the
25    horizontal seams?

Page 19

1     As a non-engineer help me understand why there's,
2     you know, one row going up and down but multiple rows
3     going horizontally.
4  A  There's different size fasteners that are used.  So the
5     vertical seam uses larger fasteners than the horizontal
6     seams do.
7  Q  By using the term "fastener," is that the bolt itself
8     or is that --
9  A  Yes.
10 Q  Okay.  Now, below -- still on the top part of 1366 --
11    there is a notation of "See Excel spreadsheet design
12    calculations," correct?
13 A  Yes.
14 Q  And that's in your handwriting?
15 A  Yes.
16 Q  If you go in the document a ways to 1376, is page 1376
17    within Exhibit 5 -- is that the Excel spreadsheet that
18    is referenced previously on 1366?
19 A  Yes.
20 Q  So on page 1376 this would show the math, if you will,
21    for the forces and stresses that are going to be on
22    that vertical seam?
23 A  Yes.
24 Q  And I keep using the term "vertical seam," but on
25    page 1376 it's titled "vertical splices."

Page 20

1     Is that basically the same thing?
2  A  Yes.
3  Q  So we're talking about that vertical single row of
4     bolts on the panels for the hopper cone?
5  A  Yes.
6  Q  And as I understand the spreadsheet, you have three
7     different snapshots, is what I'm going to call them, of
8     the forces:  One at the cone diameter of 28 feet, then
9     at 15 feet, and then at 4 feet?
10 A  Yes.
11 Q  And that would make sense because obviously this cone
12    starts wider at the top and obviously gets more narrow
13    at the bottom?
14 A  Yes.
15 Q  And I believe that angle is about 45 degrees, is it
16    not?
17 A  It is 45 degrees.
18 Q  Why -- just curious.  Why did you pick three different
19    diameters, and why did you pick the three that are
20    there?
21 A  I picked different diameters because we've got
22    different bolt spacings in those vertical seams.  So --
23    and we've got two different panels in there as well, so
24    it would be a transition from the upper panel to the
25    lower panel.  And that's what those diameters were

Min-U-Script®   Paramount Reporting ~ Audrey M. Barbush, RPR   (5) Pages 17 - 20
605.321.3539 ~ audrey@paramountreporting.com

EXHIBIT A

Page 21

1    chosen for.
2  Q  Is there a particular computer program outside of Excel
3    that helps you do this, or is your Excel set up to
4    essentially produce this mathematical calculation on
5    page 1376?
6  A  I'm not sure I understand your question.
7  Q  Well, how does all the information, all the math on
8    page 1376 -- I mean how does that get there? I'm
9    assuming you have to input some information.
10 A  Yes.
11 Q  And then is the Excel just doing the math for you?
12 A  Yes.
13 Q  And is the information that you're inputting, is that
14   the stuff below the table -- or above the table and
15   below the "Hopper Panel Vertical Splices" heading?
16 A  Yes.
17 Q  At the far right there's the utility ratio?
18 A  Utilization ratio.
19 Q  Utilization ratio. Thank you.
20    What does that tell someone like yourself? What
21   do those ratios mean?
22 A  It tells you how much the -- how much of the allowable
23   capacity is utilized.
24 Q  Okay. And it's my understanding that we want to be
25   below 1; is that correct?

Page 22

1  A  Yes.
2  Q  So, for example, at the 28-foot diameter it's my
3    understanding that those vertical seams would be
4    overstressed by 389 percent.
5    Is that how you would read that?
6  A  Yes.
7  Q  And then at 15 feet those vertical seams are
8    overstressed by 152 percent?
9  A  They would be overstressed by 52 percent.
10 Q  And at 4 foot, we're below 1, so that would be a number
11   that -- that we would like to see?
12 A  Yes.
13 Q  As a design engineer -- all three of those utilization
14   ratios should be below 1, correct?
15 A  Yes.
16 Q  What did you do when you saw that at the 28-foot
17   diameter and the 15-foot diameter we are above 1?
18 A  I'm not sure what exactly you're asking.
19 Q  Well, I'm assuming that when you did the design, you
20   referenced and referred to this page --
21 A  Yes.
22 Q  -- 1376?
23 A  Yes.
24 Q  And as I understand it, if you see utilization ratios
25   that are over 1, that's a signal that there's a

Page 23

1    problem?
2  A  Yes.
3  Q  So you would have seen that we have a problem at the
4    28-foot diameter --
5  A  Yes.
6  Q  -- and also at the 15-foot diameter?
7  A  Yes.
8  Q  In fact, at the 28-foot diameter we have a very big
9    problem, correct?
10 A  The ratio is over 1, yes.
11 Q  I mean it's -- I don't want to parse words with you,
12   but we are -- we're almost up to 4.
13 A  Yes.
14 Q  What did you then do, if anything, after you saw those
15   numbers to change your design in any way?
16 A  We didn't know that these numbers were at those levels
17   until post failure, and at that time we made design
18   changes.
19 Q  So -- okay. You never saw or appreciated these numbers
20   pre-failure?
21 A  I did not.
22 Q  Was that a mistake on your part? I mean you should
23   have realized these numbers pre-failure?
24    Let me start over.
25    The bin that was manufactured and shipped down to

Page 24

1    Mexico and that failed --
2  A  Yes.
3  Q  -- it went out per the design in Exhibit 5?
4  A  Yes.
5  Q  And it would have had utilization ratios at the 28-foot
6    and the 15-foot diameter that are problems?
7  A  Yes.
8  Q  And you'll agree with me that the hopper bin should not
9    have gone down to Mexico with utilization ratios at
10   those seams of 3.89 and 1.52?
11 A  Yes. There was a math error. Yes.
12 Q  And maybe I'm just trying to be too diplomatic, and
13   maybe that's part of our disconnect here. But, I mean,
14   a mistake was made by Sioux Steel in the design of this
15   bin, correct?
16 A  Yes. I made a mistake, yes.
17 Q  And that mistake is yours?
18 A  Yes.
19 Q  Post failure you said you made some changes. What
20   changes were made to account for these design errors?
21 A  We modified the hopper panels, changed the bolt
22   spacing, the edge distances from the edge of the
23   material to the edge of the bolts, increased that.
24 Q  Is it still just one row of bolts, or are there more
25   rows now?

Min-U-Script®        Paramount Reporting ~ Audrey M. Barbush, RPR        (6) Pages 21 - 24
                    605.321.3539 ~ audrey@paramountreporting.com

EXHIBIT A

Page 25

1  A  One row of bolts.
2  Q  So are the bolts just now bigger and further away from
3     the edge of the panel, if you know?
4  A  The fasteners are still the same size. They're just
5     farther away from the hole, and the spacing has been
6     modified.
7  Q  While we're on the subject of post failure changes,
8     would Sioux Steel allow soy meal to be put in the bins
9     today, into a hopper bin today?
10        That's a bad question.
11        Would Sioux Steel sell a hopper bin if they knew
12    that its customer or end user was going to put soy meal
13    in the hopper bin?
14 A  It kind of takes me back to the math, I guess, what I
15    said before: You've got a commodity that is a
16    processed commodity and -- but it's not a free-flowing
17    grain. It's still subject to the same dynamic
18    pressures, the dynamic flow conditions which are
19    accounted for by the overpressure factor that's applied
20    to the static load conditions.
21 Q  We're going to get into this in more detail later, but
22    when you learned about this failure and that soy meal
23    was involved, you were concerned and disappointed that
24    soy meal was being used in this application; is that
25    fair?

