**Page 1**

```
          UNITED STATES DISTRICT COURT
            DISTRICT OF SOUTH DAKOTA
               SOUTHERN DIVISION

= = = = = = = = = = = = = = = = = = = = = = = = = = = =

SIOUX STEEL COMPANY,
a South Dakota corporation,

              Plaintiff,
vs.                                        Civ. 15-4136

KC ENGINEERING, P.C., an Iowa
corporation,

              Defendant.

= = = = = = = = = = = = = = = = = = = = = = = = = = = =

       Deposition of:   JASON O'MARA, PE
                 Date:  February 27, 2017
                 Time:  2:28 p.m.

= = = = = = = = = = = = = = = = = = = = = = = = = = = =

                    APPEARANCES
Mr. G. Verne Goodsell
Goodsell Quinn, LLP
Rapid City, South Dakota

and

Ms. Amy Ellis
Sioux Steel Company General Counsel
Sioux Falls, South Dakota

       Attorneys for the Plaintiff

Mr. Michael F. Tobin
Boyce Law Firm, LLP
Sioux Falls, South Dakota

       Attorney for the Defendant

  REPORTED BY:    Audrey M. Barbush, RPR
```

**Page 2**

```
 1                      I N D E X
 2  Examination:                                    Page
 3  By Mr. Goodsell                                    4
 4  Exhibit Nos.:                                   Page
 5  Exhibit 27 - Defendant's Supplemental Answers and
 6               Responses to Plaintiff's First Set of
 7               Interrogatories and Requests for Production
 8               of Documents to Defendant            56
 9                        -oOo-
10     (The original transcript was provided to Mr. Goodsell.)
11                        -oOo-
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 3**

1  S T I P U L A T I O N
2  It is hereby stipulated and agreed by and between the
3  above-named parties through their attorneys of record, whose
4  appearances have been hereinabove noted that the deposition
5  of JASON O'MARA, PE, may be taken at this time and place,
6  that is, at the offices of Boyce Law Firm, LLP, 300 South
7  Main Avenue, Sioux Falls, South Dakota, on the 27th day of
8  February, 2017, commencing at the hour of 2:28 p.m.; said
9  deposition taken before Audrey M. Barbush, a Registered
10 Professional Reporter and Notary Public within and for the
11 State of South Dakota; said deposition taken for the purpose
12 of discovery or for use at trial or for each of said
13 purposes, and said deposition is taken in accordance with
14 the applicable Rules of Civil Procedure as if taken pursuant
15 to written notice.  Objections, except as to the form of the
16 question, are reserved until the time of trial.  Insofar as
17 counsel are concerned, the reading and signing of the
18 transcript by the witness is not waived.
19               -oOo-
20
21
22
23         JASON O'MARA, PE,
24  called as a witness, having been first duly sworn,
25  testified as follows:

**Page 4**

1             EXAMINATION
2  BY MR. GOODSELL:
3  Q  Would you state your name and your professional
4     address.
5  A  Jason O'Mara, 4300 South Lakeport, Suite 205,
6     Sioux City, Iowa.
7  Q  Jason, in the course of this you've been here during
8     some of the other depositions, but if my question is
9     something you don't understand, you tell me.  Okay?
10 A  Will do.
11 Q  And the reason is we want to get your testimony correct
12    on the record for trial.  You understand that?
13 A  Yes.
14 Q  So this is kind of my opportunity to figure out or to
15    talk with you about what you're going to say at trial.
16 A  Okay.
17 Q  Fair enough?
18 A  Fair enough.
19       MR. GOODSELL: Counsel, I think we're taking this
20    pursuant to notice, and it's been delayed and
21    rearranged.  I assume we stipulate to that it can be
22    used for all purposes?
