**Page 1**

```
               UNITED STATES DISTRICT COURT
                 DISTRICT OF SOUTH DAKOTA
                    SOUTHERN DIVISION

= = = = = = = = = = = = = = = = = = = = = = = = = = =

SIOUX STEEL COMPANY,
a South Dakota corporation,

            Plaintiff,
vs.                                          Civ. 15-4136

KC ENGINEERING, P.C., an Iowa
corporation,

            Defendant.

= = = = = = = = = = = = = = = = = = = = = = = = = = =

Videotaped Deposition of:  JOHN W. CARSON, Ph.D.
                    Date:  October 27, 2017
                    Time:  8:16 a.m.

= = = = = = = = = = = = = = = = = = = = = = = = = = =

                         APPEARANCES
Mr. G. Verne Goodsell
Goodsell Quinn, LLP
Rapid City, South Dakota

     Attorney for the Plaintiff

Mr. Michael F. Tobin
Boyce Law Firm, LLP
Sioux Falls, South Dakota

     Attorney for the Defendant

ALSO PRESENT:       Jason O'Mara

REPORTED BY:        Audrey M. Barbush, RPR

VIDEOGRAPHER:       Jeff Lambert
```

**Page 2**

```
                         I N D E X
Examination:                                         Page
By Mr. Goodsell                                       5
Exhibit Nos.:                                        Page
Exhibit 28 - Opinions of John W. Carson, Ph.D.
             November 21, 2016                        5
Exhibit 29 - Supplemental Report by John W.
             Carson, Ph.D., December 1, 2016          5
Exhibit 30 - Screenshot                              19
                          -oOo-
```

**Page 3**

1  STIPULATION
2  It is hereby stipulated and agreed by and between the
3  above-named parties through their attorneys of record, whose
4  appearances have been hereinabove noted that the videotaped
5  deposition of JOHN W. CARSON, Ph.D., may be taken at this
6  time and place, that is, at the offices of Boyce Law Firm,
7  LLP, 300 South Main Avenue, Sioux Falls, South Dakota, on
8  the 27th day of October, 2017, commencing at the hour of
9  8:16 a.m.; said deposition taken before Audrey M. Barbush,
10 a Registered Professional Reporter and Notary Public within
11 and for the State of South Dakota; said deposition taken for
12 the purpose of discovery or for use at trial or for each of
13 said purposes, and said deposition is taken in accordance
14 with the applicable Rules of Civil Procedure as if taken
15 pursuant to written notice. Objections, except as to the
16 form of the question, are reserved until the time of trial.
17 Insofar as counsel are concerned, the reading and signing of
18 the transcript by the witness is not waived.
19                         -oOo-

**Page 4**

1  THE VIDEOGRAPHER: We are now on the record. My
2  name is Jeff Lambert. I'm the videographer. The
3  deposition of John W. Carson is being taken on
4  October 27, 2017, at approximately 8:16 at the location
5  of Boyce Law Firm, 300 South Main Avenue, Sioux Falls,
6  South Dakota.
7     This deposition is taken in the matter of Sioux
8  Steel Company, a South Dakota corporation, vs.
9  KC Engineering, P.C., an Iowa corporation, Defendant,
10 venued in United States District Court, District of
11 South Dakota, Southern Division, CIV-15-4136.
12 Deposition was noticed by the plaintiff.
13    Would all counsel please voice identify yourself
14 and whom you represent.
15    MR. GOODSELL: Verne Goodsell for the plaintiff,
16 Sioux Steel.
17    MR. TOBIN: Michael Tobin on behalf of the
18 defendant, KC Engineering.
19    THE VIDEOGRAPHER: Our court reporter today is
20 Audrey Barbush. Would you please swear the witness.
21    JOHN W. CARSON, Ph.D.,
22 called as a witness, having been first duly sworn,
23 testified as follows:
24    THE VIDEOGRAPHER: Go ahead, Counselor.
25

Sioux Steel Company v.  
KC Engineering, P.C.

John W. Carson, Ph.D.  
October 27, 2017

Page 5

1           EXAMINATION
2  BY MR. GOODSELL:
3  Q  Thank you.
4     Mr. Carson, my name is Verne Goodsell, and I've
5     invited you here today to help me understand your
6     reports. And you've issued a report in this case; is
7     that correct?
8  A  Actually, two. Two, sir.
9  Q  And I have those two reports marked as Exhibits 28 and
10    29, and they're in front of you, correct?
11 A  Yes.
12 Q  And those two exhibits are the reports that you have
13    issued in this case?
14 A  Yes.
15 Q  Okay. And before we move into talking about the
16    reports, I want to just chat with you a little bit
17    about some of the areas of expertise that you have as
18    it relates to this case.
19 A  Okay.
20 Q  And the first is, is I understand that you're a
21    licensed professional engineer?
22 A  That's not true, no.
23 Q  Okay. And tell me what is correct then.
24 A  I'm not a licensed professional engineer.
25 Q  Okay. And do you have an engineering education?

Page 6

1  A  I do.
2  Q  And have you ever been a licensed professional
3     engineer?
4  A  No.
5  Q  And then I can take it that you, then, have not -- as
6     not being a licensed professional engineer, is that one
7     of your areas of expertise is not going to be in the
8     area of structural analysis and structural design?
9  A  That's correct.
10 Q  And in looking at in terms of your expertise, then,
11    would I be correct to assume that falls more in the
12    area of material flowing?
13 A  That's part of my area of expertise.
14 Q  Okay. And is that how you're approaching this case in
15    terms of the material propensity and the flow of
16    materials?
17 A  That's part of my area, yes.
18 Q  Okay. What other areas of expertise would you have
19    that you're going to apply to this case and have
20    discussed in Exhibits 28 and 29?
21 A  The loads that bulk materials exert on storage
22    structures.
23 Q  Okay. And have I wrote that down -- the load of bulk
24    material on storage structures; is that correct?
25 A  The loads, plural, that bulk materials exert on storage

Page 7

1     structures, yes.
2  Q  Okay. Any other areas of expertise that would apply to
3     the opinions that you set forth in Exhibits 28 and 29?
4  A  Could I just look through my report --
5  Q  Absolutely.
6  A  -- briefly and refresh my memory?
7     (Witness examines document.)
8     Well, there are topics related to the two that we
9     just discussed, such as the codes that are -- have been
10    published and -- that relate to the loads exerted on
11    storage structures. That's really a subset of what I
12    just mentioned a moment ago.
13 Q  Okay. Anything -- what else?
14 A  I have done extensive work over the years and have
15    published extensively on the issues of failure of
16    storage structures, structural failure of storage
17    structures, analyzing the cause of failures. I've
18    testified on this issue in litigation.
19 Q  Okay.
20 A  Related to flow are issues of how materials should be
21    stored and handled, issues such as recirculation, the
22    need for doing so, the use of flow aids, such as air
23    cannons, the pressures that air cannons exert on
24    materials and on storage structures. Related to flow
25    is the issue of caking --

Page 8

1  Q  Excuse me. Issue of what?
2  A  Caking.
3  Q  Caking?
4  A  -- of bulk solids. Moisture migration and how that
5     affects the propensity of materials to cake. I think
6     that's a reasonable summation of my areas.
7  Q  Okay. And then just so I can kind of follow up with,
8     we're talking about the loading that bulk materials
9     exert on storage structures, and then we're talking
10    about the failure of storage structures and the cause
11    of the failure.
12 A  Yes.
13 Q  And then we're talking about flow, which includes
14    storage, flow aids, caking, and moisture content?
15 A  Moisture content as well as moisture migration.
16 Q  Okay. And can I assume, then, because you're not a
17    licensed professional engineer, that you do not have
18    any training in terms of accident reconstruction?
19 A  I don't have any formal training in terms of accident
20    reconstruction, but I have certainly been involved in
21    numerous instances of looking at failure of storage
22    structures and determining the cause of failure.
23 Q  Right. And I want to distinguish between the
24    investigation that has a cause of failure versus
25    reconstructing what occurred before the failure.

| Sioux Steel Company v. | John W. Carson, Ph.D. |
| KC Engineering, P.C. | October 27, 2017 |

Page 17

1  Q  And perhaps I asked this earlier. I understand you're
2     not a registered professional engineer. Am I correct
3     that you never have been a registered professional
4     engineer?
5  A  That's correct.
6  Q  And then I'm assuming then that you have not practiced
7     engineering; is that correct?
8  A  That's not correct.
9  Q  Can you explain to me how you can practice engineering
10    for clients without being a registered professional
11    engineer?
12 A  Certainly. By my education and training. There's no
13    requirement that I have a professional engineering
14    license. That would only be necessary if, for example,
15    I were sealing drawings, particularly of a structural
16    nature. And very often that's for a public agency.
17    I've never done that type of work.
18       But my -- by my education, bachelor's in
19    mechanical engineering, master's in mechanical
20    engineering, Ph.D. from MIT in mechanical engineering,
21    and working nearly 50 years in this field, I've never
22    found it necessary, nor has any client required that I
23    have a professional engineering license to do the work
24    that I do.
25       And I've testified in numerous cases in both

Page 18

1     county, state, and federal courts, as well as
2     international tribunals. That's never been a
3     limitation in my being able to do the work that I do.
4  Q  Can you explain to me why you chose to stay outside of
5     the area of a registered professional engineer as you
6     were pursuing these various areas?
7  A  It's never been a requirement for the work that I've
8     done. None of my clients have asked for that. I've
9     never -- I've reviewed the requirements, and in my
10    opinion and in the opinion of attorneys that I've
11    consulted with, this has never been an issue. I've
12    never been prohibited from testifying in litigation
13    involving engineering issues, involving the issues of
14    the type that we're talking about here. It's never
15    been a requirement. The --
16 Q  Okay.
17 A  -- courts and others and my clients rely on my
18    education and 50 years of experience in this field.
19 Q  Yeah. And I wasn't challenging your education or your
20    experience directly. My question was is that why did
21    you choose to stay outside of the circle of being a
22    registered professional engineer?
23 A  I just never found it to be necessary. I didn't -- I
24    had other things that were more important for me to do.
25 Q  I want to talk to you --

Page 19

1        (Exhibit 30 is marked for identification.)
2  BY MR. GOODSELL:
3  Q  You have in front of you what has been marked
4     Exhibit 30. Can you identify that for me?
5  A  Yes, sir. Exhibit 30 is a screenshot of an internal
6     software program that we use in my office. This
7     particular screenshot has to do where we record
8     contacts with clients or potential clients so that we
9     can share this information internally with all of the
10    engineers in all seven of my offices around the world.
11       This particular one has to do with several
12    contacts that individuals in my firm had in 2012 with
13    Chad Kramer from Sioux Steel Company.
14 Q  Now, one of the things that I wanted to address with
15    you about this is that, in the dialogue here, Chad
16    Kramer specifically identifies that the bins are for
17    use with grain bins, correct?
18 A  I'm sorry. Could you say it again?
19 Q  Yeah. If you look at the bottom of that exhibit, I
20    think the third line down there is that Mr. Kramer is
21    talking about Sioux Steel and the hoppers for use with
22    grain bins.
23 A  Yes.
24 Q  So we're talking about grain, correct?
25 A  That's correct.

