UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

| | | |
|---|---|---|
| SIOUX STEEL COMPANY, a South Dakota corporation, | ) ) ) | CIV. 15-4136 |
| Plaintiff, | ) ) ) | |
| vs. | ) ) ) | **PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT** |
| KC ENGINEERING, P.C., an Iowa corporation, | ) ) ) | |
| Defendant. | ) | |

COMES NOW the Plaintiff, Sioux Steel Company ("SSC") by and through their counsel of record, Goodsell Quinn, LLP, and submit *Plaintiff's Response to Defendant's Statement of Undisputed Material Facts in Support of [Defendant's] Motion for Summary Judgment*.

Generally, SSC objects to the allegations in the Defendant's Statements because they are neither material, nor relevant to the issues before the court.

### RESPONSE TO DEFENDANT'S STATEMENT OF UNDISPUTED MATERIAL FACTS

1. Sioux Steel Company ("Sioux Steel") manufactures and sells hopper silos for handling and storing grain commodities. (Doc. 17 ("Amended Complaint"), ¶ 5).

    **Response:** Admit.

2. Sioux Steel manufactured and sold a 30' Diameter Hopper Cone Assembly and silo bin ("the Hopper Bin") to Agropecuaria El Avion ("Agropecuaria"), which was installed at a Agropecuaria plant in Tepic, Mexico. (Amended Complaint, ¶ 12).

    **Response:** Admit.

3. The Hopper Bin failed, resulting in the destruction of the bin and fatal injuries to two Agropecuaria employees. (Amended Complaint, ¶ 13-14).

1

**Response:** Admit.

4. The structural failure of the Hopper Bin occurred when its seams separated and catastrophically discharged the contents of the silo. (Amended Complaint, ¶ 17).

**Response:** Admit.

5. Agropecuaria sought damages from Sioux Steel, which subsequently resulted in a settlement agreement between the two parties. (Tobin Aff. at Ex. E; Amended Complaint, ¶ 26).

**Response:** Admit.

6. The terms of the Settlement Agreement held that Agropecuaria released Sioux Steel, and all other potential "joint tortfeasors," from all liability related to the collapse of the Hopper Bin. (Tobin Aff. at Ex. E).

> **Response:** Admit, but qualify that this statement is unrelated and immaterial to this case because *SSC* never released Defendant for its negligent design review, and Defendant can point to no evidence that it did. (Amended Complaint, ¶ 20-31). As stated by the Defendant, *Agropecuaria* released the joint tortfeasors from liability *to Agropecuaria,* not among themselves. *Agropecuaria* cannot release SSC's claim against Defendant.

7. Sioux Steel filed this lawsuit against KC Engineering, alleging that KC Engineering was negligent in failing to catch a mistake originally in Sioux Steel's design of the Hopper Bin, a mistake initially made by a Sioux Steel engineer who used a wrong formula. (Amended Complaint, ¶ 20-24).

**Response:** Admit.

8. Chad Kramer ("Kramer") is an engineer for Sioux Steel and designed the Hopper Bin that failed. (Deposition of Kramer ("Kramer Depo."), 9).

**Response:** Admit.

9. At the time of its design, the Hopper Bin was an entirely new sort of bin for Sioux Steel meant to expand its product line to compete with others in the industry who manufactured hoppers. (Kramer Depo., 9-10, 29-30).

**Response:** Admit.

10. As part of the Hopper Bin's design plans, Kramer calculated the various loads, forces, and stresses that would be applied on both the vertical and horizontal seams. (Kramer Depo., 17-18).

**Response:** Admit.

11. Kramer also calculated the utilization ratio for the seams, which informs how much of the allowable capacity is utilized. (Kramer Depo., 21).

**Response:** Admit.

12. According to the utilization ratios calculated by Kramer for the Hopper Bin, multiple vertical seams of the Hopper Bin were over-stressed. (Kramer Depo., 22).

