# EXHIBIT K

*Sioux Steel Company v.*
*KC Engineering, P.C.*

Jason O'Mara, PE
February 27, 2017



*Audrey M. Barbush, RPR*
*audrey@paramountreporting.com*
*605.321.3539*



**Min-U-Script® with Word Index**

Page 9

1  Just go up there --
2  A  Oh.
3  Q  -- where it says Chad.
4  A  Yeah. It says, "Chad, we are definitely interested and
5     do have recent experience with analyzing and designing
6     hopper bottoms for square bins. I don't think it would
7     be too far of a stretch to do the same for cone type
8     hoppers."
9  Q  Now, is it fair to conclude that Eric Hanson doesn't
10    have any experience in cone-type hoppers from that
11    statement?
12 A  Yes. And I know that he doesn't have much experience
13    with cone-type hoppers since then. Most of those I
14    do -- I do the work on most of those in the office now,
15    me and the engineers working for me.
16 Q  But the work that you've done has been after 2012,
17    correct?
18 A  That's correct.
19 Q  And then if we go to the bottom there is that there's a
20    response that Chad is making as to why Sioux Steel is
21    interested in having this reviewed, correct?
22 A  Yeah. It says that, "We have recently designed a line
23    of hopper cones which will be used in conjunction with
24    our 18 foot to 36 foot diameter grain bins. We're
25    looking for someone who would be willing to do a design

Page 10

1     review of the hopper cones. We've been involved with
2     grain bins for quite a while, but hopper cones are a
3     different ball game. Is this something you guys have
4     any experience in and/or would you be interested in a
5     project like this?"
6  Q  Was there any response as to your experience other than
7     what we talked about: You hadn't had any prior to this
8     and Eric hadn't either?
9  A  I think that Eric was pretty clear in his response.
10 Q  Clear in what regard?
11 A  That our experience was with designing square hopper
12    bins.
13 Q  Rather than cones?
14 A  Rather than cones, yes.
15 Q  Now, you were present when I took Derek's deposition,
16    correct?
17 A  Correct.
18 Q  As you sit here today, is there anything that you heard
19    in the course of that deposition where you felt his
20    responses were wrong or inaccurate?
21 A  There were several responses that I think could have
22    used some qualification that he gave.
23 Q  Were there any of those that you felt were wrong or
24    inaccurate as stated?
25 A  I would have to go back and review specifically. In

Page 11

1     particular, there was one when you were discussing
2     EP433.
3  Q  Okay.
4  A  You were talking about -- you had asked him why would
5     there be a section on dynamic loads if arching and
6     ratholing were not a consideration, I believe was your
7     question.
8  Q  That was the question.
9  A  And then you pointed out that they used wheat
10    somewhere.
11 Q  That should be or A or B there.
12 A  Yeah, that wheat -- overpressure factors presented are
13    based on an analysis of the results reported by those
14    two guys on full scale bins filled with wheat. Wheat
15    is considered to exert the highest pressures on bins.
16       And then you asked him something to the effect
17    that if wheat ratholed and arched, that that would be a
18    worst-case dynamic load, and he agreed with that.
19       I felt that you were reading something into this
20    standard that wasn't there. There's no mention of
21    ratholing or arching, and I think he should have
22    contested that in his deposition.
23 Q  Let me ask you this question: Based upon your
24    experience in the agricultural design of hoppers, have
25    you observed ratholing or arching and the collapse of

Page 12

1     the rathole or the arch in free-flowing grains?
2  A  Never in free-flowing grains and never -- I've never
3     been physically present when something like that
4     happened. I've read papers on the subject, you know,
5     technical papers on the subject.
6        Free-flowing grains, you know, would be whole
7     grains, like whole soybeans or corn or wheat, and the
8     only time that those kind of things can really arch and
9     rathole is when they've been very poorly managed;
10    meaning they've been allowed to get very wet or, in the
11    case of soybeans, rotten. Then they can clump together
12    and create the kind of problems that you can see, and I
13    think they become a non-free-flowing material.
14 Q  Just so I understand it, free-flowing materials,
15    depending upon the environment, can become
16    non-free-flowing?
17 A  Generally, free-flowing materials, if they are not just
18    very poorly mismanaged to the point where they're
19    ruined, they're rotten or they're -- they get too moist
20    and they get rotten, and that's not -- that's no longer
21    a free-flowing material. That's rotten material in the
22    bin. But properly cared for free-flowing material
23    should remain free-flowing materials.
24 Q  What do we mean by properly cared for?
25 A  Meaning you don't put material that's too wet into a

Sioux Steel Company v.
KC Engineering, P.C.