Page 26

1  A  Not necessarily. Maybe more concerned about the flow
2     conditions of the soy meal and how the customer was
3     going to get it in and out of the hopper.
4  Q  Is Chris Nelson a professional engineer?
5  A  He was not when he was at Sioux Steel.
6  Q  Is he no longer with Sioux Steel?
7  A  He's no longer with Sioux Steel.
8  Q  What about the previous gentleman who was your
9     engineering manager towards the end of '11? I forget
10    his name.
11 A  Keith Polzin.
12 Q  Yeah. Was he a registered -- or a professional
13    engineer?
14 A  No.
15 Q  From a design perspective internally at Sioux Steel,
16    is there anybody that would review your design as set
17    forth in Exhibit 5?
18 A  No.
19    (Exhibit 6 is marked for identification.)
20 BY MR. TOBIN:
21 Q  Chad, I'm going to hand you what's been marked as
22    Exhibit 6, and Exhibit 6, per the subject, it's a
23    weekly engineering report from you to Chris Nelson for
24    the middle of July of 2012?
25 A  Yes.

Page 27

1  Q  And one of the topics on the engineering report is the
2     hopper bins at issue?
3  A  Yes.
4  Q  My question is: I received a variety of these
5     engineering reports from Sioux Steel's attorneys, but
6     this is the first one, and I'm curious: Were you doing
7     weekly engineering reports prior to the middle of July
8     of 2012?
9  A  Yes, I would have been.
10 Q  And I know it's not an easy question to answer because
11    we're not at your computer, but recognizing that you
12    were working on the design back in February of 2012,
13    would you expect that the hopper bin would have been
14    part of the engineering reports before July of 2012?
15 A  It's tough for me to say without looking at old
16    engineering reports.
17 Q  Did the attorneys for Sioux Steel -- did they task you
18    with obtaining the engineering reports to ultimately
19    give to me?
20 A  No.
21 Q  So you don't have a memory of going through your system
22    to find engineering reports?
23 A  I do not.
24 Q  Ultimately Sioux Steel and KC Engineering entered into
25    an agreement where KC Engineering would provide some

Page 28

1     services relative to these hopper bins, correct?
2  A  Yes.
3  Q  First of all, why? Why is Sioux Steel wanting to
4     engage an outside entity to provide some services?
5  A  It was a new product for us, and we wanted to get an
6     outside set of eyes on our product to vet it for us.
7  Q  And is that -- obtaining that outside set of eyes, is
8     that something you could do on your own, or did you
9     need approval or direction from someone above you?
10 A  I would have needed approval from somebody above me.
11 Q  Was there a question or concern that you had as to the
12    propriety of your design that you wanted another set of
13    eyes to look at it?
14 A  No.
15 Q  Maybe I'm wrong, but I'm going to assume that
16    Sioux Steel does not send out its designs for all its
17    products to get another set of eyes to look at it.
18        Is that correct?
19 A  I can't comment on whether all their products have been
20    sent out for design [sic], but this was a new product
21    line and that's why we sent this one for -- to be
22    reviewed.
23 Q  Would there be any way for you to estimate in your
24    Sioux Steel career how many new products you've
25    designed?

Min-U-Script®                    Paramount Reporting ~ Audrey M. Barbush, RPR                    (7) Pages 25 - 28
                                 605.321.3539 ~ audrey@paramountreporting.com

EXHIBIT A

Page 29

1  A  Not off the top of my head.  That's pretty difficult.
2  Q  Is it a handful, or is it quite a few?
3  A  It's quite a few.
4  Q  On those projects that you design that are going to be
5     new, are all or most of them sent out to an outside
6     engineering firm to be reviewed?
7  A  It's a decision that's made based on the size or the
8     scope of the project.  A lot of the projects we work on
9     are product line extensions.  So it's similar
10    construction, you know, that we do and it's just
11    variations of that construction.
12 Q  Then what was it about this particular hopper bin that
13    Sioux Steel wanted or felt it needed to get an outside
14    review?
15 A  It was a completely new product line for us.
16 Q  What was new about it?  I mean, as I understand,
17    obviously Sioux Steel designs, sells, manufactures
18    bins, correct?
19 A  Yes.
20 Q  Is it the hopper cone portion or the connection of a
21    hopper to a bin?  What was new about it to Sioux Steel?
22 A  With a hopper bin you're obviously supporting the
23    entire grain mass with a cone structure as opposed to a
24    flat-bottom bin that is, you know, on the ground, where
25    you've got the grain being supported, you know, on the

Page 30

1     ground -- the majority of the grain being supported on
2     the ground.
3  Q  So it's the hopper portion supporting the material in
4     the bin, that was the new angle from Sioux Steel's
5     perspective?
6  A  Yes.
7  Q  And it was that perspective that Sioux Steel wanted the
8     outside review?
9  A  Yes.
10 Q  When you did your design, what were you relying upon?
11    How do you get it to be at a 45-degree angle?  I mean,
12    how do you go do what you do?
13    You're told that we need to go design these bins.
14    What reference, what artwork, what do you have that
15    will help you, guide you to go do that design?
16 A  We've got design standards that we use.
17 Q  And what would those be?
18 A  The ASABE design standard EP433 is one that we
19    reference, and then there's a reference by Edwin and
20    Charles Gaylord that we also use for design.
21 Q  You're talking to a guy who is not an engineer.  So --
22    but the 45-degree angle of the cone, is that something
23    that's driven by the standards, or is that something
24    that you can choose?
25    Could you make it 60 degrees?  Could you make it

Page 31

1     20 degrees?  That's kind of what I'm going at.  Why --
2     what guided you to get to a 45-degree-angle cone?
3  A  That can be changed.  So that would have been a request
4     based on what sales asked us to design.
5  Q  And as you sit here today do you have any recollection
6     of any discussions as to a 45-degree angle versus a
7     different degree angle?
8  A  No specific discussions, no.
9  Q  With the hopper bins that you designed and that
10    Sioux Steel manufactured and sold -- I don't know if
11    this is a fair question, but are they all
12    45-degree-angle hoppers, or do you guys do some at
13    different angles?
14 A  We now offer some at different angles.
15 Q  And that's all post failure?
16 A  Yes.
17 Q  What are some of the different angles that you do now?
18 A  We also have 60-degree hopper cones.
19 Q  From the stresses and loads in that cone, are they --
20    how does the angle affect the pressure and the load?
21 A  It varies, but the same design standard is used to
22    calculate the pressures in those cones.
23 Q  Back to the KC Engineering.  You would have discussed
24    with Chris Nelson hiring someone outside of Sioux Steel
25    to do the review?

Page 32

1  A  Yes.
2  Q  I know you indicated you didn't have any particular
3     concern other than it was a new product line.
4     Did Chris have a particular concern that you
5     recall?
6  A  No, not that I recall.
7  Q  Do you recall who would have broached the idea of
8     having someone outside review this?  Would that have
9     been your idea? Chris's idea? or someone else?
10 A  All of the above.  Chris and myself and others within
11    the organization when we meet with operations and
12    sales.
13 Q  Why KC Engineering?  Did you vet any other companies?
14 A  We did not.
15 Q  Why KC Engineering?
16 A  That's a good question.  I don't know in particular.
17    We knew of them and knew that they had a reputation for
18    doing, you know, agricultural-type designs.
19 Q  I mean to your knowledge was there any prior connection
20    between the two companies?
21 A  Not that I recall.
22 Q  And it doesn't sound like you individually had a
23    connection with anyone at KC Engineering?
24 A  I did not know anybody at KC.
25    (Exhibit 7 is marked for identification.)