23       MR. TOBIN: Correct.
24 BY MR. GOODSELL:
25 Q  Just give me your undergraduate experience in terms of

|  | Page 25 |
|---|---|
| 1 | A   I can explain why we spot-checked. |
| 2 | Q   We'll get there later. |
| 3 | A   Okay. |
| 4 | Q   A structural engineering analysis of a hopper design |
| 5 |     drawing would require an analysis and review of panel |
| 6 |     seams. |
| 7 | A   If I were the only designer, if I were the one who was |
| 8 |     responsible myself for the design and I weren't just |
| 9 |     doing a review of limited scope, then, yes, I would |
| 10 |    have to check every single connection. |
| 11 | Q   Is there anything in the structural engineering |
| 12 |    analysis of a hopper design drawing that would require |
| 13 |    an analysis and review of the panel seams? |
| 14 |    Would it be required unless it's excluded? |
| 15 | A   And I'm telling you that there's -- that that question |
| 16 |    is incomplete.  You're trying to say that because I |
| 17 |    didn't check that connection, that I didn't fulfill my |
| 18 |    duty as an engineer, but that's -- |
| 19 | Q   Let me ask you this:  By not checking that seam, the |
| 20 |    vertical panel seams in the hopper -- do you feel that |
| 21 |    by not doing that, you performed professional services |
| 22 |    from a structural analysis point of view? |
| 23 | A   Rephrase the question, please. |
| 24 |    MR. GOODSELL: Do you want to read that back for |
| 25 |    me, please. |

Page 26

1    (The record was read by the reporter as follows:
2    Question: "Let me ask you this:  By not checking
3    that seam, the vertical panel seams in the hopper -- do
4    you feel that by not doing that, you performed
5    professional services from a structural analysis
6    point of view?")
7    THE WITNESS: No.  When you don't do something,
8    that's not doing something, so no.
9  BY MR. GOODSELL:
10 Q   A structural engineering analysis of a hopper design
11    drawing would require analysis and review of the panel
12    seams.  True or false?
13 A   A complete analysis, yes.
14 Q   An analysis by KC of the drawings of the vertical
15    hopper seam panels would have disclosed an error in the
16    vertical seam design; is that correct?
17 A   I believe that it would have, yes.
18 Q   KC did not analyze the design drawings of the vertical
19    hopper panel seams.
20 A   KC did not analyze the design drawings of the vertical
21    hopper seams?
22 Q   Is that correct?
23 A   We looked at those drawings because we needed the
24    geometry in order to make our RISA model.  We did not
25    specifically check the capacity of those seams.

Page 27

1  Q   So KC did not analyze the design drawings of the
2    vertical hopper seams, correct?
3  A   Analyze the drawings?
4  Q   Analyze the design drawings of the vertical hopper
5    seams.
6  A   I don't -- the question doesn't make sense to me.
7  Q   Well, take a look at Exhibit 24.
8  A   Okay.
9  Q   I have the vertical panel seam marked there with
10    yellow.  Do you see that?
11 A   Uh-huh.
12 Q   KC did not analyze Exhibit 24, the design drawing of
13    the vertical hopper panel seam; is that correct?
14 A   By not analyzing the drawing, do you mean that we did
15    not do an independent calculation of the capacity of
16    that seam?
17 Q   I mean you didn't analyze it.
18 A   Well, we did analyze the stresses along that seam.
19    When we did our RISA model, we created a
20    three-dimensional model that included the hopper, and
21    it gave us stress -- the output of that.  After we
22    applied our loads to the model, the output of that
23    model was loads and stresses and forces that were then
24    given in the report that we gave to Chad.
25 Q   But KC did not analyze the design drawings of the

Page 28

1    vertical hopper seams to see if they could withstand
2    the forces that would be developed that you calculated
3    off the RISA model, correct?
4  A   We did not specifically do a hand calculation to check
5    the different limit states for those bolted connections
6    at those vertical seams, that's correct.
7  Q   KC specifically stated in its proposal that the project
8    description included a structural engineering analysis
9    and design review, correct?
10 A   That's correct.
11 Q   KC never modified, altered, or changed its written
12    proposal dated July 30, 2012, Exhibit 17; is that
13    correct?
14 A   We did not.
15 Q   KC never in writing altered, modified, or changed the
16    scope of the professional engineering services provided
17    in its proposal.
18 A   That is correct.
19 Q   KC never in writing notified Sioux Steel that its
20    services under the proposal, Exhibit 17, were limited
21    because of Sioux Steel's failure to provide
22    information; is that correct?
23 A   ==Our proposal included the requirement that Sioux Steel==
24    ==provide us with all criteria and full information as to==
25    ==the requirements of the project, and we also required==

Min-U-Script®   Paramount Reporting ~ Audrey M. Barbush, RPR   (7) Pages 25 - 28  
605.321.3539 ~ audrey@paramountreporting.com

EXHIBIT B

Page 29

1    for them to send us their calculations. So I think
2    that our scope was limited within our proposal.