Page 20

1  Q  And then as we go up farther is that they actually sent
2     to you to -- and how do you pronounce the name of your
3     firm?
4  A  Jenike & Johanson.
5  Q  Okay. So Jenike, then, through your engineer requested
6     assembly drawings?
7  A  Yes.
8  Q  And they were sent to you for review, correct?
9  A  Not to me personally but to our company, yes.
10 Q  To your company, correct. Okay.
11       And then they were reviewed, and it also has in
12    there the bulk density of the materials, correct?
13 A  Yes. Mr. Kramer's email of July 17, 2012, states
14    the -- quote, the hopper bins are designed for
15    materials with a bulk density of up to 55.3 pounds per
16    cubic foot, closed quotes.
17 Q  And then if we go to the top of that is that I believe
18    that it's your engineer saying, quote, our loading is
19    much higher compared to that -- to what Sioux Steel
20    calculates.
21       Did I read that correctly?
22 A  Yes, sir.
23 Q  Now, would it be fair, based on your review of this
24    case is that, when the hopper plans were submitted, is
25    that those plans were submitted to be in compliance

Min-U-Script®   Paramount Reporting ~ Audrey M. Barbush, RPR   (5) Pages 17 - 20
605.321.3539 ~ audrey@paramountreporting.com

EXHIBIT E

Page 21

1   with EP 433? Would that be a fair statement?
2 A I don't know whether it's fair or not. There's no
3   indication here that that's the case.
4 Q If the plans were compliant with EP 433, would I
5   interpret this document from your engineer that the
6   loading calculations done under EP 433 are not
7   sufficient for your firm in terms of loading being much
8   higher than that?
9 A I don't know. Unfortunately, this is all of the
10  information that we have in our files about this --
11  about this interchange, and the individual, Mr. Petro,
12  listed at the top as the project development engineer,
13  Gregory Petro, passed away a couple of years ago. And
14  so I have no way of knowing beyond what's here what
15  information he was given.
16      Whenever we are approached by a potential client
17  and given information, if it looks like there's no
18  likelihood that that will result in our writing a
19  proposal or doing a project, then we just simply don't
20  save that information any longer.
21      So I don't know, to answer your question.
22 Q And I'm not being critical of the information that was
23  or wasn't saved or how it was saved. Is that what I'm
24  observing here is the opinion of your engineer that
25  your loading, i.e., your company's loading, is much

Page 22

1   higher compared to what Sioux Steel calculates. That's
2   what it says, correct?
3 A That's what it says, yes.
4 Q And this would then be the loading, material loading
5   inside the structure, correct?
6 A The loading of the -- that the material exerts on the
7   structure, yes.
8 Q And if the plans submitted by Sioux Steel to your
9   company were in compliance with 4 -- EP 433, then your
10  engineer is telling the Sioux Steel engineer that your
11  loading is much higher for your firm than what Sioux
12  Steel calculates?
13 A That certainly is potentially the case, yes, and
14  probably that's a likely conclusion. But, again, I
15  don't know anything more than what's here. So...
16 Q Okay. And I understand that. Now, this is a
17  document -- 30 was the first time your firm was
18  involved in anything with Sioux Steel. Would that be
19  correct?
20 A That's correct. The first time we had had any contact
21  with Sioux Steel, to my knowledge.
22 Q Is it your opinion that EP 433 is not the appropriate
23  standard for loading of grain and materials that have a
24  bulk density of 55.3?
25 A I wouldn't categorically say that, no. It depends on

Page 23

1   the properties of the grain as to whether EP 433 is
2   appropriate, as I've stated in my Exhibit 28 opinions.
3 Q Are there any other U.S. standards that are recognized
4   for steel storage bins other than ANSI and ASAE EP 433?
5 A That is the only current U.S. standard.
6 Q Now, the bin in question that failed, the upper section
7   of the hopper was not in accordance with EP 433 or for
8   the Manual for Steel Construction. Is that a fair
9   statement?
10 A Could you be more specific when you talk about the
11  upper portion?
12 Q Yeah, upper portion of the hopper. I think it consists
13  of 80 panels, and it is the portion that would go into
14  the ring right below the top of the bin.
15 A And your question is whether it was in accordance with
16  EP 433 and standards, AI -- AISC standards?
17 Q Correct.
18 A Well, first of all, EP 4 -- as I've stated in my
19  report, EP 433 is not applicable to the design of this
20  bin. So to say whether it was in accordance with or
21  not is, in my mind, immaterial.
22 Q And I understand that, and I'm not arguing with you on
23  that. I just want to set the ground rules, though,
24  that it doesn't comply with EP 433 or AISI, the steel
25  construction manual.

Page 24

1 A The design of the upper portion of the hopper of this
2   bin does not include the appropriate safety factors in
3   accordance with AISI using the loads from EP 433.
4 Q Okay. Now, let's pursue, then, is that it's your
5   opinion that EP 433 -- and I'm going to just use that
6   for short rather than going through all the
7   nomenclature on it -- doesn't apply to materials that
8   potentially become nonflowing?
9 A The term, sir, is non-free-flowing.
10 Q And I think in your report you talked about the
11  potential to become non-free-flowing, correct?
12 A That's correct.
13 Q Now, is there anything in EP 433, or any subsequent
14  comments to EP 433, that would caution an engineer that
15  it doesn't apply to materials that had the potential to
16  become non-free-flowing?
17 A Certainly.
18 Q And where do you find that in EP 433?
19 A Right in the title, to begin with. It says for
20  free-flowing material. And then there's other
21  statements which I've summarized in my report that
22  elaborate on that issue.
23 Q Okay. Now, it also talks about free-flowing grain,
24  specifically wheat, because wheat has the heaviest bulk
25  density of the common grains; is that correct?

Min-U-Script®                Paramount Reporting ~ Audrey M. Barbush, RPR                (6) Pages 21 - 24
                             605.321.3539 ~ audrey@paramountreporting.com

EXHIBIT E

Page 25

1  A   I believe that's true, yes.
2  Q   It also talks about granular fertilizer, doesn't it?
3  A   I don't recall off the top of my head.
4  Q   Okay. Well --
5  A   I don't have that --
6  Q   I understand.
7  A   I don't have that standard recorded --
8  Q   And --
9  A   -- in my memory, but if you can provide me a copy, I'd
10      be happy to confirm that.
11 Q   Well, I may or may not be able to. Let me see if I've
12     got that handy.
13         I'm going to hand you what's been marked
14     previously Exhibit 26.
15         MR. GOODSELL: And for the record, I'll state on
16     that exhibit that the yellow highlighting is material I
17     put on there, Counsel.
18         MR. TOBIN: Understood.
19 BY MR. GOODSELL:
20 Q   Is that if we look at Exhibit 26, Mr. Carson, we talk
21     about loads due to bulk grains and fertilizer, correct?
22     First sentence.
23 A   You've only read part of it, sir. It was developed by
24     the ASAE Loads Due to Bulk Grains and Fertilizers
25     Subcommittee of the Structures Group.

Page 26

1      So this was the subcommittee that developed this.
2      It doesn't say that this standard applies to
3      fertilizers. Indeed the title says free-flowing grain.
4      It doesn't mention fertilizer.
5  Q   What is the position of the subcommittee, then, in
6      terms of fertilizers?
7  A   Well, not being a member of that subcommittee, I don't
8      know, but having worked with ASTM, American Society for
9      Testing Materials, and other standards writing
10     organizations, there are committees and subcommittees
11     that have a broad charter, and within that broad
12     charter they develop standards that don't necessarily
13     apply to the broad charter of the subcommittee.
14 Q   Well, let's approach it this way. Fertilizers have the
15     potential to become non-flowing granular fertilizers,
16     correct?
17 A   Yes, sir.
18         If I can just elaborate on my previous answer.
19     If -- refer you to section 1, Purpose, subsection 1.1,
20     quote, this engineering practice presents methods of
21     estimating the grain pressures within centrally loaded
22     and unloaded bins used to store free-flowing
23     agricultural whole grain, closed quotes. There's no
24     mention of fertilizer in the purpose.
25 Q   Okay. Does a free-flowing grain, such as wheat, corn,

Page 27

1      or soybeans, have the potential to become nonflowing?
2  A   It has the potential, yes. And, again, sir, just to --
3      for semantics, but the term is non-free-flowing, not
4      nonflowing.
5  Q   So I'm correct then -- or it is correct that grains
6      such as wheat, corn, and soybeans have the potential to
7      become non-free-flowing?
8  A   That's correct.
9  Q   And that potential exists when they're in the storage
10     hopper bins, correct?
11 A   Yes, sir.
12 Q   Okay. Does EP 433 address the structural design that
13     is necessary if a free-flowing material becomes
14     non-free-flowing?
15 A   First of all, EP 433 does nothing in terms of struct --
16     says nothing about structural design. It's simply
17     having to do with loads on structures. And second, it
18     is -- again, as we've talked several times here, or as
19     I've testified, EP 433 simply talks about the loads
20     when the grain is free-flowing. It says nothing about
21     what happens when the grain becomes non-free-flowing.
22 Q   So when the grain becomes non-free-flowing within a
23     compliant 433 bin, what dynamic forces are necessary to
24     be considered then when you are designing the
25     structure?