**Response:** Admit that the design submitted to Defendant included vertical seams which were overstressed. However, *but for* the Defendant's failure to conduct a competent, professional design review, the error would have been caught and fixed. (Affidavit of G. Verne Goodsell ("Goodsell Aff."), Exhibit ("Ex.") J, Report of Mark Duckett ("Duckett Report"), October 5, 2016, pg. 6; Ex. E, Deposition of Chad Kramer ("Kramer Depo."), at 88).

13. No other engineers at Sioux Steel, other than Kramer, reviewed or oversaw Kramer's design of the Hopper Bin. (Kramer Depo., 9, 26).

**Response:** Admit.

14. Where the utilization ratio is above one, there is a problem, which was the case at the 28-foot and the 15-foot diameter of the Hopper Bin. (Kramer Depo., 22, 23).

**Response:** Admit.

15. Kramer did not know or appreciate these problematic ratios until the Hopper Bin had failed. (Kramer Depo., 23).

> **Response:** Deny. Kramer was unaware that the vertical seams were over-stressed, but appreciated the importance of having safe and correct ratios, which is why Mr. Kramer paid Defendant $5,000 to ensure the designs' safety. (Goodsell Aff., Ex. E, Kramer Depo., 23, 62, 87).

16. Due to the errors relating to the utilization ratios, the Hopper Bin should never have been sent out. (Kramer Depo., 24).

> **Response:** Admit.

17. The problematic utilization ratios were due to a math error and/or mistake by Kramer. (Kramer Depo., 24).

> **Response:** Admit.

18. The mistake occurred because Kramer had utilized the wrong formula for calculating the utilization ratios. (Kramer Depo., 92-93).

> **Response:** Admit.

19. Kramer's mathematical errors led to the collapse of the Hopper Bin. (Kramer Depo., 83-84).

> **Response:** Deny. The collapse occurred because of Defendant's negligent design review. Had Defendant conducted a competent, professional engineering analysis, SSC's mathematical errors would not have caused the Hopper Bin collapse. In other words, "but for" Defendant's negligence, the collapse does not occur. (Goodsell Aff., Ex. E, Kramer Depo., 87-88).

20. Due to the failure of the Hopper Bin in Mexico, Sioux Steel made changes to account for the problematic utilization ratios, specifically modifying the hopper panels, changing the bolt spacing, and increasing the edge distances from the edge of the material to the edge of the bolts. (Kramer Depo., 24).

> **Response:** Admit.

21. Sioux Steel did not have these subsequent changes to the Hopper Bin reviewed or vetted by any outside company. (Kramer Depo., 79).

> **Response:** Admit, but qualify that the statement is misleading. The total design was reviewed by Defendant, an outside company. Once it was discovered that Defendant had performed negligently in its design review, SSC moved diligently to correct the error to protect the public. SSC was able to use Defendant's design review, to determine how to correct the vertical seams quickly and safely. (Goodsell Aff., Ex. E, Kramer Depo., 81-82).

22. Prior to the manufacture and sale of the Hopper Bin, Sioux Steel retained KC Engineering to perform a structural engineering analysis and design review of two hopper cones that Sioux Steel had designed and proposed to be used with its eighteen and thirty-foot diameter grain bins. (Kramer Depo., 27-28; Tobin Aff. at Ex. D).

> **Response:** Admit.

23. As part of that engineering analysis and design review, KC Engineering first ran Sioux Steel's design through a software program. (Kramer Depo., 34-35).

> **Response:** Admit.

24. The purpose of this analysis and review was to determine some general forces and tensions within the silo and cone but said analysis did not speak to the adequacy of the vertical seams, nor was it meant to. (Kramer Depo., 34-35, 46; Tobin Aff. at Ex. D).