Jason O'Mara, PE
February 27, 2017

Page 25

1  A  I can explain why we spot-checked.
2  Q  We'll get there later.
3  A  Okay.
4  Q  A structural engineering analysis of a hopper design
5     drawing would require an analysis and review of panel
6     seams.
7  A  If I were the only designer, if I were the one who was
8     responsible myself for the design and I weren't just
9     doing a review of limited scope, then, yes, I would
10    have to check every single connection.
11 Q  Is there anything in the structural engineering
12    analysis of a hopper design drawing that would require
13    an analysis and review of the panel seams?
14    Would it be required unless it's excluded?
15 A  And I'm telling you that there's -- that that question
16    is incomplete. You're trying to say that because I
17    didn't check that connection, that I didn't fulfill my
18    duty as an engineer, but that's --
19 Q  Let me ask you this: By not checking that seam, the
20    vertical panel seams in the hopper -- do you feel that
21    by not doing that, you performed professional services
22    from a structural analysis point of view?
23 A  Rephrase the question, please.
24    MR. GOODSELL: Do you want to read that back for
25    me, please.

Page 26

1     (The record was read by the reporter as follows:
2     Question: "Let me ask you this: By not checking
3     that seam, the vertical panel seams in the hopper -- do
4     you feel that by not doing that, you performed
5     professional services from a structural analysis
6     point of view?")
7     THE WITNESS: No. When you don't do something,
8     that's not doing something, so no.
9  BY MR. GOODSELL:
10 Q  A structural engineering analysis of a hopper design
11    drawing would require analysis and review of the panel
12    seams. True or false?
13 A  A complete analysis, yes.
14 Q  An analysis by KC of the drawings of the vertical
15    hopper seam panels would have disclosed an error in the
16    vertical seam design; is that correct?
17 A  I believe that it would have, yes.
18 Q  KC did not analyze the design drawings of the vertical
19    hopper panel seams.
20 A  KC did not analyze the design drawings of the vertical
21    hopper seams?
22 Q  Is that correct?
23 A  We looked at those drawings because we needed the
24    geometry in order to make our RISA model. We did not
25    specifically check the capacity of those seams.

Page 27

1  Q  So KC did not analyze the design drawings of the
2     vertical hopper seams, correct?
3  A  Analyze the drawings?
4  Q  Analyze the design drawings of the vertical hopper
5     seams.
6  A  I don't -- the question doesn't make sense to me.
7  Q  Well, take a look at Exhibit 24.
8  A  Okay.
9  Q  I have the vertical panel seam marked there with
10    yellow. Do you see that?
11 A  Uh-huh.
12 Q  KC did not analyze Exhibit 24, the design drawing of
13    the vertical hopper panel seam; is that correct?
14 A  By not analyzing the drawing, do you mean that we did
15    not do an independent calculation of the capacity of
16    that seam?
17 Q  I mean you didn't analyze it.
18 A  Well, we did analyze the stresses along that seam.
19    When we did our RISA model, we created a
20    three-dimensional model that included the hopper, and
21    it gave us stress -- the output of that. After we
22    applied our loads to the model, the output of that
23    model was loads and stresses and forces that were then
24    given in the report that we gave to Chad.
25 Q  But KC did not analyze the design drawings of the

Page 28

1     vertical hopper seams to see if they could withstand
2     the forces that would be developed that you calculated
3     off the RISA model, correct?
4  A  We did not specifically do a hand calculation to check
5     the different limit states for those bolted connections
6     at those vertical seams, that's correct.
7  Q  KC specifically stated in its proposal that the project
8     description included a structural engineering analysis
9     and design review, correct?
10 A  That's correct.
11 Q  KC never modified, altered, or changed its written
12    proposal dated July 30, 2012, Exhibit 17; is that
13    correct?
14 A  We did not.
15 Q  KC never in writing altered, modified, or changed the
16    scope of the professional engineering services provided
17    in its proposal.
18 A  That is correct.
19 Q  KC never in writing notified Sioux Steel that its
20    services under the proposal, Exhibit 17, were limited
21    because of Sioux Steel's failure to provide
22    information; is that correct?
23 A  Our proposal included the requirement that Sioux Steel
24    provide us with all criteria and full information as to
25    the requirements of the project, and we also required