Min-U-Script®            Paramount Reporting ~ Audrey M. Barbush, RPR            (8) Pages 29 - 32
                         605.321.3539 ~ audrey@paramountreporting.com

EXHIBIT A

**Page 33**

1  BY MR. TOBIN:
2  Q  I'm going to hand you what's been marked as Exhibit 7,
3     and Exhibit 7 is the proposal from KC Engineering to
4     Sioux Steel to do some services relative to the hopper
5     cone at issue?
6  A  Yes.
7  Q  And that's dated July 30 of 2012?
8  A  It is.
9  Q  And it's specific to your attention, correct?
10 A  Yes.
11 Q  Under the scope of the engineering services, I mean it
12    certainly speaks for itself, but I kind of digest it as
13    two different things, and I just want to know if you
14    agree with me.
15       Number one: KC Engineering is going to review
16    drawings and calculations provided by Sioux Steel,
17    correct?
18 A  [No audible response.]
19 Q  And then, second, they were going to do a RISA,
20    R-I-S-A, model of the hoppers.
21 A  Yes.
22 Q  Now, I break those down into two different functions.
23       Do you share that idea that there's two different
24    functions that KC Engineering is going to do?
25 A  I'm not sure I understand the question.

**Page 34**

1  Q  Well, I interpret their proposal as they're going to do
2     two things: They're going to review some drawings and
3     calculations, and then they're going to produce the
4     RISA model. I just want to know if you read it as
5     doing two tasks, one task, more tasks.
6  A  They would both need to be done in order to do a design
7     review. So I guess I don't know why they would be
8     different. I'm not understanding that question.
9  Q  You agree that Sioux Steel [sic] did perform and
10    produce the RISA model?
11       MR. O'MARA: You mean KC Engineering.
12 BY MR. TOBIN:
13 Q  I'm sorry. KC Engineering. They did produce a RISA
14    model for you?
15 A  Yes.
16 Q  And I believe that's, like, a 600-page document?
17 A  They sent the output from the RISA model.
18 Q  Did Sioux Steel -- did you provide drawings of the bins
19    to Sioux Steel [sic]?
20 A  Yes.
21 Q  Did you provide calculations to Sioux Steel [sic]?
22       MR. O'MARA: To KC Engineering.
23 BY MR. TOBIN:
24 Q  I mean to KC Engineering.
25       Did you provide the calculations to

**Page 35**

1     KC Engineering?
2  A  Not that I'm aware of.
3  Q  To your knowledge, did your design file, Exhibit 5 --
4     did any portion of Exhibit 5 get sent to
5     KC Engineering?
6  A  I can't say with certainty if anything would or would
7     not have been sent to them at some point.
8  Q  As you sit here today, do you have any recollection of
9     sending your design file, Exhibit 5, to KC Engineering?
10 A  I don't specifically recall that.
11 Q  KC Engineering is of the position that they did not
12    receive anything in Exhibit 5.
13       Would you have any reason to dispute that?
14 A  I would not.
15 Q  And then specifically within Exhibit 5, the Excel
16    spreadsheet on page 1376 that showed the utilization
17    ratios for the vertical splices, do you believe that
18    particular page was ever sent to KC Engineering?
19 A  I do not believe so.
20 Q  Is there a particular reason why the calculations from
21    Sioux Steel were not sent to KC Engineering?
22 A  No.
23 Q  It's my understanding that it took several weeks or a
24    month or two for KC Engineering to do their review and
25    then produce a report to you?

**Page 36**

1  A  If I recall it was about a month, yes.
2  Q  As you sit here today, can you recall how many
3     conversations you would have had with KC Engineering
4     about their work following this July 30 proposal?
5  A  I don't recall for sure.
6  Q  Do you recall having a conversation with KC Engineering
7     where you told KC Engineering that they would not need
8     to do any review of any calculations?
9  A  Could you repeat that question.
10 Q  Sure. Do you have any memory of any conversation with
11    KC Engineering where you told KC Engineering they would
12    not need to review any calculations?
13 A  No.
14 Q  You don't recall that?
15 A  No.
16 Q  The RISA model, why was that something you were
17    interested in from KC Engineering?
18 A  I don't know that we were particularly interested in
19    the RISA model specifically. In order for them to do a
20    design review they were going to have to, you know,
21    create a model of the hopper just like we would have
22    when we designed it. So that's why they would have
23    created the RISA model.
24 Q  Did you at Sioux Steel have the ability to create a
25    RISA model?

Min-U-Script®   Paramount Reporting ~ Audrey M. Barbush, RPR   (9) Pages 33 - 36
605.321.3539 ~ audrey@paramountreporting.com

EXHIBIT A

**Page 37**

1  A   We don't have that software, no.
2  Q   So when you did your design, you didn't have the
3      benefit of the RISA model?
4  A   No.
5  Q   Within the scope -- or below the scope, KC Engineering
6      lists out some standards that they are going to use or
7      reference in their review.
8          Did you have any concern at the time in July of
9      2012 about any of those particular references or
10     standards?
11 A   No.
12 Q   In fact, if I remember correctly, they're probably some
13     of the same that you already told me that you were
14     using when you did your design?
15 A   Yes.
16 Q   As you sit here today, do you have any problem with
17     those four referenced standards?
18 A   I do not.
19 Q   And maybe I already asked this -- and if I did forgive
20     me -- but you told me that no calculations were sent to
21     KC Engineering, correct?
22 A   Correct.
23 Q   And why was that?  Why were no calculations sent to
24     KC Engineering?
25         MR. GOODSELL: I'm going to object to the

**Page 38**

1      question.  It's been asked and answered.
2          You can go ahead.
3          THE WITNESS: I don't know why the calculations
4      weren't sent.  They weren't asked for.  We weren't
5      asked to provide calculations.
6      (Exhibit 8 is marked for identification.)
7  BY MR. TOBIN:
8  Q   Chad, I'm going to hand you what's been marked as
9      Exhibit 8, and Exhibit 8 is another weekly engineering
10     report from you to Chris Nelson, correct?
11 A   Yes.
12 Q   And this one is from August 10 of 2012?
13 A   Yes.
14 Q   On the second page under the hopper bins you note that
15     KC Engineering is in the process of their design
16     review?
17 A   Yes.
18 Q   And then you note some work that's being done, and I
19     just want to have a quick discussion about that.
20         The first name you reference is Gary.  Who is
21     Gary?
22 A   Gary is a designer or drafter.
23 Q   Was he at this time a Sioux Steel employee?
24 A   Yes.
25 Q   And then the next name is Tim?