3  Q  KC never in writing notified Sioux Steel that its
4    services under the proposal were limited because of
5    Sioux Steel's failure to provide information. Is that
6    a correct statement?
7  A  I think implicit in our requirement that they provide
8    calculations for us to review is that our scope
9    includes them providing calculations for us to review.
10 Q  What's the answer to my question?
11      MR. TOBIN: I think he just provided it to you.
12      MR. GOODSELL: He did not. Let me repeat the
13   question.
14      THE WITNESS: Okay.
15 BY MR. GOODSELL:
16 Q  KC never in writing notified Sioux Steel that its
17   services under the proposal were limited because of
18   Sioux Steel's failure to provide information.
19 A  I think that our proposal limits the scope based on
20   information provided by Sioux Steel.
21 Q  If your proposal limited the scope, you never notified
22   Sioux Steel that there was a limitation to the scope of
23   your review because they failed to provide information;
24   is that correct?
25 A  We notified them in our proposal that we have excluded

Page 30

1    anything not specifically stated in this proposal. We
2    did not state anywhere in our proposal that we would do
3    independent hand calculations of every connection.
4  Q  KC never in writing notified Sioux Steel that its
5    services under the proposal were limited because of
6    Sioux Steel's failure to provide information. Is that
7    a correct statement?
8  A  I think that our proposal was notification to
9    Sioux Steel that our scope was limited.
10 Q  After the proposal was accepted, KC never in writing
11   notified Sioux Steel that its services under the
12   proposal were limited because of Sioux Steel's failure
13   to provide information.
14 A  I think that's correct.
15 Q  And it's generally understood in the engineering
16   community a structural engineering analysis and design
17   review of hopper drawings should include an engineering
18   analysis of weightbearing seams.
19 A  Yes.
20 Q  A structural analysis of a hopper design drawing would,
21   by its engineering description, include an analysis of
22   weightbearing seams.
23 A  Could you read that back?
24 Q  A structural analysis of a hopper design drawing would,
25   by its engineering description, include analysis of

Page 31

1    weightbearing seams.
2  A  Correct.
3  Q  Seams in a hopper are an important structural design
4    component.
5  A  Correct.
6  Q  KC contracted with Sioux Steel to do a structural
7    engineering analysis and design review of the hoppers.
8  A  Correct.
9  Q  KC concluded that the design for all the members and
10   plates fell within acceptable material limits for each
11   member except for the columns on the 30 foot hopper.
12 A  Yes. And there's some clarification necessary with
13   that answer, that what we analyzed was the plates and
14   the members because that's what our RISA model checks
15   for us kind of automatically. So as I've stated
16   before, our scope did not include independent hand
17   calculations of all the connections which are not part
18   of the RISA model.
19 Q  If I look at Exhibit 9 and 19, that's your report?
20 A  Yes.
21 Q  We may have to go to the full context of that report,
22   but there was specific hand calculations in the report
23   that dealt with the column seams -- or the column
24   supports, correct?
25 A  That's correct.

Page 32

1  Q  And it was your best engineering opinion at the time
2    you issued your report on August 28, 2012, that the
3    column seams were not sufficient as designed, correct?
4  A  Not seams, but yes, the --
5  Q  Excuse me. The columns.
6  A  The columns. That's correct.
7  Q  Okay. And the only exception noted as not sufficient
8    as designed were the columns on the 30 foot hopper; is
9    that correct?
10 A  That is correct.
11 Q  And we talked about this: Not sufficient design is a
12   stamp that the entire structure is defective; is that
13   correct?
14 A  Yeah. If one part of a structure fails, then the
15   whole --
16 Q  It's either pass or fail, right?
17 A  Yeah. Correct.
18 Q  And it's either it's all okay or if one part is
19   deficient, then the whole is deficient, correct?
20 A  That's correct.
21 Q  Now, the exception that the columns were not sufficient
22   as designed was later withdrawn or modified, correct?
23 A  That's correct.
24 Q  KC was never hired to perform peer review evaluation of
25   SS's employees, correct?

Min-U-Script®    Paramount Reporting ~ Audrey M. Barbush, RPR    (8) Pages 29 - 32
605.321.3539 ~ audrey@paramountreporting.com

EXHIBIT B

Page 45

1  I know of.
2  Q  Well, did you perform that interview?
3  A  No. That initial meeting was Eric.
4  Q  So Eric's the only one that had an initial client
5     interview before the proposal you drafted, Exhibit 7
6     and 17, were sent to the client?