Page 28

1  A   EP 433 is silent on that issue.
2  Q   Now, EP 433 addresses in the hopper the dynamics of the
3      material, correct?
4  A   It addresses what happens when materials flow in the
5      hopper, yes, and the resulting loads.
6  Q   And is it your interpretation of EP 433 that those
7      material loads only apply when the material is
8      free-flowing?
9  A   Yes, sir. As far as EP 433 is concerned, absolutely.
10 Q   Where else in the literature can I look for
11     publications that would warn that EP 433 does not apply
12     when a free-flowing material becomes non-free-flowing?
13 A   I don't recall specifically within the literature, but
14     it should be obvious to anyone, even without an
15     engineering knowledge, to read the title of EP 433 and
16     learn that it's only applicable for free-flowing
17     grains.
18 Q   And I noticed that in your opinion. I'm not arguing
19     with you about your opinion, John. Is that I'm looking
20     for validation from other sources that are saying that
21     EP 433 does not apply to a situation where a
22     free-flowing material becomes non-free-flowing?
23 A   Well, I've written several papers on loads applied to
24     silo structures, failure of silos, and I've written
25     specifically about the limitations of EP 433. All of

Min-U-Script®   Paramount Reporting ~ Audrey M. Barbush, RPR   (7) Pages 25 - 28
605.321.3539 ~ audrey@paramountreporting.com

EXHIBIT E

Page 29

1  those papers, I believe, are referenced in my opinion,
2  particularly --
3  Q  Yeah. And what I'm looking for, though, is
4     confirmation of those opinions by other experts in flow
5     materials and in structural analysis that would agree
6     with you that EP 433 doesn't apply when the material is
7     non-free-flowing -- potential for non-free-flowing.
8  A  Well, I -- again, I've -- I've referenced in my report
9     there was a paper by Dr. Gurfinkel. This is footnote
10    46. I don't -- I don't recall specifically what he
11    says, but it talks -- he talks about a project that
12    actually I was involved in myself, and he referenced
13    the work that my firm did on this, which was a silo for
14    storing soybean meal.
15 Q  That was the one in 1979 in Iowa?
16 A  The failure?
17 Q  Yes.
18 A  That's my recollection.
19 Q  Okay.
20 A  That's about the right time frame, yes. And I believe
21    it was Iowa.
22       I mean, there are other standards out there, the
23    Eurocode EN 1991-4 doesn't reference EP 433, but it
24    talks about this issue of free-flowing and
25    non-free-flowing. And it is very specific as to the

Page 30

1     limitations of that particular code.
2  Q  Okay. And which code was that? I'm sorry.
3  A  It's -- it's -- it's British standard E --
4  Q  Okay. That's --
5  A  -- EN 1991-4.
6  Q  Yeah, the British code or the Eurocode?
7  A  It's one of many British codes or Eurocodes, yes, but
8     it's referenced here. I'm sure it's in one of my
9     footnotes. It's footnote 40, page 9 -- at page 10.
10 Q  I've looked for it, but I have not found it, outside of
11    suggestions in your publications, for a direct
12    statement that EP 433 does not apply to materials that
13    have the potential to become non-free-flowing.
14       Can you point me to any place outside of your
15    writings and other than the footnotes 46 and 40 that
16    would address that issue?
17 A  Sir, as I testified a few moments ago. It's -- to me,
18    it's obvious to anyone reading the English language by
19    the title of EP 433, by 1 -- paragraph 1.1 that this
20    only applies to free-flowing grain. If the grain
21    becomes non-free-flowing, it should be obvious that
22    this standard does not apply. I don't know that anyone
23    has to state that any more directly in any publication
24    to make it obvious.
25 Q  Okay. And I understand it's your interpretation it's

Page 31

1     obvious and that's your reading of it, but my question
2     was is that has this obvious "does not apply to
3     potential non-free-flowing materials," has that been
4     addressed by someone else out there specifically?
5  A  Not that I recall. I don't --
6  Q  Okay.
7  A  Again, it's like saying the sky is blue at times. I
8     mean, to me it's such an obvious statement I don't know
9     why anyone would have to state it.
10 Q  Now, if we go back to EP 433 and in reference to the
11    overpressure, which I think is calculated as F --
12 A  Yes.
13 Q  -- is that is it my understanding that it's your
14    opinion or interpretation of EP 433 that the
15    overpressure factor there, which I think is 1.4, is
16    that that factor only applies when the material is
17    free-flowing and would not apply when there's a
18    potential for the material to not -- to be
19    non-free-flowing?
20 A  Well, since -- since Table 1, which includes values for
21    F, is part of EP 433, then I would -- my opinion is
22    that this table only applies for free-flowing grain.
23 Q  Okay. Now, help me to understand this, because I may
24    not understand the materials flow as well as I should.
25    But if a bin is full of grain and it's free-flowing,

Page 32

1     then it's going to move out of that bin in a uniform
2     pattern at the discharge, correct?
3  A  How do you define uniform?
4  Q  Well, continuous, it's free-flowing, it's going to flow
5     based upon, you know, the amount of flow that may be
6     mechanically manipulated.
7  A  Yes, that's a reasonable statement.
8  Q  So then the internal pressures on that as the materials
9     flow out would become less and less in terms of the
10    internal hoop stresses on the bin and hopper?
11 A  Less and less relative to what?
12 Q  Relative to where they started from.
13 A  As the bin empties out?
14 Q  Yes.
15 A  Yes, that's true. Over time that's true.
16 Q  So we have a bin --
17 A  Eventually you get to a point where the bin is empty
18    and there's no pressure.
19 Q  Correct.
20 A  So, yes, they are decreasing but not uniformly. You
21    know, bulk solids are very different than liquids in
22    that regard.
23 Q  Would there be any substantial change in the hoop
24    stress at the top of the hopper during that discharge
25    process in being going from full to empty?

Min-U-Script®    Paramount Reporting ~ Audrey M. Barbush, RPR    (8) Pages 29 - 32
                 605.321.3539 ~ audrey@paramountreporting.com

EXHIBIT E

Page 37

1  flow pattern where material is flowing along the hopper
2  walls, the pressure that the material exerts against
3  the hopper walls and, hence, the hoop stress that
4  develops in that hopper, in the hopper wall itself,
5  increases dramatically as soon as flow commences. And
6  it remains at a relatively high value until the level
7  drops to a point where then it starts to decrease, and
8  eventually we get to the point where the material level
9  is below the top of the hopper and we go back to zero.
10 Zero pressure, zero hoop stress.
11 Q  And that's when we have a mass flow condition in the
12    hopper, correct?
13 A  Correct.
14 Q  Okay. Then let's talk about in terms of what happens
15    when we have a funnel flow condition in the hopper.
16 A  Okay. If we have a funnel flow condition in the
17    hopper, then those pressures and, hence, the hoop
18    stresses do not change from the initial fill conditions
19    to the discharge or flow conditions. And that's
20    well-established in various standards. It's
21    well-established in the literature that that's --
22    that's the condition that occurs.
23 Q  So at the collar, if we have a funnel flow, there is no
24    change of condition in the hoop stress; is that
25    correct?

Page 38

1  A  That's correct, at least initially. Again, it's going
2     to decrease over time as the level drops. But at least
3     initially there's no change from that initial fill
4     condition.
5  Q  Does EP 433 address mass flow?
6  A  It does, although the term mass flow is not used.
7     EP 433 uses the term plug flow to mean essentially a
8     mass flow condition.
9  Q  And I looked at that, because plug flow means that all
10    or part moves on the sides, correct?
11 A  Let's be more specific in terms of looking at the
12    wording.
13    (Examines document.)
14 Q  I think it's on page 1, 2.19. Are you with me?
15 A  Yes, I am.
16 Q  Okay. Take your time. I'm not trying to --
17 A  Yes. Yeah. You're correct. It's 2.19. The reference
18    is to Figure 1, and I stand corrected. Actually --
19    well, Figure 2 shows a mass flow bin.
20 Q  Well -- and what I was pursuing, and I'm not trying to,
21    again, argue with you, is that I understood you to tell
22    me that mass flow under EP 433 is the same as plug
23    flow. Did I understand that's what you said?
24 A  That's the statement I made, and I said this -- I stand
25    corrected. The terminology does differentiate and does

Page 39

1  refer to mass flow in 2.1.7, the Figure 2.
2  What I quoted in my report is actually the
3  commentary, which is on page 947, paragraph 5.1.2.2.
4  And, again, where you've highlighted and you have a
5  letter B next to it, plug flow is defined as flow from
6  a bin in which all or part of the material moves as a
7  unit with material movement along the wall -- the bin
8  walls.
9  To me that's -- again, that's mass flow. But I
10 stand corrected.
11 Q  Well, no. I appreciate that.
12 A  Yeah.
13 Q  I understand that viewing the commentary may be a
14    little bit different than how it's set forth in the
15    definition.
16 A  You're absolutely correct, yeah.
17 Q  But I was just trying in my own mind is to distinguish
18    is that mass flow is not the same as plug flow.
19 A  You are correct. I --
20 Q  And plug flow, as it's identified here, is when all or
21    part of the bin walls material is flowing along?
22 A  You are correct. I stand corrected.
23 Q  Now, I want to go back. As I understand, we're talking
24    about, with a funnel flow bin -- which is the type of
25    bin we have in this particular case of the failure,