> **Response:** Deny. Admit the analysis did not speak to the adequacy of the vertical seams. However, specifically deny "nor was it meant to" as false. SSC believed that the analysis "was meant to" speak to the adequacy of the vertical seams, as a part of the review and analysis as a whole. (Goodsell Aff., Ex. E, Kramer Depo., 47-48). At no time did Defendant express that its design review would not include calculations reviews of the vertical seams. (Goodsell Aff., Ex. K, O'Mara Depo., 48-49). Nor were "spot checks" of the calculations ever discussed with or agreed to by SSC. *Id.* Because of this, SSC understood that, per the engagement letter, all calculations would be reviewed -- not that only certain "spot checks" of calculations would be reviewed.

25. KC Engineering was also to review drawings and calculations provided by Sioux Steel. (Kramer Depo., 33; Tobin Aff. at Ex. D; Jason O'Mara Deposition ("O'Mara Depo."), 29).

**Response:** Admit.

26. Sioux Steel did not provide its calculations to Sioux Steel, even though KC Engineering had asked from them in their proposal. (Kramer Depo., 34-35, 38, 41; Tobin Aff. at Ex. D; O'Mara Depo., 29).

> **Response:** Admit that the calculations were not provided to Defendant, but deny that Defendant ever asked for them. The retention letter speaks for itself. (Goodsell Aff., Ex. B, Retention Letter Dated July 30, 2012). In fact, Jason O'Mara admits that he never asked Mr. Kramer for his calculations. (Goodsell Aff., Ex. K, O'Mara Depo., 28-29). Mr. Kramer had no way to know that Defendant was limiting its review to "spot checks" of calculations because Defendant never expressed this to SSC. (*Id.*).

27. Calculations were necessary in order to know whether what's shown on the drawing is adequate or not and that the drawings cannot be reviewed for adequacy without doing calculations. (O'Mara Depo., 60).

> **Response:** Denied in part. Nowhere in the report does it specifically state that the vertical seam bolt spacing was <u>not</u> checked. (Goodsell Aff., Ex. C, KC Report, pg. 1-2). To the contrary, the report actually states that hand calculations were completed. *Id.* If calculations were in fact necessary for KC to fulfill their duty, KC should have requested the calculations from SSC when they were not able to complete their task. Instead, KC chose to "spot-check" certain areas, which it claimed was "outside the scope" of their task, and to not do a complete analytical review. (Goodsell Aff., Ex. K, O'Mara Depo., 49-50). The alleged limitation placed on KC's design review was never expressed to SSC. (Goodsell Aff., Ex. K, O'Mara Depo., 28-29). In fact, the phrase "spot check" is not mentioned once in the entirety of its 26 page report. . (Goodsell Aff., Ex. C, KC Report, pg. 1-2).

28. While the calculations were not provided to KC Engineering, Sioux Steel did provide drawings that were reviewed. (Derek Matthies Depo., 13).

**Response:** Admit.

29. Sioux Steel was provided a report from KC Engineering regarding its review of Sioux Steel's design. (Kramer Depo., 46).

**Response:** Admit.

30. Sioux Steel did not review the entire report from KC Engineering. (Kramer Depo., 46).

**Response:** Admit that SSC did not do a line-by-line review of Defendant's report. Mr. Kramer reviewed the conclusions reached by KC. Because KC's findings were consistent his own conclusions, he did not "recheck" the details underlying KC's conclusions. SSC had no duty to "recheck" KC's math. SSC read the conclusions and created their product according to KC's recommendations. (Goodsell Aff., Ex. E, Kramer Depo., 48). Whether or not SSC reviewed the report does not relieve KC of their duty to report any possible errors. (Goodsell Aff., Ex. K, O'Mara Depo. 55-56).

31. Had Sioux Steel read the results, it would have known that KC Engineering did not review any of the vertical seams that were subject to Kramer's math errors. (Kramer Depo., 46- 47).

**Response:** Deny. Nowhere in the report does it specifically state that the vertical seam bolt spacing was <u>not</u> checked. Defendant just did not check the seam, and did not mention it to anyone. Kramer read the conclusions submitted in KC's report. Because they concurred with his work, he saw no reason to "recheck" KC's work. (Goodsell Aff., Ex. E, Kramer Depo., 47-48).