**Page 29**

1     for them to send us their calculations. So I think
2     that our scope was limited within our proposal.
3   Q   KC never in writing notified Sioux Steel that its
4     services under the proposal were limited because of
5     Sioux Steel's failure to provide information. Is that
6     a correct statement?
7   A   I think implicit in our requirement that they provide
8     calculations for us to review is that our scope
9     includes them providing calculations for us to review.
10   Q   What's the answer to my question?
11       MR. TOBIN: I think he just provided it to you.
12       MR. GOODSELL: He did not. Let me repeat the
13     question.
14       THE WITNESS: Okay.
15 BY MR. GOODSELL:
16   Q   KC never in writing notified Sioux Steel that its
17     services under the proposal were limited because of
18     Sioux Steel's failure to provide information.
19   A   I think that our proposal limits the scope based on
20     information provided by Sioux Steel.
21   Q   If your proposal limited the scope, you never notified
22     Sioux Steel that there was a limitation to the scope of
23     your review because they failed to provide information;
24     is that correct?
25   A   We notified them in our proposal that we have excluded

**Page 30**

1     anything not specifically stated in this proposal. We
2     did not state anywhere in our proposal that we would do
3     independent hand calculations of every connection.
4   Q   KC never in writing notified Sioux Steel that its
5     services under the proposal were limited because of
6     Sioux Steel's failure to provide information. Is that
7     a correct statement?
8   A   I think that our proposal was notification to
9     Sioux Steel that our scope was limited.
10   Q   After the proposal was accepted, KC never in writing
11     notified Sioux Steel that its services under the
12     proposal were limited because of Sioux Steel's failure
13     to provide information.
14   A   I think that's correct.
15   Q   And it's generally understood in the engineering
16     community a structural engineering analysis and design
17     review of hopper drawings should include an engineering
18     analysis of weightbearing seams.
19   A   Yes.
20   Q   A structural analysis of a hopper design drawing would,
21     by its engineering description, include an analysis of
22     weightbearing seams.
23   A   Could you read that back?
24   Q   A structural analysis of a hopper design drawing would,
25     by its engineering description, include analysis of

**Page 31**

1     weightbearing seams.
2   A   Correct.
3   Q   Seams in a hopper are an important structural design
4     component.
5   A   Correct.
6   Q   KC contracted with Sioux Steel to do a structural
7     engineering analysis and design review of the hoppers.
8   A   Correct.
9   Q   KC concluded that the design for all the members and
10     plates fell within acceptable material limits for each
11     member except for the columns on the 30 foot hopper.
12   A   Yes. And there's some clarification necessary with
13     that answer, that what we analyzed was the plates and
14     the members because that's what our RISA model checks
15     for us kind of automatically. So as I've stated
16     before, our scope did not include independent hand
17     calculations of all the connections which are not part
18     of the RISA model.
19   Q   If I look at Exhibit 9 and 19, that's your report?
20   A   Yes.
21   Q   We may have to go to the full context of that report,
22     but there was specific hand calculations in the report
23     that dealt with the column seams -- or the column
24     supports, correct?
25   A   That's correct.

**Page 32**

1   Q   And it was your best engineering opinion at the time
2     you issued your report on August 28, 2012, that the
3     column seams were not sufficient as designed, correct?
4   A   Not seams, but yes, the --
5   Q   Excuse me. The columns.
6   A   The columns. That's correct.
7   Q   Okay. And the only exception noted as not sufficient
8     as designed were the columns on the 30 foot hopper; is
9     that correct?
10   A   That is correct.
11   Q   And we talked about this: Not sufficient design is a
12     stamp that the entire structure is defective; is that
13     correct?
14   A   Yeah. If one part of a structure fails, then the
15     whole --
16   Q   It's either pass or fail, right?
17   A   Yeah. Correct.
18   Q   And it's either it's all okay or if one part is
19     deficient, then the whole is deficient, correct?
20   A   That's correct.
21   Q   Now, the exception that the columns were not sufficient
22     as designed was later withdrawn or modified, correct?
23   A   That's correct.
24   Q   KC was never hired to perform peer review evaluation of
25     SS's employees, correct?