**Page 39**

1  A   Yes.
2  Q   Who is Tim?
3  A   Tim is an R&D lab technician.
4  Q   At that time was Tim a Sioux Steel employee?
5  A   Yes.
6  Q   And then the other name is Chuck.  Who is Chuck?
7  A   Chuck is part of operations and does bills of
8      materials.
9  Q   And obviously he would have been a Sioux Steel employee
10     at the time as well?
11 A   Yes.
12 Q   Are those three gentlemen still with Sioux Steel today?
13 A   Yes.
14 Q   Did any -- from previous answers I think I know that
15     the answer is no, but those gentlemen would not have
16     played any role in the design -- in your design of the
17     hopper bin at issue?
18 A   No.
19 Q   It appears to me from these engineering reports that in
20     the summer of 2012 -- and now we're into August per
21     this engineering report -- that Sioux Steel is going
22     forward with the actual manufacture of these hopper
23     bins.  Is that accurate?
24 A   We are preparing for the manufacture of the hopper
25     bins, yes.

**Page 40**

1  Q   What do you mean by you're preparing for the
2      manufacture of the hopper bins?
3  A   Creating weld fixtures for operations to use.
4  Q   To your knowledge had any bins -- exemplar bins of any
5      type been manufactured and produced during -- by or in
6      August of 2012?
7  A   I'm sorry.  What type of bins?
8  Q   The hopper bins at issue, any sort of exemplar or any
9      other type of hopper bins, had any been produced?
10 A   No.
11 Q   I guess what I'm driving at is -- and see if you agree
12     with this or not:  Sioux Steel was going forward with
13     the manufacture of these bins and almost were not
14     waiting necessarily for what KC Engineering has to say?
15 A   We were going down parallel paths of being prepared to
16     manufacture.
17     (Exhibit 9 is marked for identification.)
18         MR. TOBIN: Why don't we take a short break if
19     that's okay.
20         MR. GOODSELL: Sure.
21     (Recess taken from 9:59 a.m. to 10:14 a.m.)
22 BY MR. TOBIN:
23 Q   Before we turn to Exhibit 9, I just want to circle back
24     to a few issues.
25         The calculations.  We were discussing

Min-U-Script®    Paramount Reporting ~ Audrey M. Barbush, RPR    (10) Pages 37 - 40
605.321.3539 ~ audrey@paramountreporting.com

EXHIBIT A

Page 41

1  KC Engineering's proposal, which is Exhibit 7, and you
2  told me that you don't believe that the calculations
3  were ever asked for by KC Engineering. Did I say --
4  A  Not that I recall.
5  Q  Okay. And that was going to be part of what I was
6     going to ask.
7        Do you know for sure they were never asked for, or
8     do you just not have a recollection as you sit here of
9     a request for them?
10 A  Can you repeat that?
11 Q  Sure. Do you know for sure that they were never asked
12    for, or are you telling me you just don't have a
13    recollection of them asking for them?
14 A  I don't have a recollection, but if they would have
15    asked for the calculations, we would have sent the
16    calculations.
17 Q  Well, you'll agree with me that in their proposal,
18    Exhibit 7, they're requesting the calculations?
19       MR. GOODSELL: Object to the form of the question.
20       You can go ahead and answer.
21       THE WITNESS: Yes.
22 BY MR. TOBIN:
23 Q  All right. The other topic I want to circle back to is
24    with soy meal and specifically our discussion about --
25    I think you told me on a few different occasions that

Page 42

1  the same design standards would be used on a hopper
2  like this whether it's soy meal or a free-flowing
3  grain.
4     Did I paraphrase what you were telling me
5  accurately?
6  A  Yes, the math would be the same.
7  Q  Okay. And what I want to -- I'm going to try to come
8     at this from a few different angles and just see what
9     you say, but...
10       You'll agree with me that a major problem or
11    challenge with soy meal is the possibility of it
12    bridging, correct?
13 A  Yes.
14 Q  And especially vis-a-vis a free-flowing grain?
15 A  Free-flowing grains can be subject to the same dynamic
16    flow conditions that soy meal would be as well.
17 Q  Correct. Free-flowing grain can bridge, but you'll
18    agree with me that that's a far more rare occurrence
19    than bridging with soy meal?
20 A  The frequency as to which they're subject to those
21    dynamic loads may be different, yes, but the math is
22    the same. When you go back to the math, the
23    overpressure factor accounts for those dynamic flow
24    conditions in the same manner.
25 Q  Correct. Had you known from the beginning -- maybe

Page 43

1  this is a better way to come at it. Had you known from
2  the beginning, at the end of 2011/early 2012 when
3  you're doing the design, if you knew or anticipated
4  that soy meal was going to be used in these hopper
5  bins, would you have done anything different in your
6  design?
7     MR. GOODSELL: Excuse me, Counsel. In the
8  structural design?
9     MR. TOBIN: Correct.
10    THE WITNESS: Not necessarily. The design
11 standards referenced or that we use don't distinguish
12 between those, and again, the same math is used for
13 those dynamic flow conditions. They may occur at
14 different frequencies, but the same overpressure factor
15 is used.
16 BY MR. TOBIN:
17 Q  But would you not do something in the design to try to
18    eliminate or reduce the risk of the soy meal bridging?
19 A  Not in the structural design.
20 Q  In what other design would you account for that?
21 A  Can you rephrase that question or repeat that one?
22 Q  Well, you said not in the structural design.
23 A  Right.
24 Q  So I didn't know if --
25 A  Not in the structural design, yes.

Page 44

1  Q  Okay. All right. Will you agree with me that a
2     45-degree-angle cone will or could promote bridging of
3     soy meal?
4  A  Not necessarily. It depends on the condition of the
5     material inside the hopper.
6  Q  We'll come back to it after a bit. I'm going to hand
7     you what's been marked as Exhibit 9, and Exhibit 9 is a
8     report from KC Engineering to you dated August 28,
9     2012, following their analysis and review of the 18-
10    and 30-foot diameter hopper cones?
11 A  Yes.
12 Q  Exhibit 9's got several pages to it, and the first two
13    pages would be the report from KC Engineering, the
14    letter report?
15 A  Yes.
16 Q  And then the next two pages are the table of contents
17    for the RISA model?
18 A  Yes.
19 Q  And we already talked about this, and the table of
20    contents makes it clear: The RISA model is over a
21    thousand pages long?
22 A  Yes.
23 Q  So that's why I didn't include the whole thing. But my
24    point is, is you did receive the complete printout from
25    the RISA model when you received the first two pages of

Min-U-Script®   Paramount Reporting ~ Audrey M. Barbush, RPR   (11) Pages 41 - 44
605.321.3539 ~ audrey@paramountreporting.com

EXHIBIT A

**Page 45**

1     Exhibit 9?
2 A  We did.
3 Q  And then after the table of contents from the RISA
4     model, there are 26 additional pages, and I'm going to
5     call them the KC Engineering working papers or design
6     papers. And you would have received those 26 pages as
7     well when you received their report?
8 A  Yes.
9 Q  So it's a long way of saying: On or about August 28
10    you received from KC Engineering their two-page letter
11    report, the very thick RISA printout, as well as
12    26 pages of KC Engineering's working papers?
13 A  Yes.
14 Q  Okay. When you received their report, did you read it?
15 A  Yes.
16 Q  What, if anything, did you do with the RISA printout?
17 A  Not really -- there's not much you can do with a model.
18    I mean there's a lot of pages that you didn't really --
19    I couldn't really do a whole lot with.
20 Q  And it's my understanding that the RISA model would say
21    nothing about the vertical panel sections that we're
22    here to talk about for this hopper cone.
23       Do you agree with that?
24 A  The models don't have any of the bolted joint
25    connection design.