7  A  I believe I talked to Chad on the phone as well during
8     the proposal phase.
9  Q  And, again, if you did talk with Chad, that's not
10    memorialized any place in the documents of KC; is that
11    correct?
12 A  Other than what shows up on my proposal and what's on
13    this job information sheet, I mean, that's where I
14    would have taken what I learned and memorialized it, as
15    you say.
16 Q  It's the obligation of a licensed professional engineer
17    to set out clearly the scope of professional services
18    to be provided; is that correct?
19 A  That's correct.
20 Q  It's the obligation of a licensed professional engineer
21    to set out any limitations to the scope of services to
22    be provided; is that correct?
23 A  And we did that.
24 Q  And to the extent that you did that is that that's your
25    interpretation of the original proposal, Exhibit 7 and

Page 46

1  17; is that correct?
2  A  Yeah, we said we excluded anything not specifically
3     stated in the proposal.
4  Q  Is there any documentation in your file that your
5     interpretation of the proposal, Exhibit 7 and 17, are
6     consistent with the client's understanding of the
7     limitations you claim exist in 7 and 17?
8  A  You're asking did I get -- well, Sioux Steel accepted
9     our proposal.
10 Q  I'm asking two questions: One, is it documented? And
11    did it happen?
12 A  Okay. Sioux Steel accepted our proposal, so that
13    implies that they read it and accepted it.
14        You want to know if I got some confirmation from
15    him as to what he understood our proposal meant?
16 Q  That's correct, before you issued your report on
17    August 28, 2012.
18 A  Yeah, that's what I think we talked about and I think
19    Eric talked about with him was kind of the goal of this
20    review.
21        The goal of this review, as I said, was to do an
22    independent determination of the loads and the RISA
23    model so that he could compare those to his loads and
24    RISA model because it was something new for him.
25 Q  But did you have any discussion during this 30-day

Page 47

1     period with Chad?
2  A  Yeah, I think I did.
3  Q  Do you have any -- there's no reference to that?
4  A  I don't have anything in writing.
5  Q  If there's a question on the scope of work, it's the
6     obligation of the licensed professional engineer to
7     confirm in writing the client's understanding of a
8     limitation of services; is that fair?
9  A  I did not believe that there was a question as to the
10    scope of work.
11 Q  I understand that. But if there is.
12 A  If I believed that there was a question, then it would
13    have been my obligation to clarify for Chad, yes.
14 Q  In performing professional services, engineering
15    services, it's the obligation of the engineer to
16    disclose to the client any circumstances that might
17    modify the scope of services; is that correct?
18 A  I don't think it's possible to anticipate everything,
19    so I don't -- I don't think it's practical to make a
20    long list of "if this, then this" type things in a
21    proposal.
22        I think that it's clear from our proposal that
23    they were to provide us with their calculations for
24    review, and they did not do that.
25 Q  And you never indicated to them that that was a problem

Page 48

1     for you to issue your opinion letter/engineering
2     document on August 28, 2012, that the designs were
3     sufficient except for the columns on the 30 foot
4     hopper?
5  A  Yeah, what I decided to do in the absence of Chad's
6     calculations to review was to have Derek spot-check
7     some of the connections. This was above and beyond our
8     scope. Spot-checking connections was not part of our
9     scope. This is something that we did in the absence of
10    calculations from Chad to review.
11        So I asked him to spot check some connections that
12    I felt were unique as far as Sioux Steel's experience.
13    The results of those spot checks gave me a high degree
14    of confidence in Chad's ability because the results
15    showed that those connections were neither
16    significantly overdesigned or significantly
17    underdesigned. So I felt that we had fulfilled our
18    responsibility based on my understanding because we had
19    provided Chad with what he asked for specifically.
20        MR. GOODSELL: I'm going to move to strike the
21    answer as being nonresponsive.
22        MR. TOBIN: I object.
23 BY MR. GOODSELL:
24 Q  In performing professional engineering services, it's
25    the obligation of the engineer to disclose to the

Min-U-Script®        Paramount Reporting ~ Audrey M. Barbush, RPR        (12) Pages 45 - 48
                     605.321.3539 ~ audrey@paramountreporting.com

EXHIBIT B

Page 49

1   client any circumstances that would modify the scope of
2   services.  Is that a correct statement?