Page 40

1  correct?
2  A  That's correct.
3  Q  -- is that there's going to be no change in the hoop
4     pressures at the collar during discharge or unloading?
5  A  That is -- that is my opinion. That is
6     well-established in the literature. It's certainly
7     well-established in several other codes that are in
8     existence, including the most modern code, this British
9     standard that I referenced earlier.
10 Q  Okay. Now, what I'm struggling with as a layperson is
11    that since the parameters of the structure in terms of
12    the loading that we have when it's low is that -- and
13    is static, we understand what type of structure it
14    takes to hold that static load, correct?
15 A  Yes. Well, I think so.
16 Q  Okay. Well, the literature -- the literature talks
17    about it. I don't know that I understand it or not,
18    but the literature understands, with a static load,
19    this is what we have to have to support it so there
20    won't be a failure, correct?
21 A  Right.
22 Q  Now, then, if we go to EP 433, it begins to talk about
23    dynamic load.
24 A  Uh-huh.
25 Q  And that would be, then, the change as it discharges

Min-U-Script®        Paramount Reporting ~ Audrey M. Barbush, RPR        (10) Pages 37 - 40
                    605.321.3539 ~ audrey@paramountreporting.com

EXHIBIT E

Page 41

1 and what happens to the materials as it's discharged
2 from full to empty, correct?
3 A Yes.
4 Q And what I'm struggling with is what change would there
5   be in dynamics at the collar of this hopper if we have
6   a funnel discharge and there's no change in that
7   dynamic, why do we have to address dynamic load to any
8   specific level, because it would seem that the same
9   static loading on it would be able to handle the
10  material because there's no change at that collar
11  level?
12      That was a long question.
13 A I'm not sure I understand your question.
14 Q Okay.
15 A Could you restate it, please.
16 Q Well, I probably can't. Let me see if I can kind of
17   rephrase that.
18      What I'm struggling with is, is that if there
19   really is no change in hoop stress in terms of
20   discharge from full to empty in a funnel flow, why is
21   it necessary to discuss dynamic loading --
22 A Discuss it --
23 Q -- as it's discussed in EP 433?
24 A That's a good question. EP 433, in my opinion and I
25   think in the opinion of most experts in this field, is

Page 42

1   a highly simplistic, very inadequate design code.
2   There are many -- well, not many. There are several
3   codes and certainly a vast amount of literature that
4   are consistent with my opinion, which is that if you
5   have a funnel flow vessel, the change in pressures near
6   the top of the hopper from an initial fill condition to
7   a discharge condition is essentially zero. There is
8   virtually no change in those pressures.
9      That's contrary to what's stated here, I
10  recognize. But, again, this is, again, a highly
11  simplistic and not very well-presented document, in my
12  opinion and the opinion of, I think, most experts in
13  the field who have studied this area.
14     Again, solids and liquids behave very differently.
15  If you have a --
16 Q And I don't want to -- we've got little time here, and
17  we don't want to talk about liquids. We're talking
18  about solids here, correct?
19 A Yes.
20 Q Okay. So you don't have an explanation, though, if
21  there's no change in the pressure, particularly at the
22  area we're talking about, at the hoop collar, as to why
23  we would go into some discussion then about the
24  dynamics of the load because that would suggest that
25  the loading pressures are changing.

Page 43

1 A I don't have -- I'm not a member of this committee. I
2   wasn't part of writing it. I don't know why they would
3   consider that because it's contrary to most of the
4   literature.
5 Q The -- and I understand your criticism of EP 433, and
6   yet that's the only standard that we have in the
7   United States that deals with steel bins.
8 A That is correct.
9 Q Now, I want to move into talking about some of the
10  reasons why a potential free-flowing material -- a
11  free-flowing material has the potential to become
12  non-free-flowing. And there's going to be some type of
13  obstruction that occurs in the flow process; is that
14  correct?
15 A I'm not sure what you mean by an obstruction.
16 Q Obstruction.
17 A Well, there is -- there is something that causes the
18  flow to be affected, either slowed down or stopped.
19  Could be a mechanical interruption or, more likely,
20  when it deals with the material itself, it has to do
21  with something that happens to those particles to cause
22  them either to not slide at the walls or to stop
23  flowing.
24 Q And common problems with flow are referred to as
25  ratholing?

Page 44

1 A That's one.
2 Q And ratholing can occur in a funnel flow bin.
3 A It can occur, yes.
4 Q And the other one that seems to be in the literature is
5   talking about arching or bridging.
6 A That's correct.
7 Q Now, since grains have the potential to become
8   non-free-flowing, is grain then going to, in a funnel
9   flow bin, be subject to ratholing and arching?
10 A Again, it has the potential of those problems
11  occurring, but if it's a free-flowing material, those
12  problems will not occur.
13 Q Right. So as long as it's free-flowing there's no
14  problem, correct?
15 A There's no ratholing problem. There's no arching or
16  bridging problem. That's correct.
17 Q That's right. So there's no additional stress -- and
18  we talked about that before -- as long as it's
19  free-flowing?
20 A Well, when you say we talked about it before, I mean --
21 Q At the collar.
22 A That really has nothing to do whether it's free-flowing
23  or non-free-flowing. What we were talking about before
24  is whether you have funnel flow or mass flow. We're
25  talking about the flow pattern, not flow problems.

Min-U-Script®   Paramount Reporting ~ Audrey M. Barbush, RPR   (11) Pages 41 - 44
605.321.3539 ~ audrey@paramountreporting.com

EXHIBIT E

Page 45

1  Q  Okay. But let's go back to flow, and I probably went
2     off on the wrong direction on that.
3        Let's go back to flow, is that grains have the
4     potential to become non-free-flowing, and
5     non-free-flowing then has the same potential that
6     grains can have the problem of being ratholing as well
7     as arch and bridging?
8  A  That's correct.
9  Q  Now, these phenomena, ratholing, arching and bridging,
10    with material such as grain or other bulk solids, have
11    been known to the industry for a long period of time,
12    correct?
13 A  Absolutely.
14 Q  And so one of the hazards in terms of material handling
15    in a funnel flow bin is known to be ratholing and
16    arching?
17 A  That's -- those are both potentials, yes.
18 Q  And those are potential hazards in terms of danger to
19    the structure?
20 A  Among other things, yes.
21 Q  And what other dangers would they have? I assume that
22    if it's a flow problem, you can't use it, so it's a
23    function problem?
24 A  That's correct.
25 Q  So the hazards of ratholing are structural, when it

Page 46

1     collapses?
2  A  Yes.
3  Q  And the hazard to ratholing -- and I'm going to refer
4     to ratholing and arching as the same problem, unless
5     you want to distinguish --
6  A  I'd like to distinguish because they are very different
7     problems, and one -- two of those occur in funnel flow
8     bins and one of them -- or can occur in funnel flow
9     bins, and one of them can occur in a mass flow bin.
10 Q  Okay. Well, let's just take it, then, that ratholing
11    is that one of the things that, when the rathole
12    collapses, that's a hazard to the structure?
13 A  Correct.
14 Q  And when the ratholing occurs, that means that it's
15    going to be difficult and it's not going to function
16    properly at discharge?
17 A  That's correct.
18 Q  And the reason is the stuff sticks along the walls and
19    there's a little rathole that goes right down the
20    middle, so to speak, and then the flow stops?
21 A  That's correct.
22 Q  Okay. And then with arching is that that's simply
23    something that blocks the flow someplace in the hopper
24    or the bin?
25 A  That's correct.

Page 47

1  Q  And that also, when it collapses, can be a hazard to
2     the structure?
3  A  That's correct.
4  Q  And, again, these hazards to the structure from
5     ratholing and arching have been well-recognized and
6     known for a long time in the industry and profession?
7  A  Yes.
8  Q  Now, with arching, then, also the function of the bin
9     is destroyed; is that correct?
10 A  Yes. That's --
11 Q  Can't get the material out.
12 A  Correct.
13 Q  Okay. Is it your opinion that the overpressure, as
14    discussed in EP 433, doesn't take into consideration
15    the dynamic forces created when either a rathole or a
16    arch collapses?
17 A  Yes.
18 Q  So -- I'm not sure I understand that, and perhaps it's
19    how I asked the question. Is that the overpressure in
20    EP 433 is not addressing ratholing and arching?
21 A  That's correct.
22 Q  Is that your opinion?
23 A  Yes.
24 Q  I want to shift with you and talk just briefly a little
25    bit about your personal experience with hopper bins

Page 48

1     that have failed.
2  A  Okay.
3  Q  Other than the one we talked about in Iowa, which I
4     think was in '79, are there other failures that you've
5     investigated in hopper bins where there has been a
6     complete failure of the hopper such as occurred in this
7     case?
8  A  Yes.
9  Q  And can you identify those for me?
10 A  Well, I would, first of all, refer you to footnote 45,
11    which is a paper that I wrote back in 2000, which
12    provides a number of examples, case histories of silo
13    failures, and several of those involve hopper-bottom
14    bins.
15 Q  So we have two of them in your paper under footnote 45;
16    is that correct?
17 A  I don't recall how many are in there. There's at least
18    two. There may be more. I don't recall.
19 Q  And I've looked at that paper, but as I sit here, I
20    don't know whether it was specified how many of them
21    you actually studied in terms of hopper failure similar
22    to ones we have in this case.
23 A  I've investigated many hopper failures. I don't know
24    the number but in the dozens of bins and silos that
25    have failed in the hopper section.