32. KC Engineering provided information showing which seams they did and did not review i.e. spot-checking. (Kramer Depo., 47).

**Response:** Deny only because this statement is so misleading. Nowhere in the report does it specifically state that the vertical seam bolt spacing was <u>not</u> checked. (Goodsell Aff., Ex. C, KC Report, pg. 1-2). To the contrary, the report actually states that hand calculations were completed. *Id.* Defendant just did not check the seam, and did not mention it to anyone. *Id.* The report does not explain or caution that Defendant unilaterally limited its review to "spot checks" of Mr. Kramer's calculations. In fact, the phrase "spot check" is not mentioned once in the entirety of its 26 page report. SSC had no way to know that this limitation was being applied prior to receiving Defendant's report. Kramer read the conclusions submitted in KC's report. Because they concurred with his work, he

saw no reason to "recheck" KC's work. (Goodsell Aff., Ex. E, Kramer Depo., 47-48, 88-89).

33. KC Engineering did review the horizontal connections. (Kramer Depo., 47).

   **Response:** Admit.

34. KC Engineering's decision to spot-check was a direct result of Sioux Steel's failure to provide its calculations, which it was required to do. (O'Mara Depo., 48, 61).

   **Response:** Deny. Defendant agreed to review SSC's calculations. (Goodsell Aff., Ex. B, Retention Letter, pg. 1). Defendant never indicated that SSC needed to provide its calculations, and in fact, performed calculation checks without SSC's calculations. (Goodsell Aff., Ex. K, O'Mara Depo., 28-29).

35. The spot-checks that were done did not show that the connections reviewed were significantly overdesigned or significantly underdesigned. (O'Mara Depo., 48).

   **Response:** Denied to the extent that Defendant should not have unilaterally limited its design review to "spot checks." All calculations should have been checked as a part of a competent, professional structural engineering analysis. (Goodsell Aff., Ex. E, Kramer Depo., 47-48; Ex. J, Duckett Report, pg. 6).

36. The report provided by KC Engineering documented what was checked and Sioux Steel could have reviewed the report to see what was and was not checked by KC Engineering. (O'Mara Depo., 50-51).

   **Response:** Admit.

37. Sioux Steel alleges as a direct and proximate cause of KC Engineering's alleged negligence, Sioux Steel has incurred damages for the failure of the Hopper Bin. (Amended Complaint, ¶ 25-31).

   **Response:** Admit.

38. Sioux Steel does not allege that KC Engineering's negligence was the sole cause of its alleged damages. (*See generally* Amended Complaint).

**Response:** Admit, but with the qualification that Defendant's negligence was the proximate cause of SSC's damages. (Goodsell Aff., Ex. J, Duckett Report, 6).

39. Kramer conceded that blame was with both Sioux Steel and KC Engineering. (Kramer Depo., 88).

**Response:** Admit.

Dated this 6th day of April, 2018.

        GOODSELL QUINN, LLP

        BY: */s/ G. Verne Goodsell*
            G. Verne Goodsell
            Nathan R. Oviatt
            246 Founders Park Dr., Suite 201
            P.O. Box 9249
            Rapid City, SD 57709-9249
            Tel: 605 343-3000/Fax: 605 343-3251
            Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that he served a true and correct copy of the foregoing *Plaintiff's Response in Opposition to Defendant's Statement of Undisputed Material Facts* in *Support of Their Motion for Summary Judgment* upon the person identified below by US Mail, E-Mail and Odyssey File and Serve System:

    Michael F. Tobin
    mftobin@boycelaw.com


    Mitchell W. O'Hara
    mwohara@boycelaw.com


Dated this 6th day of April, 2018.

                            */s/ G. Verne Goodsell*
                            G. Verne Goodsell