Page 45

1  I know of.
2  Q  Well, did you perform that interview?
3  A  No. That initial meeting was Eric.
4  Q  So Eric's the only one that had an initial client
5     interview before the proposal you drafted, Exhibit 7
6     and 17, were sent to the client?
7  A  I believe I talked to Chad on the phone as well during
8     the proposal phase.
9  Q  And, again, if you did talk with Chad, that's not
10    memorialized any place in the documents of KC; is that
11    correct?
12 A  Other than what shows up on my proposal and what's on
13    this job information sheet, I mean, that's where I
14    would have taken what I learned and memorialized it, as
15    you say.
16 Q  It's the obligation of a licensed professional engineer
17    to set out clearly the scope of professional services
18    to be provided; is that correct?
19 A  That's correct.
20 Q  It's the obligation of a licensed professional engineer
21    to set out any limitations to the scope of services to
22    be provided; is that correct?
23 A  And we did that.
24 Q  And to the extent that you did that is that that's your
25    interpretation of the original proposal, Exhibit 7 and

Page 46

1     17; is that correct?
2  A  Yeah, we said we excluded anything not specifically
3     stated in the proposal.
4  Q  Is there any documentation in your file that your
5     interpretation of the proposal, Exhibit 7 and 17, are
6     consistent with the client's understanding of the
7     limitations you claim exist in 7 and 17?
8  A  You're asking did I get -- well, Sioux Steel accepted
9     our proposal.
10 Q  I'm asking two questions: One, is it documented? And
11    did it happen?
12 A  Okay. Sioux Steel accepted our proposal, so that
13    implies that they read it and accepted it.
14       You want to know if I got some confirmation from
15    him as to what he understood our proposal meant?
16 Q  That's correct, before you issued your report on
17    August 28, 2012.
18 A  Yeah, that's what I think we talked about and I think
19    Eric talked about with him was kind of the goal of this
20    review.
21       The goal of this review, as I said, was to do an
22    independent determination of the loads and the RISA
23    model so that he could compare those to his loads and
24    RISA model because it was something new for him.
25 Q  But did you have any discussion during this 30-day

Page 47

1     period with Chad?
2  A  Yeah, I think I did.
3  Q  Do you have any -- there's no reference to that?
4  A  I don't have anything in writing.
5  Q  If there's a question on the scope of work, it's the
6     obligation of the licensed professional engineer to
7     confirm in writing the client's understanding of a
8     limitation of services; is that fair?
9  A  I did not believe that there was a question as to the
10    scope of work.
11 Q  I understand that. But if there is.
12 A  If I believed that there was a question, then it would
13    have been my obligation to clarify for Chad, yes.
14 Q  In performing professional services, engineering
15    services, it's the obligation of the engineer to
16    disclose to the client any circumstances that might
17    modify the scope of services; is that correct?
18 A  I don't think it's possible to anticipate everything,
19    so I don't -- I don't think it's practical to make a
20    long list of "if this, then this" type things in a
21    proposal.
22       I think that it's clear from our proposal that
23    they were to provide us with their calculations for
24    review, and they did not do that.
25 Q  And you never indicated to them that that was a problem

Page 48

1     for you to issue your opinion letter/engineering
2     document on August 28, 2012, that the designs were
3     sufficient except for the columns on the 30 foot
4     hopper?
5  A  Yeah, what I decided to do in the absence of Chad's
6     calculations to review was to have Derek spot-check
7     some of the connections. This was above and beyond our
8     scope. Spot-checking connections was not part of our
9     scope. This is something that we did in the absence of
10    calculations from Chad to review.
11       So I asked him to spot check some connections that
12    I felt were unique as far as Sioux Steel's experience.
13    The results of those spot checks gave me a high degree
14    of confidence in Chad's ability because the results
15    showed that those connections were neither
16    significantly overdesigned or significantly
17    underdesigned. So I felt that we had fulfilled our
18    responsibility based on my understanding because we had
19    provided Chad with what he asked for specifically.
20       MR. GOODSELL: I'm going to move to strike the
21    answer as being nonresponsive.
22       MR. TOBIN: I object.
23 BY MR. GOODSELL:
24 Q  In performing professional engineering services, it's
25    the obligation of the engineer to disclose to the