**Page 46**

1 Q  So can we agree that the RISA report really doesn't
2    have anything to do with what we're here to talk about
3    today?
4 A  Not necessarily. The RISA model is going to have
5    stresses in it that would be used for what we're
6    talking about today.
7 Q  Okay. All right. But it doesn't speak to the vertical
8    seams, that we'll talk about later, the vertical seams
9    where it ultimately failed on this hopper bin when it
10    collapsed -- or when the material came out of it,
11    I should say.
12 A  Yes.
13 Q  Okay. And the RISA report wouldn't talk about those
14    bolted connections?
15 A  It would not.
16 Q  Okay. The 26 pages that KC Engineering included from
17    their file, did you review those when you received the
18    report?
19 A  Not in depth, no.
20 Q  Since the failure at issue up until today have you had
21    a chance to go through those 26 pages in detail?
22 A  Yes.
23 Q  Will you agree with me that nowhere in those 26 pages
24    does KC Engineering do any review of those vertical
25    seams?

**Page 47**

1 A  I would agree with that, yes.
2 Q  And we can look specifically -- if I can find it quick.
3       It's toward the back. The lawyer number is
4    Plaintiff 28, and the handwritten KC Engineering number
5    is 22.
6       On this page you'll agree with me that
7    KC Engineering did a review of the horizontal seam for
8    the horizontal connection?
9 A  Yes.
10 Q  And as we talked earlier, that would encompass the
11    three rows of bolts at the top of the panel?
12 A  Yes.
13 Q  And it's plain that there is no review of the vertical
14    seam, correct?
15 A  Yes.
16 Q  Do you recall when you received this report in August,
17    late August of 2012, noting that there was no review of
18    the vertical seam?
19 A  I did not know that at the time, no.
20 Q  You'll agree with me, though, that KC Engineering
21    provided information to you showing which seams they
22    did and did not review?
23 A  The calculations on the page you're talking about
24    reference the horizontal seam.
25 Q  And you'll agree with me that if you had reviewed those

**Page 48**

1    26 pages thoroughly and carefully, you would have seen
2    and recognized that there was no design review of the
3    vertical seam?
4       MR. GOODSELL: I'm going to object to the form and
5    foundation of the question.
6       You can go ahead and answer.
7       THE WITNESS: Honestly I focused on the
8    conclusions of their report and focused on the areas
9    that they said needed to be addressed.
10      You know, we did our design and sent it to KC to
11    be vetted and, you know, assumed that they were going
12    to check the entire design of the hopper.
13 BY MR. TOBIN:
14 Q  Now, in their report on Exhibit 9 they do identify one
15    issue with the 30-foot diameter hopper, correct?
16 A  Yes.
17 Q  And it's my understanding that that concern has to do
18    with the legs of the hopper bin structure and not
19    anything to do with the cone?
20 A  Yes.
21 Q  And then in a follow-up report between you and
22    KC Engineering, the issue with the legs, that issue was
23    resolved to the mutual satisfaction of yourself and
24    KC Engineering?
25 A  Yes. We responded that we didn't agree with their --

Min-U-Script®     Paramount Reporting ~ Audrey M. Barbush, RPR     (12) Pages 45 - 48
605.321.3539 ~ audrey@paramountreporting.com

EXHIBIT A

Page 49

1   with the report, and we ultimately came to a conclusion
2   that the legs were indeed okay.
3   Q   At no time did you ever specifically address with
4       KC Engineering anything -- let me back up.
5           At no time did you specifically address those
6       vertical seams with KC Engineering, correct?
7   A   We did not.
8   Q   And at the time KC Engineering did its review, it did
9       not have your working file, Exhibit 5, correct?
10          MR. GOODSELL: Object to the form of the question.
11          You can go ahead and answer.
12          THE WITNESS: Correct.
13  BY MR. TOBIN:
14  Q   I'm going to hand you what was marked as Exhibit 4 from
15      yesterday. Exhibit 4 is a series of e-mails. I think
16      the first one is actually on the third page.
17          If you want to take a few minutes and go ahead and
18      review that, then we'll have some questions about it.
19          (Pause in the proceedings.)
20          Have you reviewed Exhibit 4?
21  A   Yes.
22  Q   We're going to start on the third page. This e-mail
23      string starts with an e-mail from Les Garcia to you
24      about some questions he had about some air cannons,
25      correct?

Page 50

1   A   Yes.
2   Q   And you respond to Les, and you let him know that
3       you've never dealt with air cannons, correct?
4   A   Yes.
5   Q   We know at this point in time in late July of 2014 that
6       the bin that ultimately fails, it has already been
7       purchased and is being shipped and may even be in
8       operation down in Mexico, correct?
9           MR. GOODSELL: I'm going to object to the form and
10      the foundation of the question.
11          You can go ahead and answer.
12          THE WITNESS: Per Les it appears it was being
13      installed at that point.
14  BY MR. TOBIN:
15  Q   Correct. Okay. And I don't think there's a dispute,
16      but the bin that went down to Mexico that's being
17      installed, that had air cannons with it, correct?
18  A   Per the e-mails, that's what it looks like, yes.
19  Q   And it's my understanding that you had no involvement
20      with anyone about whether air cannons should or should
21      not be on that bin that's being installed down in
22      Mexico in late July of 2014, correct?
23  A   Correct.
24  Q   In fact, you're making that clear in Exhibit 4 that you
25      were not consulted prior to that particular bin being

Page 51

1   sold and installed down in Mexico, correct?
2   A   Correct.
3   Q   And my question is maybe one you don't have an answer
4       for, but how could a bin be sold by Sioux Steel where
5       you're having this add-on equipment and engineering
6       isn't going to be consulted?
7   A   Engineering is responsible for the structural design.
8       Accessories on our bins, you know, that sales deals
9       with, you know, sales will do that, and engineering
10      won't be involved with the sale of accessories for
11      bins.
12  Q   So it was not a surprise to you that sales is selling a
13      product and they're putting some accessories to it
14      without consulting with you first?
15  A   Can you repeat that question?
16  Q   Sure. It was not a surprise to you that sales is
17      selling a product and they're adding some accessories
18      to it without consulting with you first?
19  A   We wouldn't necessarily know what accessories are being
20      sold with the bin.
21  Q   Correct. And I guess what I'm trying to get to is if
22      sales is going to include some accessories with a
23      product, it's not normal for that to be run through
24      engineering first?
25  A   Correct.

Page 52

1   Q   But these particular accessories, the air cannons, that
2       was of some concern for you, as expressed in Exhibit 4,
3       right?
4   A   It was something that I had never -- never dealt with
5       before.
6   Q   Correct. But if you look on page 2 towards the top,
7       your e-mail back to Les, you are highlighting for Les a
8       concern about air cannons and non-free-flowing product,
9       correct?
10  A   Yes.
11  Q   And that further confirms that when you designed this
12      bin -- and we talked about this -- that you were not
13      contemplating soy meal, correct?
14  A   Again, it goes back to the math; that the same math is
15      going to apply and that overpressure factor is going to
16      account for the dynamic flow conditions of the
17      commodities that would be placed in the hopper bin.
18  Q   Well, then explain that e-mail that we're looking at.
19      Because you're telling Les that you're more concerned
20      with eccentric loads that non-free-flowing materials
21      could place on the hopper, right?
22  A   Yes.
23  Q   What are the eccentric loads that the non-free-flowing
24      materials could place on the hopper? What could those
25      be?