3 A I don't think it's a fair statement, no.
4 Q Okay.  Spot-checking of seams is not set out in the
5   proposal to perform a structural engineering analysis
6   and design review; is that true?
7 A True.
8 Q The limitation of the structural analysis and design
9   review by KC to, quote, spot-checking, quote, of
10  bearing seams was never addressed with the client?
11 A Well, I disagree.  I did -- I do believe that I
12   addressed with Chad that he was supposed to provide us
13   with calculations to review.  I did it in writing in
14   the proposal, and I believe we talked about it verbally
15   on the phone.  As I said, I have no written
16   documentation of the phone conversation.
17 Q The limitation of the structural analysis and design
18   review to spot-checking by KC of bearing seams was
19   never addressed in writing with the client?
20 A That's correct.
21 Q And spot checking is not used in Exhibit 7 or 17,
22   correct?
23 A That's correct.
24 Q Spot checking is not used in Exhibit 9 and Exhibit 19;
25   is that correct?

Page 50

1 A Which one is 19?
2 Q It's going to be your report.
3 A Well, actually, the report did include the spot checks.
4 Q Let me --
5 A The body of the report included what we checked.
6 Q Let me rephrase the question.  The summary of your
7   findings --
8 A The summary did not mention the word spot check, that's
9   correct.
10 Q The addendum of October 2, 2012, which is Exhibit 21
11   [sic], that didn't include any reference to spot
12   checking, did it?
13 A That's correct.
14 Q Would it be correct then after the addendum of
15   October 2, 2012, that the designs were approved as
16   being sufficient on both the 18 and 30 foot hoppers?
17 A With regard to the things that we checked, yes.  Chad
18   was --
19 Q Now we're back to the scope and --
20 A Yes.
21 Q -- whether or not you can limit the scope --
22 A It's key.
23 Q -- or whether you did limit the scope, correct?
24 A Right.  And we provided Chad with our full report, and
25   he could have looked to see what we checked and what we

Page 51

1   did not check.
2 Q Did you ask Sioux Steel to review your work after you
3   submitted it to them?
4 A Well, I assumed that was the entire point of the
5   exercise was that he was going to review my work in
6   order to use it to check his design.
7 Q So I understand it is that they're coming to you with a
8   design, asking you for professional opinions on the
9   structural analysis of the design drawings, and you're
10  assuming after you've given your opinion that they're
11  going to come back and review their drawings to make
12  sure your work's correct?
13 A I assumed that they would review my report thoroughly
14  because my understanding was that he wanted to use my
15  report to confirm his own design, and if he doesn't
16  look at my report, I don't know how he can use it.
17    The other possibility -- and I didn't think that
18  this is what he was doing, but the other possibility is
19  that he just wanted somebody else to be responsible in
20  case something bad happened.  And I don't think that's
21  what he was doing.
22 Q No, I think they wanted you to check the hopper seams
23  and do it because they didn't -- they wanted somebody,
24  a third-party, to take a look at it.
25 A He did not ask us to check the hopper seams.

Page 52

1 Q And it's your interpretation that the structural
2   analysis of the design drawings, which includes the
3   hopper seams, would exclude an analysis of the
4   hopper seams?
5 A We've been over this a few times.  I think I've
6   explained it.
7 Q Is that your interpretation?
8 A I think I've explained myself.
9 Q Is that your interpretation?
10 A Is it my interpretation that what -- you're going to
11   try put ridiculous words in my mouth.
12 Q I'm not.
13    MR. GOODSELL: Would you read the question back,
14   please.
15    (Discussion off the record.)
16    MR. GOODSELL: I'll readdress it.
17 BY MR. GOODSELL:
18 Q It's your position that after Sioux Steel came to you
19   and asked you to perform a structural engineering
20   analysis of the design drawings, that after you
21   performed that analysis, Sioux Steel or its engineer
22   was to check your work; is that your position?
23 A No.  He was going -- my position is that he would look
24   at my work, review my work and use that to check his
25   work.  Not to check my work.  To use my report to check

Min-U-Script®            Paramount Reporting ~ Audrey M. Barbush, RPR            (13) Pages 49 - 52
                         605.321.3539 ~ audrey@paramountreporting.com

EXHIBIT B

Page 57

1  responses made to interrogatories by Sioux Steel to KC.