Min-U-Script®   Paramount Reporting ~ Audrey M. Barbush, RPR   (12) Pages 45 - 48
605.321.3539 ~ audrey@paramountreporting.com

EXHIBIT E

Page 49

1  Q  And what I'm talking about is a catastrophic failure
2     where the entire hopper gives out and the entire load
3     is dropped.
4  A  Absolutely.
5  Q  Okay. Now, on any of those did you personally
6     determine what the design standard was for the hopper?
7  A  Yes, I did.
8  Q  Okay. And which ones would you have determined the
9     design standard for the hoppers on?
10 A  Which ones specifically?
11 Q  Yes.
12 A  Well, there's several that come to mind. There was a
13    failure -- in fact, this is one that's described in
14    this paper, footnote 45. This was a series of bins. I
15    think, as I recall, there were eight or ten altogether.
16    Only one of them failed, but the others were about to
17    fail. This was at a chemical processing plant in
18    Texas. The material was polystyrene fluff that was
19    being stored. That's one example.
20       I can think of another one somewheres out in the
21    Midwest, some type of a grain material. I don't know
22    if it was an ethanol plant. I don't recall. But that
23    was another one where the hopper failed.
24       There was another one I recall in western
25    Massachusetts that was, again, at a chemical processing

Page 50

1     plant. In that case, it was polyethylene or
2     polystyrene pellets. There were a bunch of silos at
3     various chemical plants in the U.S. back in the 1970s
4     that I investigated. This was, again, a chemical
5     processing plant. There have been a number of them
6     over the years that I've investigated.
7  Q  Okay. And I'm not trying to make you recall all of
8     those. What I'm really interested in, though, is that
9     the specific ones that you have investigated that
10    involve a grain or agricultural material, and on those
11    we have the soy one in Iowa in '79 and then the ethanol
12    one you just described?
13 A  As I recall it was ethanol. I'm not positive of that.
14    But it was -- it was one in the western part of the
15    U.S. or Midwest, I don't recall.
16 Q  And the material would have been what?
17 A  At this point I can't recall, sir. I'm sorry.
18 Q  Okay. So going back to the Iowa failure, is that did
19    you determine the design standard on the hopper that
20    failed?
21 A  I determined the standard that was used, yes.
22 Q  Okay. And what standard was used?
23 A  As I recall -- and this goes back to --
24 Q  I understand.
25 A  -- the '70s. 30, 40 years ago.

Page 51

1     As I recall, even though it was a steel bin, I
2     think they used the ACI code, if I'm not mistaken,
3     which even though it's for concrete, I mean, the
4     storage -- the vessel itself doesn't affect the loads.
5     It's the material that affects the loads as well as the
6     flow pattern. So -- again, this is 40 years ago. I
7     don't recall that specifically.
8  Q  Okay. And what I'm really looking for here, I'm
9     looking for a case where you have done the
10    investigation, there's been a hopper failure, and
11    there's confirmation that the hopper design was
12    consistent with EP 433.
13 A  I can't recall a specific instance of that.
14 Q  Okay.
15 A  It probably has. Again, I've been doing this for
16    nearly 50 years. I've looked at a lot of -- literally
17    hundreds of failures. I don't recall a specific one
18    sitting right here.
19 Q  As you sit here today, you have no recollection?
20 A  I don't have a specific recollection, no.
21 Q  Okay.
22    MR. GOODSELL: Are you okay if we take a break,
23    Counsel?
24    MR. TOBIN: Sure. Absolutely.
25    MR. GOODSELL: Okay.

Page 52

1     THE WITNESS: That'd be great.
2     THE VIDEOGRAPHER: The time is 9:39. End of media
3     unit 1. We're off the record.
4     (Recess taken from 9:39 a.m. to 9:54 a.m.)
5     THE VIDEOGRAPHER: We are back on the record. The
6     time is 9:54. This begins media unit No. 2 in the
7     video deposition of John Carson.
8     Go ahead, Counselor.
9     MR. GOODSELL: Thank you.
10    BY MR. GOODSELL:
11 Q  I want to kind of just go back and visit a little bit
12    about your criticisms of EP 433.
13    Now, have you ever filed with either ANSI or the
14    American Society of Agricultural Engineers a proposed
15    comment --
16 A  No.
17 Q  -- to EP 433 that would address the issues that you
18    have discussed with me today as to the limitations
19    under your interpretation of EP 433?
20 A  Not that I can recall. No, I don't believe so.
21 Q  Are you aware of any of your colleagues that may hold a
22    similar view to yours having done that?
23 A  Not that I'm aware of, no.
24 Q  Okay. Let's move then to -- earlier you said you had
25    opinions as to what caused and didn't cause the

Min-U-Script®     Paramount Reporting ~ Audrey M. Barbush, RPR     (13) Pages 49 - 52
605.321.3539 ~ audrey@paramountreporting.com

EXHIBIT E

Page 53

1  accident in question.
2      What caused the accident in question? And I'm not
3  so interested in the opinions that you expressed, and
4  I'm not foreclosing that either, but I just want to
5  know, in lay terms, why did that happen?
6  A  In my opinion, it happened for one of two reasons.
7     Either it happened because of additional pressures
8     exerted on the material and on the hopper section of
9     the silo because of the firing of air cannons or -- and
10    I think perhaps -- I won't say perhaps, I would say, or
11    more likely the failure occurred because of the sudden
12    collapse of an arch or a rathole.
13 Q  Now, in regard to the opinions of the additional
14    pressure on materials on bin walls from the air
15    cannons, have you done any specific calculations of
16    those additional pressures?
17 A  I have not done any specific calculations. But in my
18    report, Exhibit 28, I discuss the pressure that is in
19    the cylindrical portion of each of these air cannons,
20    which according to Mr. Nohr, as I recall, was 140 psi.
21       And as I note in my report, that's at least in
22    order of magnitude, at least a factor of 10 greater
23    than any material-induced pressures, that is,
24    material-induced pressures on the hopper or silo walls.
25       So that's the extent of my analysis.

Page 54

1  Q  And when you say increased by a factor of 10 as to
2     material-induced loads, that would be at the time that
3     the rathole and material in the bin was stable?
4  A  I'm not sure, when you say the rathole and the
5     material --
6  Q  Okay.
7  A  I'm just saying in terms of initial pressures which
8     would be the same as discharge pressures, given it's a
9     funnel flow bin, in looking at Mr. Godoy's calculation
10    from ESI, confirmed with internal calculations done by
11    Dr. Craig or Mr. Wu at my firm, I'm just saying that
12    the magnitude of those pressures of the grain
13    against -- or in this case, the soybean meal against
14    the hopper walls, that that -- those pressures are on
15    the order of 10 percent or less of the pressures of 140
16    psi from an air cannon.
17 Q  Well, how do we calculate the factor of 10?
18 A  Well, again, sir, if -- and I don't have it in front of
19    me, but if we were to look at Mr. Godoy's calculations,
20    he has the pressure that the material exerts. He's
21    calculated the pressure the material exerts against the
22    hopper section.
23       And if you could provide me that report, I could
24    look at those numbers. But I'm just saying that, as I
25    recall, those pressures are less than 15 -- less than

Page 55

1  10 psi, pounds per square inch. So I'm comparing those
2  pressures to the 140 psi that Mr. Nohr reported as
3  being the pressure in the air cannon.
4 Q  Okay. So just to make sure I'm following this
5     correctly is that -- is that before the air cannon
6     would have been fired, the load factors on psi would be
7     in that 10 or 15 percent against the cylinder wall?
8 A  Well, let me -- you know, we're not talking the load
9     factor. We're talking loads. And we're not talking
10    percentages. We're talking psi.
11 Q  Okay.
12 A  I'm just saying that those pressures, as I recall from
13    Mr. Godoy -- and if you could provide me, I could look
14    at that report. But those -- as I recall, those
15    material-induced pressures against the walls of the
16    cylinder and hopper were less than 10 to -- 10 or 15
17    pounds per square inch. And I'm comparing that to the
18    140 psi that Mr. Nohr reported as being the pressure in
19    the air cannon.
20 Q  So let me see if I can rephrase the question correctly.
21    Is that, under the normal loading, there would have
22    been 10 or 15 psi material-induced load against the
23    cylinder wall?
24 A  Cylinder or hopper wall, yes.
25 Q  Or hopper wall.

Page 56

1 A  Yes, sir.
2 Q  Okay. And then with the air cannon, which has 140 psi,
3    is that that's how you get to the 10 times?
4 A  That's correct.
5 Q  Okay.
6 A  And, again, I'm talking order of magnitude here. It
7    could be that the pressures are less than 10 psi. I
8    don't recall offhand.
9 Q  And I'm just trying to understand the process.
10 A  Right.
11 Q  And I understand the numbers may vary depending upon
12    which ones you apply --
13 A  Right.
14 Q  -- and the results. Okay?
15 A  Understood.
16 Q  All right. In your opinion, an increase of pressure on
17    the cylinder walls of 140 psi, would that be sufficient
18    to cause a failure either of the field metal or the
19    seam of a hopper designed pursuant to EP 433?
20 A  It could, yes.
21 Q  Now, can you say that it would to an engineering
22    certainty?
23 A  Well, the issue, sir, is we have a certain pressure --
24    according to Mr. Nohr it's 140 psi -- in the cylinder
25    of the air cannon. Now, there's a quick-acting

Min-U-Script®  
Paramount Reporting ~ Audrey M. Barbush, RPR  
605.321.3539 ~ audrey@paramountreporting.com  
(14) Pages 53 - 56

EXHIBIT E

Page 57

1 solenoid valve that, once it's activated, that pressure
2 is then -- or the air that's in that cylinder is
3 released into the vessel.
4     At the instant it's released, you have essentially
5 140 psi directly around the nozzle of that air cannon.
6 And depending upon the permeability of the material in
7 the vessel, it will determine how that pressure wave
8 then dissipates within the vessel itself.
9     So, again, it's potential. And I've seen
10 instances where air cannons have caused failure of bin
11 and hopper sections. Very often there's some sort of a
12 reinforcement ring around the nozzle to reinforce the
13 walls of the cylinder or the hopper to make sure that
14 that pressure does not cause failure.
15 Q Now, the maximum pressure that could be exerted,
16   though, with a cannon at 140 psi would be if there was
17   no absorption of materials and all of the force was
18   back into the wall would be 140 psi?
19 A Potentially, yes, sir.
20 Q And just like a gun, if you shoot it, the shotgun
21   shell, the material goes clear out there. But if you
22   plug it up, it's going -- it's going to blow up.
23 A Yes, sir.
24 Q Okay. Now, are there any studies that you have that
25   show that the seams, if they were EPA [sic] compliant,