Page 49

1    client any circumstances that would modify the scope of
2    services. Is that a correct statement?
3  A  I don't think it's a fair statement, no.
4  Q  Okay. Spot-checking of seams is not set out in the
5    proposal to perform a structural engineering analysis
6    and design review; is that true?
7  A  True.
8  Q  The limitation of the structural analysis and design
9    review by KC to, quote, spot-checking, quote, of
10   bearing seams was never addressed with the client?
11 A  Well, I disagree. I did -- I do believe that I
12   addressed with Chad that he was supposed to provide us
13   with calculations to review. I did it in writing in
14   the proposal, and I believe we talked about it verbally
15   on the phone. As I said, I have no written
16   documentation of the phone conversation.
17 Q  The limitation of the structural analysis and design
18   review to spot-checking by KC of bearing seams was
19   never addressed in writing with the client?
20 A  That's correct.
21 Q  And spot checking is not used in Exhibit 7 or 17,
22   correct?
23 A  That's correct.
24 Q  Spot checking is not used in Exhibit 9 and Exhibit 19;
25   is that correct?

Page 50

1  A  Which one is 19?
2  Q  It's going to be your report.
3  A  Well, actually, the report did include the spot checks.
4  Q  Let me --
5  A  The body of the report included what we checked.
6  Q  Let me rephrase the question. The summary of your
7    findings --
8  A  The summary did not mention the word spot check, that's
9    correct.
10 Q  The addendum of October 2, 2012, which is Exhibit 21
11   [sic], that didn't include any reference to spot
12   checking, did it?
13 A  That's correct.
14 Q  Would it be correct then after the addendum of
15   October 2, 2012, that the designs were approved as
16   being sufficient on both the 18 and 30 foot hoppers?
17 A  With regard to the things that we checked, yes. Chad
18   was --
19 Q  Now we're back to the scope and --
20 A  Yes.
21 Q  -- whether or not you can limit the scope --
22 A  It's key.
23 Q  -- or whether you did limit the scope, correct?
24 A  Right. And we provided Chad with our full report, and
25   he could have looked to see what we checked and what we

Page 51

1    did not check.
2  Q  Did you ask Sioux Steel to review your work after you
3    submitted it to them?
4  A  Well, I assumed that was the entire point of the
5    exercise was that he was going to review my work in
6    order to use it to check his design.
7  Q  So I understand it is that they're coming to you with a
8    design, asking you for professional opinions on the
9    structural analysis of the design drawings, and you're
10   assuming after you've given your opinion that they're
11   going to come back and review their drawings to make
12   sure your work's correct?
13 A  I assumed that they would review my report thoroughly
14   because my understanding was that he wanted to use my
15   report to confirm his own design, and if he doesn't
16   look at my report, I don't know how he can use it.
17   The other possibility -- and I didn't think that
18   this is what he was doing, but the other possibility is
19   that he just wanted somebody else to be responsible in
20   case something bad happened. And I don't think that's
21   what he was doing.
22 Q  No, I think they wanted you to check the hopper seams
23   and do it because they didn't -- they wanted somebody,
24   a third-party, to take a look at it.
25 A  He did not ask us to check the hopper seams.

Page 52

1  Q  And it's your interpretation that the structural
2    analysis of the design drawings, which includes the
3    hopper seams, would exclude an analysis of the
4    hopper seams?
5  A  We've been over this a few times. I think I've
6    explained it.
7  Q  Is that your interpretation?
8  A  I think I've explained myself.
9  Q  Is that your interpretation?
10 A  Is it my interpretation that what -- you're going to
11   try put ridiculous words in my mouth.
12 Q  I'm not.
13   MR. GOODSELL: Would you read the question back,
14   please.
15   (Discussion off the record.)
16   MR. GOODSELL: I'll readdress it.
17 BY MR. GOODSELL:
18 Q  It's your position that after Sioux Steel came to you
19   and asked you to perform a structural engineering
20   analysis of the design drawings, that after you
21   performed that analysis, Sioux Steel or its engineer
22   was to check your work; is that your position?
23 A  No. He was going -- my position is that he would look
24   at my work, review my work and use that to check his
25   work. Not to check my work. To use my report to check