Min-U-Script®    Paramount Reporting ~ Audrey M. Barbush, RPR    (13) Pages 49 - 52
605.321.3539 ~ audrey@paramountreporting.com

EXHIBIT A

Page 77

1        You may answer.
2        THE WITNESS: It's difficult to say whether or not
3     it would have failed.
4  BY MR. TOBIN:
5  Q  Why?
6  A  Because if it's designed per the design standard and if
7     the design is there and you have the proper factor of
8     safety on it -- again, there would be issues with
9     design standards.  There would be, you know, engineers
10    and everybody else going around, you know, saying we
11    need to make changes to the design standards.
12 Q  Well, I guess I'll just move on.
13       In that same e-mail you're again stating that
14    Sioux Steel would limit the height of the bins.  And I
15    know we've talked about this, but again why are we
16    still in February of 2015 wanting to limit the height?
17 A  From a flow perspective.
18 Q  To hopefully try to keep material from bridging?
19 A  To help ensure that the material is -- that the
20    customer is able to get the material out of the hopper
21    without any issues.
22 Q  On page 2 there is an e-mail from Randy to Les, and
23    you're not included on it.  It's kind of towards the
24    top of the page.  And it talks about two bins being
25    sold to Molinos down in Mexico.  Do you see that?

Page 78

1  A  Yes.
2  Q  As you sit here today, do you know anything else about
3     that other bin?  Do you know the size? anything?
4  A  I do not.  I know there is another, but I don't know
5     anything other than that.
6  Q  You said that you do know there is another bin?
7  A  Yes.
8  Q  Do you know where that bin is?
9  A  The one that -- the one that I have discussed or been
10    involved with is in Veracruz.
11 Q  Do you know the size of that bin?
12 A  I don't recall for sure.
13 Q  Do you know if soy meal is being used in it?
14 A  Yes.
15 Q  Was anything done to that bin post failure?
16 A  Yes.
17 Q  What was done?
18       MR. GOODSELL: I'm going to object to form and
19    foundation in terms of remedial action.
20       You can go ahead and answer the question.
21       THE WITNESS: We provided new hopper panels to be
22    installed on the hopper.
23 BY MR. TOBIN:
24 Q  Is that the only bin to your knowledge where
25    Sioux Steel had to go back and perform some remedial

Page 79

1     work?
2  A  To my knowledge, yes.
3  Q  Who did the engineering design for that remedial work
4     on that bin?
5  A  I did.
6  Q  Did you have that vetted through any other outside
7     company?
8  A  I did not.
9  Q  Quickly -- I'm sorry for shifting gears, but back to
10    Exhibit 4.  This is the e-mail in August of '14.  I
11    just want to make sure I'm correct that when you and
12    Les are discussing the application of soy meal, air
13    cannons, and heights, at no time in August of '14 do
14    you come back to KC Engineering to ask for their input
15    as to these issues, do you?
16 A  No.
17 Q  Is it correct that -- and I didn't print it off, but we
18    discussed earlier that when KC Engineering gave you
19    their original report at the end of August, they had an
20    issue with the legs on the 30-diameter bin, correct?
21 A  That's correct.
22 Q  And then we talked that some additional work was done,
23    some discussions were had, and that those issues were
24    then resolved to your satisfaction and KC Engineering's
25    satisfaction?

Page 80

1  A  Correct.
2  Q  And then I believe there was an issue about some
3     additional payment to KC Engineering for some
4     additional work related to that.
5        Does that comport with your memory?
6  A  Yes.  They invoiced us for the check of -- the
7     discrepancy that we had with them based on the first
8     report, they invoiced us to reevaluate the issue that
9     they had on the 30-foot hopper.
10 Q  And I guess my point is, is that -- well, and then in
11    connection with that discrepancy they then issued an
12    addendum letter clarifying the issue and making clear
13    that they're now okay with the legs of the 30-diameter
14    bin?
15 A  Correct.
16 Q  Following your receipt of that addendum letter -- and I
17    believe that was in October of '12 -- did you have any
18    discussion with anyone at KC Engineering about these
19    hopper bins again?
20 A  No.
21 Q  Post failure have you had any contact with
22    KC Engineering about these bins?
23 A  No.
24       MR. GOODSELL: You're referring to him, Counsel,
25    personally?

Min-U-Script®       Paramount Reporting ~ Audrey M. Barbush, RPR       (20) Pages 77 - 80
                    605.321.3539 ~ audrey@paramountreporting.com

EXHIBIT A

Page 81

1       MR. TOBIN: Correct.
2       MR. GOODSELL: Okay.
3       Would this be a good time for me to take a coffee
4    break --
5       MR. TOBIN: Absolutely.
6       MR. GOODSELL: -- or a break because of coffee?
7       MR. TOBIN: Sure.
8       (Recess taken from 11:20 a.m. to 11:35 a.m.)
9    BY MR. TOBIN:
10   Q  Chad, I want to talk a little bit about the work -- the
11      remedial work that was done at the Veracruz bin that we
12      were just talking about.
13      What is different -- I know you said that they
14      replaced the hopper panels. What's different about
15      them? For example, is it still a 45-degree angle, or
16      did it go to a different angle?
17   A  Hopper angle is the same at 45 degrees.
18   Q  Are there more bolts, or is it still a single line?
19   A  There were additional bolts placed in the panels, and
20      the edge distance from the bolts to the edge of the
21      panel was increased.
22   Q  Were thicker panels used?
23   A  Yes.
24   Q  How much thicker? Do you know what it went -- from
25      what to what?

Page 82

1    A  I don't recall off the top of my head.
2    Q  Any other differences that you can think of?
3    A  No.
4    Q  Did you go redesign and reengineer that, or did you go
5       back to Exhibit 5, your old work, and just use
6       different -- you know, plug in information at that
7       level?
8    A  Plugged in different information to the spreadsheet
9       that designed the vertical joints in the hopper cone.
10   Q  Do you still have those in your office?
11   A  Yes.
12   Q  Would you be able to get those to the attorneys, a copy
13      of that?
14   A  Yes.
15   Q  If you know, pre-failure it sounds like Sioux Steel
16      sold only two of the hopper bins.
17      Would that sound right?
18   A  Boy, I don't know for sure.
19   Q  And the only reason I say that is because it sounds
20      like to your knowledge they've only gone back to do
21      remedial work on one.
22   A  Correct.
23   Q  Do you have any idea of how many hopper bins have been
24      sold post failure?
25   A  I don't have a number, no.