2  Does that sound correct?
3       Take a look at it with counsel. I want to make
4  sure that we understand the document.
5  A  It says, "Defendant's Supplemental Answers and
6  Responses to Plaintiff's First Set of Interrogatories
7  and Requests for Information."
8  Q  And if you go to the end of it, I think it's signed by
9  the client, and is that your signature?
10 A  Yes, it is.
11 Q  Okay. And I want to discuss with you your answers, and
12 I'm going to do it phrase by phrase starting on page 5.
13 A  Okay.
14 Q  "Defendant answers that Plaintiff and its in-house
15 engineers and designers were responsible for the
16 design."
17     Is that your testimony?
18 A  Wait. Where?
19     MR. TOBIN: I don't think we're on the same page.
20     MR. GOODSELL: Okay. It should be right about
21 here. Are you there?
22     MR. TOBIN: It starts right there.
23     THE WITNESS: Defendant answers? Oh, yes.
24 BY MR. GOODSELL:
25 Q  So let me read that. Is that "Defendant answers that

Page 58

1  Plaintiff and its in-house engineers and designers were
2  responsible for the design of the hopper."
3     Is that your statement?
4  A  Yes.
5  Q  And by responsible, does that mean responsible to get
6  the design drawings to KC?
7  A  No. That means responsible for the design of the
8  hopper.
9  Q  And it was the design of the hopper that they performed
10 that they were asking you to review, correct?
11 A  Yes.
12 Q  So Sioux Steel is coming to you with hopper designs
13 prepared in-house, and they're asking you to review
14 those designs.
15 A  Yes.
16 Q  Correct?
17 A  Yes.
18 Q  And you can't rely upon any responsibilities that
19 Sioux Steel in-house may have between its in-house
20 engineer and the corporation -- you can't rely upon
21 that professionally, correct?
22     MR. TOBIN: I'm going to object to form of the
23 question.
24     THE WITNESS: I disagree with that statement.
25 Chad is an engineer in his own right. When he designs

Page 59

1  something, the public is supposed to be assured that
2  it's designed properly.
3  BY MR. GOODSELL:
4  Q  But you can't rely upon his work or his stamp or his
5  design in giving any opinions as to the sufficiency of
6  the hopper design, correct?
7  A  You're trying to make it an all-or-nothing thing, like
8  either Chad's entirely responsible or I'm entirely
9  responsible, and it's -- Chad has testified that he was
10 the designer responsible for the design and that he
11 hired us to do a review. Our review, as I've stated,
12 was limited in its scope. It was not to design these
13 things from scratch. Chad spent months on this. We
14 spent 40 hours plus --
15 Q  Let me just stop you there. At the time that you
16 entered into a proposal, there's no documentation that
17 you discussed with Chad the limitation of your services
18 in terms of the scope of structural engineering
19 analysis on hopper seams; is that correct?
20 A  I believed at the time that the scope was understood.
21 Q  The next statement is, "Plaintiff hired Defendant to do
22 a peer review of Plaintiff's design."
23     Is that your testimony?
24 A  Yes.
25 Q  Continuing on, "that the review was limited in scope

Page 60

1  and did not include a detailed calculation of every
2  connection." Is that your testimony?
3  A  That's my testimony.
4  Q  Pardon?
5  A  Yes.
6  Q  And it's your testimony that under the controlling
7  scope of your review, there was no duty to review the
8  assembly of the hopper seams in the panel?
9  A  Well, it was in my scope to review Chad's calculations,
10 yes, it was.
11 Q  But you want to make a distinction between calculations
12 and drawings, and you were obligated to review the
13 drawings.
14 A  ==Calculations are necessary in order to know whether==
15 ==what's shown on the drawing is adequate or not. You==
16 ==can't review the drawings and know whether they're==
17 ==adequate without doing calculations.==
18 Q  That's your calculations, though.
19 A  Somebody has to do calculations, and in this case the
20 scope was for Chad to do the calculations and for me to
21 review them.
22 Q  Had you personally reviewed Exhibit 24 and had
23 performed a structural analysis of that seam, you would
24 have concluded that the seam was insufficient as
25 designed, correct?

Min-U-Script®              Paramount Reporting ~ Audrey M. Barbush, RPR              (15) Pages 57 - 60
                           605.321.3539 ~ audrey@paramountreporting.com

EXHIBIT B

Page 61

1  A  I believe so, yes.
2  Q  I want to go to the second paragraph of your answer,
3     starting with "to confirm that they were reasonable."