Page 58

1   would have separated or breached on 140 psi?
2 A What do you mean by EPA compliant?
3 Q In other words, if it was compliant with EPA [sic]
4   standards. In other words, the hopper was not. We
5   know that.
6 A If you're referring -- I think there's some confusion,
7   sir.
8 Q Okay.
9 A You're referring to EPA standards. I think you mean
10   EP 433.
11 Q I do. I do. I do that. And I'm talking about EP 433.
12   Sorry on that. It's getting late.
13     But if we go back to that, if we have an
14   EP-433-compliant hopper design, is there anything in
15   the literature out there that would show me that a 140
16   psi cannon would cause the seam to breach?
17 A Well, again, some corrections here. EP 433 only deals
18   with pressures of material against walls. It doesn't
19   have anything to do with the ability of the wall itself
20   or the bolted joint to resist those loads. That would
21   get into AISC or AISI calculations. So...
22 Q Yeah. And the ASI [sic] is probably what I need to
23   refer to that. Is that --
24 A That would be more appropriate.
25 Q Is that the ASI [sic] calculations for steel seams, is

Page 59

1   that if it's compliant with that standard, is there any
2   evidence out there that 140 psi of pressure will cause
3   that seam to breach?
4 A I'm not aware of anything that specifically addresses
5   that, but, again, AISI, AISC both deal with the ability
6   of -- among other things, the ability of a bolted
7   connection to resist hoop stress or pressure that's
8   acting perpendicular to that bolted seam.
9     And so given the fact that whatever pressure that
10   the -- that is exerted against the walls of a
11   cylindrical or hopper section of a storage vessel,
12   those pressures acting normal or perpendicular to the
13   wall are going to generate hoop stresses, and those
14   stresses then are going to act perpendicular to that --
15   to that bolted seam.
16     If the pressures indeed are 140 psi, which as I
17   said may or may not occur, but if they were to occur,
18   it would stand to reason, then, that that seam would
19   fail.
20 Q Okay. Now, that last portion, stand to reason, is that
21   I'd like to have the engineering basis for why a 140
22   psi force from a cannon would separate the seam.
23 A Okay. We're talking now of a potential failure
24   situation. I'm not saying it would necessarily occur.
25   Indeed, there are many, many vessels that use air

Page 60

1   cannons where this doesn't -- this does not occur.
2   It's more common in weaker storage structures such as
3   we're dealing with here, that is, bolted steel
4   structures as opposed to welded structures. And the
5   vast majority of applications of air cannons involve
6   some sort of a reinforcement plate near the nozzle to
7   strengthen that connection so that there isn't a
8   failure.
9     What I'm simply saying is, pressures that act
10   normal or perpendicular to a hopper wall, whether they
11   be pressures from material or pressures from an air
12   cannon, that those pressures generate hoop stresses,
13   and once the hoop stress reaches the limit of the
14   ability of a bolted seam to resist those hoop stresses,
15   the seam is going to fail.
16 Q Okay. And I understand the theory. What I'm looking
17   for is the documentation. I'm looking for
18   documentation that 140 psi from an air cannon would
19   cause a bolted seam in the hopper to separate.
20 A I'm not aware of any documentation, but, again, it
21   stands to reason that if you follow the calculations in
22   AISC or AI -- AISI, that if you have sufficient hoop
23   tension on a bolted joint in a hopper, it's going to
24   fail. There's a limit to what it can withstand, and
25   once you exceed that limit, it's going to fail.

Min-U-Script®    Paramount Reporting ~ Audrey M. Barbush, RPR    (15) Pages 57 - 60
605.321.3539 ~ audrey@paramountreporting.com

EXHIBIT E

Page 61

1  Q  And I understand there's going to be a limit to it. My
2     question still goes back and my inquiry goes back to is
3     that how do we know that 140 psi force on the hoop
4     stress would have been sufficient to cause a seam
5     failure?
6  A  Well, again, terminology. 100 ps -- '40 psi is not a
7     force and the 140 psi is not acting -- it's acting
8     normal or perpendicular to the wall. As a result of
9     that pressure, there is hoop stress, additional hoop
10    stress applied in the hopper. And all I'm saying is
11    that, in a joint, whether it be a bolted joint or a
12    welded joint or simply a piece of metal, it has a
13    certain limit. It reaches yield. At that point it
14    starts to deform. It can reach ultimate, in which case
15    it fails. There is a limit to what that value is. And
16    if -- if one were to increase that pressure sufficient,
17    that is, the pressure internally, to create additional
18    hoop stress, eventually you're going to reach a point
19    of failure.
20 Q  Now, earlier you said that it could, and so I want to
21    pursue that in terms of a possibility versus a
22    reasonable engineering probability.
23       Is it your opinion to a reasonable engineering
24    probability that the air cannon firing at 140 psi
25    caused the seam in the hopper to breach?

Page 62

1  A  I believe that's less probable than the second
2     mechanism that I described earlier. It's possible but
3     not probable.
4  Q  So it's not likely; is that fair?
5  A  Yes.
6  Q  And then the more likely cause of what happened here is
7     a collapse of either an arch or the rathole?
8  A  Yes, sir.
9  Q  And those forces then caused it to collapse, correct?
10 A  In my opinion, that was the most probable cause of
11    failure, yes.
12 Q  Okay. Now, I want to just talk with you a little bit
13    about hoop stresses in the hopper.
14 A  Okay.
15 Q  Okay. If we have a loaded hopper like we have in this
16    case is that the hoop stress at the outlet or the
17    bottom of the hopper is going to be lesser than the
18    hoop stress at the top of the hopper at the collar.
19    Would that be correct?
20 A  In general, that's correct, yes.
21 Q  And the reason why the hoop stress is less at the
22    bottom than it is at the top is simply a mathematical
23    formula in terms of the area surface or circumference
24    in those areas?
25 A  That's -- that's part of it. It also has to do with

Page 63

1     what's the magnitude of the pressure that's acting
2     normal to the hopper wall.
3  Q  But just in lay terms, if I'm understanding it, the
4     hoop stresses at the bottom where they have the
5     discharge are going to be substantially less than the
6     hoop pressures we're going to have at the top of the
7     hopper?
8  A  In general, that statement is true.
9  Q  Okay.
10 A  There are exceptions. But, in general, that's true.
11 Q  Is there any exceptions in this case to that?
12 A  I assume we're talking now just gravity-induced,
13    material-induced loads, nothing to do with collapsing
14    arches or ratholes; is that correct?
15 Q  Well, I want to get to that a little bit later. But
16    right now I'm just trying to understand, you know, that
17    hoop stresses generally are lesser at the bottom and
18    more at the top of the hopper. And I think we agreed
19    generally that was. There might be some exception,
20    correct?
21 A  Yes, sir.
22 Q  And my question is what exceptions might there be?
23 A  The hoop stress calculation depends upon the amount
24    of -- in the case of a hopper storing a bulk solid, the
25    hoop stress depends on the pressure that's acting

Page 64

1     normal or perpendicular to that wall surface, the
2     thickness of the metal, and the -- in the case of a
3     conical hopper, the diameter of the hopper at that
4     point in question.
5        The -- so let's take each of those in turn. As
6     far as the normal pressure is concerned, pressure
7     acting normal to the hopper surface, the change of
8     normal pressure as one moves from the top of the hopper
9     to the bottom depends on the hopper angle. It depends
10    on the friction, the coefficient of sliding friction
11    between the bulk solid and the wall material. It
12    depends on a parameter. It usually is the initial K,
13    the letter K is used. But it's the ratio of the
14    pressure normal to the wall divided by the pressure
15    that's acting vertically downward.
16       So in most instances, unless you have a very low
17    coefficient of sliding friction between the bulk solid
18    and the wall, the pressure that acts normal to the wall
19    is going to decrease from the top to the bottom, both
20    in terms of initial pressures and, if you had a mass
21    flow bin, in terms of flow pressures.
22       The second factor, of course, is the thickness.
23    Very often hoppers are the same thickness top to
24    bottom. So if that is the case, then that doesn't come
25    into account.

Min-U-Script®   Paramount Reporting ~ Audrey M. Barbush, RPR   (16) Pages 61 - 64
605.321.3539 ~ audrey@paramountreporting.com

EXHIBIT E

Page 65

1   And the third factor, then, would be the diameter,
2   which is in the denominator. So as the -- I'm sorry.
3   It's in the numerator. So as the diameter decreases,
4   the pressure decreases. So in general, you have --
5   unless you have an extremely low coefficient of sliding
6   friction or some reason why the K value is changing,
7   you would get lower pressures acting in the lower
8   portion of the hopper than in the upper portion.
9 Q Well, I noted I think in Exhibit 29, on 5, your first
10  sentence there. "As I noted in my previous report, the
11  hoop stresses generated by gravity-induced pressure
12  acting on the hopper walls were considerably smaller in
13  the lower portion of the hopper than higher up."
14      Did I read that correctly?
15 A Yes, sir.
16 Q And at that point, then, you're saying that with
17  gravity-induced pressures is that there's going to be
18  lower hoop stress at the bottom of the hopper than
19  there is at the top?
20 A In this particular instance, yes.
21 Q Okay. Now, I want to talk to you about, when you talk
22  about gravity-induced, what does that mean?
23 A It means the pressure that the material exerts against
24  the walls of a storage vessel, the cylinder, and the
25  hopper portion simply as the result of gravity acting

Page 66

1   on the material. It excludes any effects of air
2   cannons, vibrators, collapsing arches, collapsing
3   ratholes or whatever. Simply it's there because
4   gravity acts on the material.
5 Q Now, would I be correct, though, that when a rathole or
6   arch collapses is that that's still collapsing because
7   of gravity?
8 A Well, it is, that's correct. Gravity is always
9   present, but it's a different phenomena than what I'm
10  talking about here.
11 Q And that's what I'm trying to --
12 A Right.
13 Q -- to put in context here, because I understand you're
14  talking more about the, what I would term more static
15  loading or consistent decreased pressures as you go
16  through the process of discharging a full hopper?
17 A Yes, sir.
18 Q And so when we're talking about gravity-induced, that's
19  kind of what you're referring to?
20 A Yes, sir.
21 Q And then you're not talking about the gravity force
22  when there's a collapse on a rathole or a bridge?
23 A That's correct.
24 Q Okay. I want to talk to you a little more about the
25  video, and that's going to be Exhibit 29.