Page 53

1  his work.
2  Q  Well, now we're getting to who is the checker.
3     You were the checker on this, right?
4  A  I was not provided with his calculations to check.
5  Q  You were provided, though, with the drawings, and you
6     agreed to do a design analysis of the drawings.
7  A  We agreed to do the things that are in our proposal,
8     which is: Determine the loads, do an independent RISA
9     model, review his calculations for the connections, and
10    to use those specific codes and reference documents to
11    do so.
12       My report isn't worth much if he doesn't read it,
13    other than having someone else to point a finger at.
14 Q  The KC report and addendum contains no exclusions.
15 A  I believe that's correct. No explicit exclusions.
16 Q  The KC report and addendum contains no reference to
17    limitation of review of the vertical panel seams.
18 A  Well, the report included the calculations which
19    clearly showed what we checked and what we didn't
20    check.
21 Q  But without you making a disclosure, how is the client
22    going to know whether those calculations are ones you
23    did the calculations on or whether you reviewed the
24    others, did the calculations and didn't include it in
25    your report?

Page 54

1  A  As I say, he should have reviewed our report. If he
2     had reviewed our report, he would know what was checked
3     and what wasn't checked.
4  Q  And if we take a look at your report, though, initially
5     you said it was not sufficient as to legs. Then you
6     changed that. And when that was changed, that simply
7     meant that your scope of review found it to be
8     sufficient to meet the standards required set out in
9     your proposal, correct?
10 A  Yes, within the context of the scope of work. I agree
11    that our report could have been more explicit as to
12    reiterating exclusions.
13 Q  The KC report and addendum contains no instructions to
14    the client to review the scope of KC's structural
15    analysis.
16 A  As I said, I think that was supposed to be the entire
17    point of the exercise was for them to review our
18    report.
19 Q  My question is not that. My question is: The KC
20    report and addendums contain no instructions to the
21    client to review the scope of KC's structural
22    engineering analysis.
23 A  I didn't believe it was necessary to provide them with
24    those instructions. I assumed that's what they were
25    doing.

Page 55

1  Q  So you didn't provide any instructions in your report
2     that Kramer was to review the scope of your structural
3     engineering analysis.
4  A  Like I should have said, "Please review this report,"
5     in my report?
6  Q  I'm just asking whether you did or didn't.
7  A  I did not say that, no.
8  Q  The KC report and addendum contains no instruction that
9     the client was to, quote, check, end quote, the
10    professional engineering work of KC.
11 A  Correct.
12 Q  It's a duty of a licensed professional engineer in
13    private practice to document and disclose any
14    limitations of their professional engineering work in
15    their reports.
16 A  Any limitations of their professional engineering work
17    in their reports? I just think that there's a limit to
18    how much documenting of the limitations you can do. I
19    don't think that you can possibly list all the things
20    that we didn't do. That's why we said anything we
21    didn't specifically say we would do we're not doing.
22    That's what we said in our proposal.
23 Q  My question: It is the duty of a licensed professional
24    engineer in private practice to document and disclose
25    any limitations on their professional work to their

Page 56

1     client.
2  A  Within reason, yes.
3  Q  The hopper cone vertical seam panels on the 30 foot bin
4     did not comply with the design standards set forth in
5     Steel Bins for Storage of Bulk Solids by Gaylord and
6     Gaylord.
7  A  That's correct.
8  Q  The hopper cone vertical seam panels on the 30 foot bin
9     did not comply with the designated standards set forth
10    in ANSI/ASAE EP433.
11 A  That's correct. The connections. We're talking about
12    the connections, right?
13 Q  Panel seams.
14 A  Uh-huh.
15 Q  Assembly and connection, correct?
16 A  That's correct.
17 Q  The hopper cone vertical seam panels on the 30 foot bin
18    did not comply with the AISC Manual of Steel
19    Construction, 13th Edition; is that true?
20 A  That is true.
21       (Exhibit 27 is marked for identification.)
22 BY MR. GOODSELL:
23 Q  I'm going to hand you what's marked Exhibit 27 and ask
24    you to turn to page 5, if you would, please.
25       First of all, I believe that Exhibit 27 are