Page 83

1    Q  I mean do you know if it's even any?
2    A  We have sold hopper bins post failure, yes.
3    Q  You just don't know how many?
4    A  Correct.
5    Q  Do you know if any of those went to Mexico or somewhere
6       in a hot, humid climate?
7    A  I don't know.
8    Q  Post failure I believe the only communications that I
9       have would be this e-mail string Exhibit 1, okay, and
10      what I want to ask some questions about is if you
11      recall any conversations with Les about this bin and
12      the failure other than what's on Exhibit 1.
13   A  I don't recall any conversations.
14   Q  What about with Chris?
15   A  He and I would have had conversations post failure,
16      yes.
17   Q  Do you recall those discussions as you sit here now?
18   A  Yes.
19   Q  What do you recall?
20   A  The day after the failure, when they sent pictures and
21      I was able to look at the pictures and immediately drew
22      a conclusion to what I thought was, you know, maybe the
23      failure mode and went into the design and figured out
24      the math error on the spreadsheet that resulted in the
25      utilization ratios being much higher than what we

Page 84

1       originally thought they were on those vertical bolted
2       seams.
3    Q  So you discovered that mathematical error the day after
4       the failure?
5    A  Yes.
6    Q  And you discussed that with Chris?
7    A  Yes.
8    Q  Have you discussed that failure with anyone else at
9       Sioux Steel outside of Ms. Ellis or Mr. Goodsell?
10   A  Yes.
11   Q  Who else have you discussed it with?
12   A  Scott Rysdon, the CEO.
13   Q  On more than one occasion?
14   A  We've met multiple times, yes.
15   Q  Did you inform Mr. Rysdon of the mathematical error on
16      the vertical seam?
17   A  Yes.
18   Q  One of the engineering consultants who has been out
19      there I think goes by ESI.
20      Have you seen a copy of ESI's report?
21   A  Yes.
22   Q  Have you reviewed that report?
23   A  Yes.
24   Q  Did you speak with anyone at ESI?
25   A  I did not.

Min-U-Script®                    Paramount Reporting ~ Audrey M. Barbush, RPR            (21) Pages 81 - 84
                                 605.321.3539 ~ audrey@paramountreporting.com

EXHIBIT A

Page 85

1  Q  Did you play any role in furnishing documents or
2     information to ESI?
3  A  We didn't provide them any documents prior to their
4     report coming out.
5  Q  And I don't have a copy of it with me, and I can grab
6     it if we need to, but in the ESI report they have
7     copies of some of KC Engineering's documents that were
8     forwarded to you with their August report, and I'm
9     wondering: Do you have any idea as to how ESI would
10    have gotten their hands on that information?
11 A  We must have provided that information.
12 Q  Correct. I understand things are happening at
13    different levels, and I understand that you're not in
14    charge of all that. But I'm just wondering if you were
15    tasked with putting together information to get to ESI.
16 A  No.
17 Q  When I read the ESI report, I didn't see anywhere any
18    discussion about Sioux Steel's design error on those
19    vertical panels.
20    Did you see anything in the ESI report discussing
21    Sioux Steel's design error?
22 A  I don't recall.
23 Q  And I don't believe in the documents referenced by ESI
24    that they ever had a copy of your work file, which has
25    been marked Exhibit 5.

Page 86

1     Do you recall them discussing anything from your
2     work file, Exhibit 5, in their report?
3  A  I do not.
4  Q  I know you told me that you discussed the mathematical
5     error with Chris and Scott.
6     Did you ever provide a copy of your work papers,
7     Exhibit 5, to either Chris or Scott?
8  A  I would have had them in hand when we met, yes.
9  Q  Do you have any recollection of giving them a copy or
10    them retaining a copy.
11 A  I don't remember. Typically they don't keep stuff like
12    that. I mean I have all that information. So -- I
13    don't recall for sure whether or not they have a copy.
14 Q  From your perspective, what did KC Engineering do
15    wrong?
16 A  They failed to analyze the vertical joint in the hopper
17    panels that ultimately failed on the hopper down in
18    Mexico.
19 Q  Is there anything else?
20 A  No. Ultimately that's what it comes down to.
21 Q  From your perspective who is more at fault, Sioux Steel
22    for the design error or my client for what you contend
23    they did wrong?
24    MR. GOODSELL: I'm going to object to the form and
25    foundation of the question. This is a legal issue, and

Page 87

1     he's instructed not to answer.
2  BY MR. TOBIN:
3  Q  I'm going to give you a chance to answer the question.
4     He may not let you, but I'm going to let you know that
5     if we have to have this in front of a judge, we'll be
6     back together again for an opportunity for you to
7     answer that question.
8     MR. GOODSELL: Court Reporter, would you read it
9     back again, please.
10    (The record was read by the reporter as follows:
11    Question: "From your perspective who is more at
12    fault, Sioux Steel for the design error or my client
13    for what you contend they did wrong?")
14    MR. GOODSELL: Okay. I'm going to reassert the
15    objection and instruct you to go ahead and answer.
16    THE WITNESS: Sioux Steel is responsible for our
17    product and for the design of our product, but I don't
18    feel that we're responsible for the failure. We
19    designed our product per design standards, applied the
20    appropriate factor of safety, and sent it out to be
21    vetted, to be -- to have that additional step of safety
22    there.
23    So, again, I feel that, you know, we are
24    responsible -- we own up to -- you know, I made a
25    mistake. Sioux Steel is responsible for their product,

Page 88

1     but we sent out this design to be vetted so that
2     something -- you know, a failure like this would not
3     happen.
4  BY MR. TOBIN:
5  Q  ==So you place responsibility for the event in Mexico on==
6     ==whom?==
7     MR. GOODSELL: Again I'm going to object to the
8     form and foundation of the question.
9     You may go ahead and answer.
10    ==THE WITNESS: Ultimately, the design was missed by==
11    ==both people. I mean, I made the mistake. Again, I own==
12    ==up to that. There was a math error in the design==
13    ==spreadsheet. And we sent it out to be vetted, and it==
14    ==didn't get -- it didn't get caught. So== ==there's==
15    ==responsibility on both parties.==
16 BY MR. TOBIN:
17 Q  Do you think there's any responsibility or fault on
18    yourself for not providing Exhibit 5 to KC Engineering?
19 A  I would say no. I haven't really considered it before
20    today honestly.
21 Q  Do you think there's any fault or responsibility on you
22    for not thoroughly going through what KC Engineering
23    sent to you at the end of August 2012?
24 A  I don't because, you know, we sent it out to be
25    reviewed by them, you know. We aren't reviewing their

Min-U-Script®    Paramount Reporting ~ Audrey M. Barbush, RPR    (22) Pages 85 - 88
605.321.3539 ~ audrey@paramountreporting.com

EXHIBIT A

Page 89

1    work; they're reviewing our work is how I look at it.
2  Q  Let's talk a bit about Mr. Nohr. We chatted about him
3    and his report a bit ago. Just to set the stage -- not
4    to kind of rehash, but just to set the stage: Mr. Nohr
5    believes that the mechanism of failure started at the
6    bottom of the hopper cone, correct?
7        I'm not asking you to agree with him, but
8    that's -- you understand that's what Mr. Nohr's
9    conclusion is?
10 A  Correct.
11 Q  Okay. And I think you told me that per the math the
12   failure should have started further up in the hopper
13   cone, towards the top of the hopper cone?
14 A  Correct.
15 Q  And I just want to flesh some of that out and make sure
16   I understand what you're thinking.
17       You said you didn't see the video of the event?
18 A  I did not.
19 Q  Is the sole basis for your disagreement with Mr. Nohr
20   the math that it's overstressed at the 27-foot
21   diameter? Is that the basis for your disagreement with
22   Mr. Nohr's conclusion that it actually started at the
23   bottom?
24 A  Yes.
25 Q  Have you ever spoken with Mr. Nohr in any respect about