4        Are you with me there?
5  A  Hold on a second.
6  Q  Okay.
7        (Pause in the proceedings.)
8  A  Okay. Yes.
9  Q  And you're saying that, "in order to confirm that they
10    were reasonable and that Plaintiff appeared to be
11    knowledgeable and competent."
12 A  Yeah, I thought that in the absence of calculations
13    from Chad, it would be prudent for us to do some spot
14    checks of connections. This is something beyond our
15    scope.
16 Q  And based on those spot checks, it's your conclusion
17    that he was knowledgeable and competent.
18 A  Yes. As I said, the results of those spot checks gave
19    us confidence that Chad was doing things right because
20    the designs came back as neither way overdesigned or
21    way underdesigned but looked like somebody intelligent
22    had designed them.
23 Q  There were three spot checks that you performed,
24    correct? One was on the support columns?
25 A  Yeah, I believe that's right.

Page 62

1  Q  Two was on the assembly of the upper panel to the ring,
2     correct?
3  A  Yes.
4  Q  And the third one that was performed was on the
5     compression ring weldment?
6  A  That's correct.
7  Q  Those are the only three spot checks that were
8     performed?
9  A  That's correct.
10 Q  And out of those three spot checks that you performed
11    at the time you issued your report, you concluded that
12    one out of three was incorrect?
13 A  No. Which one was incorrect?
14 Q  Okay. In your report of August 28, 2012 --
15 A  Oh, the column.
16 Q  -- you find that it was deficient as to columns?
17 A  Yeah, the column is not something -- the column check
18    is not what I would call a spot check. The column
19    check was something that RISA -- the RISA-3D software
20    actually does the check. Why Derek did an independent
21    hand calculation I'm not sure. He did a separate hand
22    calculation at the back, along with the spot checks,
23    but it's not a connection calc. It's a column.
24 Q  But at the time you issued your report --
25 A  Uh-huh.

Page 63

1  Q  -- at that time, where you now are testifying in your
2     answers to interrogatories that he was knowledgeable
3     and competent --
4  A  Yeah.
5  Q  -- your own report and calculations in your report show
6     that out of the three hand-checked calculations, one
7     was wrong; is that correct?
8  A  Yeah, but that's not a failure rate at 33 percent, if
9     that's what you're thinking. It takes very many
10    calculations to get to a correct answer, and it takes
11    only one error to get an incorrect answer.
12       So Chad was correct about the loading, about the
13    load distribution and how it transferred through the
14    structure, and then he designed those connections
15    having made correct calculations all the way through.
16       To arrive at an incorrect answer for the column,
17    it only takes one mistake. So it's not a 33 percent
18    error rate, if that's your point.
19 Q  Is there any place in the engineering documents where
20    Sioux Steel requested you to review the competency of
21    Chad Kramer?
22 A  Well, no. I mean, the review of his design is checking
23    to see if his design is correct, but it's not -- it's
24    not necessarily going to tell me if he's competent,
25    you know.

Page 64

1  Q  The review of the design is a design review, correct?
2  A  Yes.
3  Q  Now, had you discussed in your proposal at the time you
4     entered into it peer review and the scope of peer
5     review, that could have been addressed before you
6     completed your work, not in this litigation; is that
7     correct?
8  A  What could have been addressed?
9  Q  If you would have addressed the peer review statement,
10    that's what you designed to do, if you'd have addressed
11    that with them at the time of your proposal, any
12    misunderstandings or expansion of the review could have
13    been addressed at that point in time?
14       MR. TOBIN: I'm going to object.
15       THE WITNESS: I'm sorry. I don't understand.
16       MR. TOBIN: I think he's already indicated that
17    the use of the word peer review and design review is a
18    distinction without a difference. You are subscribing
19    something substantive to that. We are not. And we can
20    address the whole issue by either orally amending the
21    answer now to substitute design for peer, or we can do
22    that in a written supplement following this deposition,
23    but there's no difference from the defense perspective
24    as to that issue. So if we can moot that, we'll
25    happily do so.

Min-U-Script®                Paramount Reporting ~ Audrey M. Barbush, RPR                (16) Pages 61 - 64
                              605.321.3539 ~ audrey@paramountreporting.com

EXHIBIT B