Page 67

1 A Yes.
2 Q I think that's the -- Exhibit 29 is a supplement that
3   you reported on after seeing the video, correct?
4 A Yes.
5 Q And am I correct that your interpretation of what
6   happened is from your observations that you personally
7   have made in viewing the sequencing scenes from the
8   videotape?
9 A That's correct.
10 Q And we're not talking about an engineering opinion or
11  any engineering part that went into that; that's purely
12  an observation that you're making?
13 A Yes. I'm drawing engineering conclusions from those
14  observations.
15 Q Right. And I understand your conclusion. I mean, I've
16  gone through it and have taken a look at it.
17      Then in terms of where you're looking at on this
18  video, you're looking at about 20 panels, correct?
19 A I don't know the number of panels that I'm looking at.
20  The video is what it is. I don't recall the number.
21 Q Okay.
22 A But there's a number of panels, yes.
23 Q Correct. And the video's only going to show one side,
24  correct?
25 A That's correct, yes.

Page 68

1 Q And we have no evidence of what occurred on the other
2   side of the hopper, correct?
3 A I wouldn't say necessarily. Again, we're only looking
4   at one side. But if something were happening on the
5   opposite side, particularly the release of a puff of
6   dust or particles, that would -- that would be visible
7   as well -- or could be visible.
8 Q Okay. But let's break this down. From the videotape
9   analysis we're only looking at one side, correct?
10 A Yes.
11 Q And from the videotape analysis we can't see or
12  determine what was going on on the opposite side?
13 A We can't see directly, that's true. We can only see
14  after the fact if something happened on the other side.
15 Q And is there anything after the fact that would -- that
16  you're using, that you haven't expressed in 29, that
17  would support the opinion that the failure occurred in
18  the lower portion of the bin?
19 A Say that again, sir.
20 Q Okay. Is there any other data other than the videotape
21  that you're using to form the opinion that the breach
22  of the hopper occurred in the lower portion of the
23  hopper?
24 A Yes.
25 Q What's that?

Min-U-Script®   Paramount Reporting ~ Audrey M. Barbush, RPR   (17) Pages 65 - 68  
605.321.3539 ~ audrey@paramountreporting.com

EXHIBIT E

Page 69

1  A  Mr. Nohr's report.
2  Q  And what about Mr. Nohr's report are you referring to
3     then?
4  A  Where he stated that the failure initiated at the
5     bottom of the hopper.
6  Q  Okay. I understand that's his opinion, but have you
7     used any documentation that he has as to that
8     opinion --
9  A  No, I just have --
10 Q  -- as to how he got there?
11 A  No, I just have his report.
12 Q  So you're just taking his report, this is what he says?
13 A  That's in addition to my own viewing of the video,
14    correct.
15 Q  Okay. So in forming your opinions that are expressed
16    in Exhibit 29, you've looked at the video and you
17    looked at Mr. Nohr's report?
18 A  That's correct.
19 Q  And that would be the sum total of what you reviewed
20    then --
21 A  Yes.
22 Q  -- correct?
23 A  Yes.
24 Q  Have you made any determination as to the location or
25    side -- size of a void created by a rathole or arching?

Page 70

1  A  No.
2  Q  Have you made any determination as to whether the
3     material inside was a collapse of a rathole or a
4     collapse of an arch?
5  A  No, I haven't differentiated between the two.
6  Q  Now, you're not critical of Sioux Steel in securing an
7     outside firm to review the structural integrity of
8     their hopper designs, are you?
9  A  No.
10 Q  That would be an appropriate thing to do?
11 A  Yes.
12 Q  You said earlier that you determined what did cause the
13    failure, and I think we discussed that it probably was
14    a rathole or an arch collapse, correct?
15 A  In that it's the most probable cause of the failure, in
16    my opinion.
17 Q  Okay. And then I think you said you've also determined
18    what did not cause?
19 A  Yes.
20 Q  Now, what did not cause this failure, in your opinion?
21 A  Can I refer to my report just to make sure --
22 Q  Certainly.
23 A  -- I don't miss something?
24    (Examines document.)
25    I think this is most directly stated by my opinion

Page 71

1  11 on page 11, which reads, quote, the silo did not
2  fail because of material-induced loads resulting from
3  gravity alone, closed quotes.
4  Q  Let me just catch up with you. All right. Okay. I'm
5     there.
6     Okay. We're at 11. That's page 11?
7  A  Yes, sir.
8  Q  And their silo did not fail because of material-induced
9     loads resulting from gravity alone?
10 A  Yes.
11 Q  Okay. And then point out the quote that you just read
12    for me, if you would, please.
13 A  The quote that I just --
14 Q  Yeah, maybe I misunderstood. I thought you read --
15 A  I read the title of No. 11 which --
16 Q  Gotcha. Okay.
17 A  -- you just -- which you just read back to me.
18 Q  And so -- and we talked about this earlier, though.
19    When you're talking about gravity-induced loads, is
20    that you're not talking about the dynamic impact of a
21    collapse of a rathole or an arch, correct?
22 A  That is correct.
23 Q  Okay. I want to just discuss a couple things in your
24    opinion on Exhibit 28. And let's go to No. 6, if you
25    would, on page 7.

Page 72

1  A  Okay.
2  Q  And the last sentence there, it says, By omitting such
3     a statement, one could assume that this was an
4     oversight of KC's part. However, as explained below in
5     opinion 13, even if this joint had been strengthened to
6     meet code requirements, it would still have failed.
7     Is that your opinion?
8  A  Yes, sir.
9  Q  Okay. Will you tell me how you arrived at the
10    conclusion that if the seam had met code requirements
11    it would still have failed?
12 A  As Mr. Godoy noted in his report, the seam -- the
13    bolted seam at the top of the hopper was overstressed
14    in relation to the design code, but it was not stressed
15    to the point where failure would be predicted.
16    Second, the magnitude of loads and pressures that
17    would result from the collapse of an arch or a rathole
18    are so large compared to what I'm calling
19    material-induced loads by gravity alone, that slightly
20    increasing the strength of a connection perhaps by a
21    factor of two or so to meet code requirement for
22    allowable loads would not have been able to resist
23    that.
24    And third, and perhaps most importantly, is the
25    fact that, in my review of the video and in the view of

Min-U-Script®   Paramount Reporting ~ Audrey M. Barbush, RPR   (18) Pages 69 - 72
605.321.3539 ~ audrey@paramountreporting.com

EXHIBIT E

Page 73

1  Mr. Nohr, the failure occurred not at the region where
2  the bolted joint was below code, namely at the top of
3  the hopper, but instead the failure occurred near the
4  bottom of the hopper where that bolted joint was far
5  less loaded and certainly well designed to withstand
6  gravity-induced loads. And, therefore, a collapse of a
7  rathole was what caused the failure.
8      So it's a long about way of saying that if
9  KC Engineering had looked at that radial joint at the
10 top of the hopper and made a recommend -- or found that
11 it was not up to code limit and it should have been
12 made stronger, that would have -- that if that change
13 had been made, that would not, in my opinion, have
14 prevented this failure.
15 Q Okay. And I want to just kind of go through these.
16   The ESI report, Mr. -- I never pronounce his name
17   correctly -- that was his observation?
18 A I'm sorry. What was his observation?
19 Q The ESI, Mr. Godall or Godow?
20 A I don't know the gentleman, so I -- but it's G-o-d-o-y.
21   I think it's Godoy, but I don't know.
22 Q Okay. I don't either, so -- and I don't know him.
23   But, anyway, is that he's saying that the top was
24   stressed. And that's where you then have incorporated,
25   in your opinion, that the top of the seam was stressed

Page 74

1  at the hopper?
2 A What Mr. Godoy noted was that the radial seam, the
3  bolted radial seam near the top of the hopper was
4  stressed greater than the allowable, which includes a
5  factor of safety.
6    But, again, allowable includes a factor of safety.
7  He found that if you take that factor of safety away,
8  that the amount of stress would not have predicted
9  failure of the -- of that seam. And I agree with that
10 analysis.
11 Q Is there any way for us to determine the observations
12   that Mr. Godoy made, whether that stress occurred
13   before or during the failure process?
14 A Again, I don't think Mr. Godoy made any observations.
15   He did calculations. And those calculations were based
16   on the assumption that the -- what I'm calling the
17   material-induced loads by gravity alone, ignoring
18   ratholing and ignoring collapse of a rathole or
19   collapse of an arch, that those calculations resulted
20   in what I just testified.
21 Q So the material-induced loads are the ones that caused
22   stress to the top of the hopper seam?
23 A Absolutely. Sure. That always happens. There's
24   nothing unique about that in this instance.
25 Q And we're talking about stress and we're talking about

Page 75

1  some deformation or deforming of the metal?
2 A Stress does not imply deformation, no.
3 Q Okay. Well, I'm struggling to understand the
4  observation or what you're incorporating from this
5  other report. And maybe it's just my lack of being
6  able to grasp some of it.
7    Tell me again what you're adopting from Mr. Godoy.
8  Are you adopting what he observed or his calculations?
9 A The latter.
10 Q Okay. And his calculations are relating to what?
11 A His calculations relate to what were the pressures that
12   the material, the soybean meal, exerted on the walls of
13   the hopper, both at the top and the bottom and
14   throughout from top to bottom, and what that -- what
15   those pressures then resulted in differing amounts of
16   hoop stress, and then he looked at the ability of the
17   bolted radial seams to resist that hoop stress. And
18   what he found is that that amount of hoop stress at
19   near the top of the hopper was greater than the
20   allowable hoop stress for that particular bolted joint,
21   but it was not great enough to predict or cause failure
22   of that radial seam.
23 Q Did Mr. Godoy make an opinion as to where the breach
24   occurred?
25 A As I recall -- and if you provide me his opinion, I --

Page 76

1  I could point it out directly. But my recollection is
2  that he concluded that the failure started at the top
3  of the hopper section, and the way he arrived at that
4  conclusion was by improperly, in my opinion, mixing and
5  matching different codes and different calculations to
6  result in a condition that would predict failure.
7    But, again, that was not only an improper mixing
8  and matching of different calculation methods but also
9  is inconsistent with the video and Mr. Nohr's report.
10 Q Okay. And then the magnitude of the collapse of either
11   the rathole or the arch is the second factor?
12 A Yes.
13 Q And the third factor is the video and Mr. Nohr's
14   report?
15 A Yes.
16 Q Okay. Have I covered all those?
17 A I believe so, yes.
18 Q Okay.
19 A If I can just add to that, I think my opinion 13,
20   beginning on page 12, goes into it in more detail. And
21   I have several other reasons why it failed and why it
22   didn't fail. And those are all listed bullet -- by
23   bullet point on pages 12 and 13.
24 Q Okay. I want to try to see if I can just follow up
25   here and get some of this so we can get to conclusion.