Page 90

1    that failure down in Mexico or his report?
2  A  I have not.
3  Q  Did you ever communicate your disagreement with
4    Mr. Nohr's conclusion to anyone at Sioux Steel?
5  A  I don't recall for sure. We had multiple conversations
6    about it, but I don't know if we specifically discussed
7    disagreement with Nohr's report.
8  Q  To your knowledge has anyone asked Mr. Nohr -- from
9    Sioux Steel -- about that conclusion of it starting at
10   the bottom and how he arrived at that?
11 A  I'm sorry. Can you repeat that question?
12 Q  Well, maybe -- you haven't been involved in any
13   discussions with Mr. Nohr about his report?
14 A  I have not.
15 Q  And to your knowledge no one has taken your concern
16   with Mr. Nohr's conclusion back to Mr. Nohr?
17 A  Not to my knowledge.
18 Q  Did you ever assemble any documents to provide to
19   Mr. Nohr?
20 A  I did not.
21 Q  If Mr. Nohr is correct -- and I know you disagree with
22   that, so I'm kind of asking you to make a mental leap
23   that you don't want to do. But hypothetically
24   speaking, if Mr. Nohr is correct that the mechanism of
25   failure was at the bottom of the hopper cone, that's

Page 91

1    where it started, okay, if you can just mentally accept
2    that for me -- and we've already looked in Exhibit 5
3    that at the 4-foot diameter the utilization ratio is
4    good, correct?
5  A  Correct.
6  Q  So what I want to ask just to gauge your reaction is:
7    If Mr. Nohr is correct that the failure began at the
8    bottom of the hopper cone where the math says there is
9    no mistake, wouldn't that failure mean that Sioux Steel
10   is not responsible, nor is KC Engineering responsible?
11       MR. GOODSELL: I'm going to object to the form and
12   foundation of the question.
13       You can go ahead and answer.
14       THE WITNESS: After reading Nohr's report and
15   comparing it to what we were looking at in the design
16   calculations, we struggled to make sense of why that --
17   why he would have come to that conclusion, and it
18   didn't make sense with the math.
19 BY MR. TOBIN:
20 Q  And I appreciate that, but I'm asking you to set that
21   aside and if Nohr is right -- I know it disagrees with
22   the math that you have.
23 A  Right.
24 Q  Okay. But if Nohr is right and the failure began at an
25   area where it says it shouldn't fail, wouldn't that

Page 92

1    mean that Sioux Steel did nothing wrong and
2    KC Engineering did nothing wrong; maybe it's the
3    standard?
4  A  I agree that could be the case.
5       MR. TOBIN: Why don't we take another break. We
6    may be nearing the end.
7       (Recess taken from 11:55 a.m. to 12:11 p.m.)
8  BY MR. TOBIN:
9  Q  Chad, I'm almost done.
10      I want to go back to Exhibit 5, which would be
11   your design documents, and specifically that page 1376
12   on the vertical seams, and what I want to try to get a
13   better understanding of is -- you've referred to the
14   mistake as a mathematical error in your testimony, and
15   I want to get a sense as to what that means.
16      This document, this page 1376, that comes from an
17   Excel spreadsheet, correct?
18 A  Yes.
19 Q  And you would have been the one who built that
20   spreadsheet?
21 A  Yes.
22 Q  And you would have been the one who would have inputted
23   the formulas into the necessary cells?
24 A  Yes.
25 Q  Is the mistake that you put an incorrect formula into

Min-U-Script®         Paramount Reporting ~ Audrey M. Barbush, RPR         (23) Pages 89 - 92
                     605.321.3539 ~ audrey@paramountreporting.com

EXHIBIT A

Page 93

1  one of the cells so that it produced a number with a
2  better utilization ratio, or was the mistake that you
3  didn't look at or appreciate what those numbers mean
4  under the utilization ratio?
5  A   It was a mistake in the formula.
6  Q   It was?
7  A   Yes.
8  Q   Which one?
9  A   So the design spreadsheet was taken from an LRFD
10     design, Load and Resistance Factor Design, and the
11     omega that you see on this sheet here, which is the
12     safety factor, is part of allowable stress design.
13     That used to be a phi, which is a resistance factor,
14     and in LRFD design, you multiply that by -- you know,
15     your allowable load by that, and in allowable stress
16     design you actually divide by that.
17        So instead of dividing by your safety factor to
18     get allowable load, it actually multiplied by the
19     safety factor.
20 Q   The document that I have in front of me, 1376, shows
21     the 3.89 utilization ratio at the 28-foot diameter,
22     correct?
23 A   Yes.
24 Q   Are you telling me that at one point in time a document
25     like this existed that had a better utilization ratio,

Page 94

1  or are you telling me that the 3.89 on this document is
2  incorrect?
3  A   This document has been changed to be correct.
4  Q   So the document we're looking at -- again, 1376 -- this
5     probably would have been fixed or created post failure?
6  A   Yes.
7  Q   Do you still have the papers that you did pre-failure?
8     Or is it, once you change the spreadsheet formula, it's
9     kind of gone?
10 A   It's electronic so I -- yeah, I don't, to my knowledge,
11     have a copy of that.
12 Q   Do you recall what those utilization ratios were
13     originally?
14 A   I don't.
15 Q   Do you know if they were more than 1 or less than 1?
16 A   It would have been less than 1.
17 Q   And you didn't catch that error until post failure?
18 A   Correct.
19 Q   And -- this is new information for me, so I'm trying to
20     digest it while I'm asking you questions but -- and you
21     went through that a little quick.
22        But you were taking a spreadsheet to assess a
23     different issue and kind of were borrowing some
24     information for this particular issue or -- help me
25     understand how we went from the different omega --

Page 95

1  A   It was a design spreadsheet that had been used to do
2     LRFD design in the past, and we're utilizing allowable
3     stress design for the hopper design, and so you change
4     from a phi to an omega, you know, your safety factor.
5        So that's what -- and so instead of dividing by
6     your safety factor, it essentially multiplied by a
7     safety factor to figure out what your allowable load
8     is.
9  Q   But to your knowledge there wouldn't be a print-off of
10     that other document that would show the much better
11     utilization ratios?
12 A   Not to my knowledge.  Not that I'm aware of.
13 Q   So on the original one -- well, on the one that we have
14     in front of us, there's an omega and then across from
15     it is a 2, and I thought you were saying that might be
16     the area where on the original one there would have
17     been something different?
18 A   Yes.
19 Q   And instead of an omega it's a...
20 A   A phi.
21 Q   Okay.  And then what number comes across from it?
22 A   It would be a .9 or a .75, depending on whether it's
23     tensile or yield.
24 Q   So then if I'm understanding correctly, the mistake you
25     made is, is you used an incorrect formula when you were

Page 96

1     running the calculations on this spreadsheet, 1376?
2  A   Yes.
3        MR. TOBIN:  With that, let's take another really
4     short break.  We'll be back.
5        MR. GOODSELL:  Go ahead.
6        (Recess taken from to 12:18 p.m. to 12:25 p.m.)
7        MR. TOBIN:  I have no further questions.
8     Thank you.
9        MR. GOODSELL:  You have a right to review your
10     deposition and make sure it's written down correctly,
11     or you can waive that right.  And I suggest you read it
12     in this particular case.
13        THE WITNESS:  Okay.
14        MR. GOODSELL:  You have to tell her you want to
15     read it.
16        THE WITNESS:  I'd like to read it.
17        (Whereupon, at 12:25 p.m. the deposition was
18     concluded.)

Min-U-Script®    Paramount Reporting ~ Audrey M. Barbush, RPR    (24) Pages 93 - 96
605.321.3539 ~ audrey@paramountreporting.com

EXHIBIT A