Min-U-Script®   Paramount Reporting ~ Audrey M. Barbush, RPR   (19) Pages 73 - 76
605.321.3539 ~ audrey@paramountreporting.com

EXHIBIT E

Page 77

1    By way of follow up, Exhibit 30 would have been
2    the first contact that your company had with Sioux
3    Steel; is that correct?
4  A Yes.
5  Q And looking at Exhibit 30, your engineer advised that
6    the loading for your company was much higher compared
7    to what Sioux Steel calculated; is that correct?
8  A That's what it states, yes.
9  Q And Sioux Steel was coming to you asking you to do a
10   structural analysis on their hopper bins, correct?
11 A Yes.
12 Q Was there ever a letter sent by your company explaining
13   why its calculations of loads were higher than what was
14   calculated by Sioux Steel?
15 A Not that I'm aware of, and there's nothing that I'm
16   aware of that's been produced by Sioux Steel to
17   indicate that they -- the fact that they -- they don't
18   even recognize or note the fact that they had the
19   contact. Mr. Kramer's weekly notes doesn't even
20   mention this contact.
21 Q Well, but we know that there was contact because of the
22   fact that you found it in your files, correct?
23 A That's correct. I'm just saying, from their
24   standpoint, there was -- there was no mention of it.
25 Q And I'm looking from your standpoint is that you're an

Page 78

1    engineering company, you have received plans, your
2    engineer has taken a look at it, they've talked with
3    Sioux Steel, correct?
4  A Yes.
5  Q Correct?
6  A They have taken --
7  Q That's correct?
8  A They've taken a cursory look. There was no job here.
9    There was no payment for any services. It was simply a
10   cursory look at -- apparently a cursory look at the
11   drawings and then a phone conversation.
12 Q And --
13 A And that was the extent of it.
14 Q And you were reviewing it to obtain a client in order
15   to perform services on structural engineering, correct?
16 A That's correct.
17 Q And your company came to the conclusion, through your
18   engineer, that your loading would be much higher
19   compared to what Sioux Steel calculated in the plans
20   that they submitted; is that fair?
21 A That's correct.
22 Q And having received this, though, understanding then
23   that, from your perspective of your company, the plans
24   were deficient, did your company ever send a letter
25   back to Sioux Steel saying, these are the issues you

Page 79

1    need to take a look at with EP 433?
2  A Not that I'm aware of.
3  Q Now, had you been there and had you addressed EP 433
4    with Mr. Kramer, you would have told him similar things
5    that you have set out in Exhibits 28 and 29, correct?
6  A Very likely I would have.
7  Q And what we've discussed today?
8  A Very likely I would have. Again, you can only push
9    things so far. If a client -- a potential client is
10   set in their ways and doesn't want to talk about it,
11   you can only go so far in trying to convince them that
12   they're wrong.
13 Q Isn't there a duty on the part of an engineering firm
14   that if the client's plans are not adequate, to advise
15   them of that?
16 A And I believe that was done here.
17 Q It doesn't say anything here where Sioux Steel was
18   advised that the loading is much higher compared to
19   what G&J [sic] would have had; it simply is an internal
20   memo, correct?
21 A It's a -- this is an internal note of a phone
22   discussion between our Mr. Petro and Mr. Kramer of
23   Sioux Steel.
24 Q And Mr. Petro is not with us anymore, so we can't talk
25   to him about what was said, correct?

Page 80

1  A Unfortunately, that's the case, yes.
2  Q When you incorporated and referred to Exhibit 30 in
3    your report, did you have consent from Sioux Steel?
4  A No.
5  Q Did you attempt to get consent from Sioux Steel?
6  A No.
7  Q Do you understand that your use of the information in
8    Exhibit 30 and the contact that Sioux Steel had with
9    you is now being used adversely by your firm and by you
10   against Sioux Steel?
11 A I don't understand that at all.
12 Q Would you go to Exhibit No. 28 and look at page 12,
13   item 12.
14 A Okay.
15 Q And item 12 says that Sioux Steel Corporation's
16   Mr. Kramer was aware that higher material-induced loads
17   should have been used to design the hopper section?
18 A Yes.
19 Q Is that correct?
20 A Yes.
21 Q And you are imputing that knowledge that Mr. Kramer had
22   based on Exhibit 30, correct?
23 A That is correct.
24 Q And so you're using Exhibit 30 adversely against Sioux
25   Steel, your potential client, and in favor of KC, your

Min-U-Script®    Paramount Reporting ~ Audrey M. Barbush, RPR    (20) Pages 77 - 80
605.321.3539 ~ audrey@paramountreporting.com

EXHIBIT E

Page 81

1    present client, to come to the conclusion of what  
2    Mr. Kramer was aware of, correct?  
3  A  I don't see it adverse at all, sir. It's --  
4  Q  Pardon?  
5  A  -- simply a fact.  
6       I don't see it adverse at all, sir. I see it  
7    simply as a factual statement.  
8  Q  So you're a fact witness in this case as well as an  
9    expert?  
10 A  As relates to opinion 12, I'm essentially a fact  
11   witness, that's correct.  
12 Q  And we have no basis to conclude on Exhibit 30 that  
13   Mr. Petro, the author of that exhibit, ever told  
14   Mr. Kramer that there needed to be higher  
15   material-induced loads used?  
16 A  All we have is what's here. So it states -- the words  
17   are the words that are there. I can't go beyond what's  
18   there to --  
19 Q  Well, you have gone beyond that because you've imputed  
20   that Mr. Kramer knew that. In order for Mr. Kramer to  
21   know that, Mr. Petro would have had to explain to him  
22   that the loads of J.C. [sic] are much higher compared  
23   to Sioux Steel, correct?  
24 A  The loads that J.C.? Who is J.C.?  
25 Q  That our loading is much higher compared to that that  

Page 82

1    Sioux Steel calculated.  
2  A  ==Yes, I -- knowing Mr. Petro as long as I did, he==  
3    ==wouldn't write something like this unless he had told==  
4    ==this to a potential client.==  
5  Q  ==So now you're projecting what he did or didn't do on==  
6    ==his behavior?==  
7  A  ==I am, based on my working with him for some 20 years.==  
8    ==He wouldn't write something like this unless he told==  
9    ==the client. If there's a potential job here, he would==  
10   ==have --==  
11 Q  Okay. And now --  
12 A  -- he would have written a proposal, and he didn't do  
13   so. In fact, he wrote here that there's no job here,  
14   so therefore there was no need to write a proposal.  
15 Q  So the information that you're now using, then, is that  
16   Sioux Steel knew there should have been higher  
17   material-induced loads --  
18 A  That's correct.  
19 Q  -- comes from the contact that Sioux Steel had with  
20   your company, correct?  
21 A  Yes.  
22 Q  And you're now using that conduct and what you think  
23   that Mr. Petro may have done adversely to Sioux Steel?  
24 A  I wouldn't say might have done. I think most probably  
25   did do, yes.  

Page 83

1  Q  Okay. So what he most probably did do is adversely to  
2    Sioux Steel?  
3  A  Again, sir, this -- I don't see it's adverse or not  
4    adverse. This is a factual statement.  
5  Q  Well, there's no factual statement that we have that's  
6    in writing that shows that Sioux Steel was aware that  
7    higher load -- higher material-load induced  
8    calculations were necessary.  
9  A  All we have is Exhibit 30. As I --  
10 Q  And that doesn't say that, does it?  
11 A  It doesn't say those specific words, that is correct.  
12 Q  Thank you.  
13      MR. GOODSELL: I think I'm about done, Counsel.  
14   Can I take a break for about five minutes, and we'll  
15   finish up and get everybody out of here, okay?  
16      THE VIDEOGRAPHER: The time is 10:49. We are off  
17   the record.  
18      (Recess taken from 10:49 a.m. to 11:06 a.m.)  
19      THE VIDEOGRAPHER: We are back on the record. The  
20   time is 11:06.  
21      MR. GOODSELL: Mr. Carson, I want to thank you for  
22   coming here and chatting with me today, helping me  
23   understand a little bit better about some of the  
24   processes and how you got to some of your conclusions.  
25   I don't have any more questions.  

Page 84

1       THE WITNESS: Thank you, sir.  
2       MR. TOBIN: Thank you. And we will read and sign.  
3       THE VIDEOGRAPHER: Ready to go off the record?  
4    The time is 11:06. This concludes the video  
5    deposition of John Carson. We are off the record.  

Min-U-Script®   Paramount Reporting ~ Audrey M. Barbush, RPR   (21) Pages 81 - 84  
605.321.3539 ~ audrey@paramountreporting.com

EXHIBIT E