UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

| | | |
|---|---|---|
| SIOUX STEEL COMPANY, a South Dakota corporation, | ) ) ) | CIV. 15-4136 |
| Plaintiff, | ) ) | |
| vs. | ) ) ) | **PLAINTIFF'S REPLY TO DEFENDANT'S RESPONSIVE BRIEF IN OPPOSITION TO MOTION TO STRIKE** |
| KC ENGINEERING, P.C., an Iowa corporation, | ) ) ) | |
| Defendant. | ) | |

COMES NOW the Plaintiff, Sioux Steel Company ("SSC"), by and through its counsel of record, Goodsell Quinn, LLP, and submits this Reply to Defendant's Response in Opposition to Plaintiff's Motion to Strike (the "Reply"). In support of SSC's Reply, SSC relies on its Memorandum of Law in Support of Motion to Strike (Document ("Doc.") 35), which is incorporated herein by reference.

## FACTUAL BACKGROUND

The underlying facts of this matter have been laid out extensively in SSC's Brief in Support of Motion to Strike. Doc. 35. Those factual averments are incorporated herein by reference. In addition, SSC incorporates by reference the attached Affidavit of Chad Kramer ("Kramer Aff.")[1].

## DISCUSSION

Defendant's Response in Opposition to Plaintiff's Motion to Strike ("Response") misses the mark of precisely why Defendant's expert, John Carson, should be excluded.

---

[1] The attached affidavit is signed by the affiant but is not notarized. Mr. Kramer is no longer employed with SSC and although we are in contact with him, he was unable to get his signature notarized by the time of filing. The notarized document will be filed by SSC on Monday, April 23, 2018.

1

First, Defendant gives undue weight to the initial report of Rod Nohr to justify Carson's opinions and conclusions. Doc. 37 at 2. However, there are two critical differences between Carson's Report and Nohr's Report: (1) Nohr's Report never mentions the fact that the Hopper's vertical seam was under-designed, and (2) Nohr's Report never mentions EP 433. *See* Doc. 36-9. There is nothing in Nohr's Report to suggest that he had any knowledge of the under-designed vertical seam. Mr. Nohr specifically reserved the right to add to the report as more information became available. *Id.* The presence of such a glaring error would have logically been featured in his preliminary report had he known about it. The omission of this fact from his report strongly suggests that he was completely unaware of the mathematical miscalculation at the time he authored his report.

Also, unlike Nohr, Carson never visited the scene of the accident. Doc. 36-1. Instead, he Carson took the opinions of Nohr at face value and adopted them as his own. Recall, Nohr was hired immediately after the Agropeguaria failure in order to corral facts. Those preliminary facts were then incorporated into his report. Nohr did not have the benefit of hindsight that Carson did. Although true that Carson reviewed the video of the failure, his opinions and conclusions were not materially different from Nohr's Report. Nohr's opinions and conclusions are not the subject of Plaintiff's Motion.

Next, Carson's technical testimony is challenged to the extent that it lacks any indicia of reliability in the engineering community. In his affidavit submitted in opposition of SSC's Motion to Strike, Carson acknowledges, as he did in his deposition, that no recognized U.S. or international standard exists that "deals" with loads imposed by non-free-flowing materials. Doc. 38 ¶ 16. Despite this, Carson opines without citing to any authority that the "appropriate steps" for a structural engineer to take when dealing with such materials include:

> "(1) altering the geometry and/or material of construction of the hopper (i.e., slopping portion of the bin) or eliminating the hopper altogether and using a flat bottom with an unloader that activates the full cross-section of the bin; (2) making operational changes to control the moisture, oil content, temperature, etc. of the potentially non-free-flowing material before it is placed in a bin so as to ensure that it is free-flowing; (3) continuously moving the material to prevent caking; and/or (4) adjusting the size of the bin to reduce pressures acting on the material to an acceptable level."

*Id.* Because Carson cannot point to any recognized standard beyond his own "say so," SSC has moved to strike this testimony.

In addition to Carson's *ipse dixit* testimony regarding the "standard" for non-free-flowing materials, SSC has also moved to exclude another aspect of Carson's opinion - that the air cannons used in the bin to stimulate the materials also contributed to the Agropecuaria failure. SSC has moved to exclude this testimony because it is speculative. As discussed in SSC's Motion to Strike, Carson was unable to assert that the air cannons were a probable cause of the structure's failure. Doc. 36-10. Nothing in Defendant's Response contradicts this fact.

The best Defendant can offer is to argue that Carson's opinion regarding the air cannons *could* have contributed to the Agropecuaria collapse. Respectfully, Carson's suspicion regarding the air cannons does not pass muster under *Daubert*. Accordingly, SSC has moved to strike it.

Finally, regarding the prior contact between J & J and Chad Kramer, SSC is not arguing that there were discussions regarding litigation strategies, theories, witnesses, or the strengths and weaknesses of the case. The relationship at issue is one between an engineering firm and a potential client, not an attorney and potential expert. Plaintiff *is arguing* that the information given to J & J from Chad Kramer in July of 2012 was confidential and proprietary information that Mr. Kramer was providing them for a possible engineering review. *See* Kramer Aff. ¶¶ 3-4. Regardless of the fact that J & J was not hired to do the review, SSC believed the information

released to them was done so in confidence. *Id.* Furthermore, SSC expected that the advice received from J & J would remain confidential.

Defendant argues that Carson had no knowledge of Kramer's contact with J & J prior to the inception of this lawsuit. Doc. 37 at 24. Defendant admits, however, that SSC and Kramer's information surfaced during Carson's "*conflict check*". Doc. 38 ¶¶ 4-5. Carson further admits that J & J provided SSC with engineering advice during its meeting with Mr. Kramer. *Id.* at ¶¶ 6-7. Nevertheless, Carson contends that no breach of confidentiality has occurred.

The fact remains, however, that Carson used the information obtained from SSC when preparing his expert report in this case. Carson has never denied this. Specifically, Carson has concluded that because of SSC's communications with J & J, it should have known the loads contemplated would overwhelm the structure's design. Doc. 36-1 at 12. By the time he prepared his report for this litigation, he was aware of where that information came from and that it was not information he would have had access to without the 2012 conferences between Kramer and J & J. Nevertheless, Carson has taken those communications and incorporated them into his testimony to the detriment of SSC.

## LEGAL ANALYSIS

**I. Carson's Opinions Re: EP 433 and Air Cannons Do Not Satisfy *Daubert*.**

In *Daubert*, the Supreme Court charged trial courts with the responsibility to act as "gatekeepers" when it came to the admissibility of unreliable expert testimony. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597 (1993). This responsibility is greater than simply confirming an expert opinion that comes from a qualified specialist.[2] Furthermore, the "trial

---

[2] SSC acknowledges that Carson has substantial experience in the field of mechanical engineering, but even he admits that he lacks any formal training as a structural engineer, and that he is not a certified engineer. Doc. 38 ¶¶ 13-14.

court's gatekeeping function requires more than simply taking the expert's word for it . . . [t]he more subjective and controversial the expert's inquiry, the more likely the testimony should be excluded as unreliable." Fed. R. Evid. 702, Advisory Committee Note (2000) (citations and quotations omitted). "The *Daubert* standard requires the trial court to ensure that an expert's testimony both 'rests on a reliable foundation and is relevant to the task at hand. Pertinent evidence based on scientifically valid principles will satisfy those demands.'" *State v. Loftus,* 1997 S.D. 131, ¶21, 573 N.W.2d 167, 173.

> In making the reliability determination, the court may consider: (1) whether the theory or technique can be or has been tested; (2) whether the theory or technique has been subjected to peer review or publication; (3) whether the theory or technique has a known or potential error rate and standards controlling the technique's operations; and (4) whether the theory or technique is generally accepted in the scientific community. Additional factors to consider include: "whether the expertise was developed for litigation or naturally flowed from the expert's research; whether the proposed expert ruled out other alternative explanations; and whether the proposed expert sufficiently connected the proposed testimony with the facts of the case." "This evidentiary inquiry is meant to be flexible and fact specific, and a court should use, adapt, or reject" these factors as the particular case demands.

*Berg v. Johnson & Johnson,* 940 F.Supp.2d 983, 988 (D.S.D. 2013) (citations omitted). In other words, to satisfy the reliability requirement, the party offering the expert testimony must show "that the methodology underlying [the expert's] conclusions is scientifically valid." *Barrett v. Rhodia, Inc.,* 606 F.3d 975, 980 (8th Cir.2010).

### A. Carson's Opinion Is Improper *Ipse Dixit* Testimony.

As discussed in SSC Motion to Strike, for opinion evidence to be admissible it must rely on more than the "say so" of an expert. It must be supported by the field of expertise. "Where 'opinion evidence . . . is connected to existing data only by the *ipse dixit* of the expert,' a district court 'may conclude that there is simply too great an analytical gap between the data and the opinion proffered.'" *Pro Serv. Auto., L.L.C. v. Lenan Corp.*, 469 F.3d 1210, 1216 (8th Cir.

5

2006) (quoting *Gen. Elec. Co. v. Joiner,* 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997)). Here, Carson's testimony fails to meet this benchmark.

In its Response, Defendant submitted an Affidavit of John W. Carson. Doc. 38. His affidavit only further supports SSC's contention that Carson's opinion is a naked *ipse dixit* conclusion without the requisite objective standards required by *Daubert*.

In his affidavit, Carson argues there is "no bin design code in existence in the U.S. or internationally that deals with material-induced forces on bins and other storage structures when storing non-free-flowing materials." *Id.* ¶ 15. Despite this, Carson asks the Court to permit him to testify on his own personal standard of engineering care for non-free-flowing materials. Carson argues that the appropriate steps that an engineer should follow when dealing with non-free-flowing materials involve: "(1) altering the geometry and/or material of construction of the hopper (i.e., slopping portion of the bin) or eliminating the hopper altogether and using a flat bottom with an unloader that activates the full cross-section of the bin; (2) making operational changes to control the moisture, oil content, temperature, etc. of the potentially non-free-flowing material before it is placed in a bin so as to ensure that it is free-flowing; (3) continuously moving the material to prevent caking; and/or (4) adjusting the size of the bin to reduce pressures acting on the material to an acceptable level." *Id.* ¶ 16. *None* of these suggestions are supported by any recognized standard either in the U.S. or internationally.

Instead, Carson's standard of engineering care relies exclusively on the "say so" of Carson. Because his opinion was constructed around only his experience and training, there is no recognized standard against which to compare it. These opinions rest exclusively on the *ipse dixit* opinions of Carson. The only recognized standard with respect to calculating loads on steel bins is EP 433. This is the same standard used by both SSC and Defendant in designing and reviewing

(respectively) the structure at issue in this case. Because Carson's opinions regarding EP 433 and the appropriate standard of care for "non-free-flowing materials" fails to bridge the analytical gap set forth in *Pro Serv. Auto.,* discussed above, it should be properly excluded.

### B. Carson's Opinions Re: Air Canons Are Unreliable.

Next, SSC contends that Carson's opinions with respect to the air cannons fail to meet *Daubert*'s reliability requirement. Expert testimony "based on possibility or speculation is insufficient [to establish causation]; it must be stated as being *at least* 'probable,' in other words, more likely than not." *Barrett v. Rhodia, Inc.*, 606 F.3d 975, 985 (8th Cir. 2010) (citing *Fackler v. Genetzky*, 638 N.W.2d 521, 527-28 (Neb. 2002)) (emphasis added). In order for the testimony to be helpful to the jury, the opinion must rest on firm scientific footing, and cross the threshold from "possible" to "probable." "Expert testimony that is speculative is not competent proof and contributes nothing to a legally sufficient evidentiary basis." *Concord Boat Corp. v. Brunswick Corp.,* 207 F.3d 1039, 1057 (8th Cir.)

Defendant argues that Carson's opinion regarding the air cannons is admissible because Carson "believes that the collapse *could have* occurred because of the presence and use of the air cannons." Doc. 37 at 17 (emphasis added). Respectfully, this testimony contributes nothing to the issues presented in this case. Mere speculation is improper for the jury to consider, especially when that speculation is cloaked in the imprimatur of an expert. Nothing in Defendant's Response changes this conclusion. Precious trial time should not be spent on speculative evidence that contributes nothing to the issues submitted for the jury's consideration. For this reason, Carson's testimony regarding air cannons should be stricken.

## II. Carson's Breach of Confidentiality Should Bar His Testimony.

Finally, SSC has moved to strike Carson's testimony to the extent that his testimony has misappropriated SSC's confidential information to the benefit of himself and his client. "Courts have the inherent power to disqualify expert testimony, if necessary, to protect privileges, which would be breached if an expert were to switch sides, and to preserve public confidence in the fairness and integrity of judicial proceedings." *U.S. v. Salamanca*, 244 F.Supp.2d 1023, 1025 (D.S.D. 2003) (citation omitted). Defendant's Response does not argue that *Salamanca* is the incorrect standard governing issues of expert conflicts. Doc. 37 at 18-24. Instead, Defendant expends considerable effort in its Response distinguishing that case from the instant case. *Id.*

Because Defendant does not contend otherwise, it is undisputed that the analysis on this issue begins with *Salamanca*'s two-part test: (1) "Did the first party have an objectively reasonable belief that a confidential relationship existed," and (2) "did the party disclose any confidential information to the expert." *Id.* (citing *English Feedlot, Inc. v. Norden Labs, Inc.*, 833 F.Supp. 1498, 1501 (D. Colo. 1993)). In analyzing these questions, Carson's Affidavit scuttles rather than saves Defendant's argument that Carson's testimony should be permitted.

SSC had an objectively reasonable belief that a confidential relationship existed; it disclosed confidential, proprietary information to J & J, and did not waive confidentiality. *See* Kramer Aff. ¶ 4. Even though it was an initial consultation, SSC believed the information it was sharing with Defendant would remain confidential. *Id.* Although the structural design reviewed by J & J was intended to ultimately become public upon its manufacture and marketing, the advice received by SSC from J & J was never intended to be public. *Id.*

Carson's own affidavit acknowledges the conflict of interest manifest in his retention for Defendant. Carson admits that SSC's initial contact with his employer came up in his *conflict*

*check* when he was contacted by Defendant for retention in this matter. Doc. 38 ¶¶ 4-12 (emphasis added). Then, he used the information against the potential client in this matter.

Unlike the facts in *Northbrook Digital LLC v. Vendio Servs., Inc.*, cited Defendant's Response, this case does not involve wholly separate matters from those initially discussed with the subject expert. 2009 WL 5908005, at * 1 (D. Minn. Aug. 26, 2009). Here, Carson was hired as the expert of the adverse party in the case arising out of the scope of J & J's review -- not a different, unrelated case -- but the exact same design review.

Furthermore, unlike Carson, the expert in *Northbrook* did not use the information learned in the initial consultation to the detriment of the potential client. *Id.* Here, with respect to the advice offered to SSC from J & J, Carson did just that. Although a factor in *Northbrook*, Mr. Kramer did not believe he needed to address confidentiality as he believed the status of confidence was understood by the nature of the conversation. Kramer Aff. ¶ 4. After all, he was discussing details about a new product line for his company with a peer engineering firm; information that would be reasonably construed as sensitive and confidential under the circumstances. This is particularly true of the advice received from J & J in response to SSC's consultation. For these reasons, this case is clearly distinguishable from *Northbrook*.

Next, Defendant argues that *Larson v. Rourick*, compels the Court to deny SSC's Motion to Strike. Doc. 37 at 22 (citing 284 F.Supp.2d 1155 (N.D. Iowa, 2003)). Once again, Defendant misses critical differences between *Larson* and the present case. First, although true that *Larson* explains that purely technical information is not confidential, in this case, Carson has misappropriated more than just technical information. Here, Carson took the communications from J & J to SSC, and used those communications to conclude that SSC knew or should have

known that its loading calculations were inadequate. Doc. 36-1. This goes well beyond the mere technical information addressed in *Larson*.

In *Larson*, the contact involved the hiring of an attorney expert for already-anticipated litigation. 284 F.Supp.2d at 1155-56. An attorney was contacted by the plaintiff with the intention of being hired as an expert witness in an upcoming litigation. *Id.* After a meeting with the plaintiff and reviewing a number of documents, the attorney determined he would not be retained as the expert and declined the position. *Id.* at 1156. The expert attorney did not enter the plaintiff into the firm's conflict check system and did not submit a bill. *Id.* Then, the defendant hired an attorney from the firm as the original expert. *Id.* The plaintiff moved to disqualify the defendant's expert contending the plaintiff's contacts with the expert's firm disqualified the expert from the case. *Id.* The court allowed the testimony rationalizing that very few details regarding the litigation and strategies were discussed. *Id.* at 1158.

Those facts are dissimilar to the present situation, where Carson's engineering firm was contacted to perform an engineering analysis on the specific product, which later became the subject of litigation. Also, unlike the attorney in *Larson*, J & J did enter SSC into their conflict check system. Carson admits that he both ran a conflict check for SSC, and found an entry summarizing the communications between J & J and SSC from July, 2012. Doc. 38 ¶¶ 4-5. Although there was only one retained document in their system, Carson pursued the matter and discovered there were a number of emails and at least one phone call between his firm and SSC. *Id.* ¶7.

Despite this discovery, Carson not only concluded that he did not have a conflict because he was not personally involved in those communications, but he determined it was appropriate to use the communications of those who were involved to SSC's detriment. *Id.* It is unconscionable

for Carson to argue that he did not have a conflict when SSC's information was returned in response to his *conflict check*. However, to then have the hutzpah to take the information recovered from the conflict check and *incorporate it into his report* is breathtaking.

A conflict of interest is when a party has duties owed to two or more parties, which duties are or appear incompatible. Black's Law Dictionary 341 (9th. Deluxe ed. 2009) ("conflict of interest. … 1. A real or seeming incompatibility between one's private interests and one's public or fiduciary duties. 2. A real or seeming incompatibility between the interests of two of a [professional's] clients, such that the [professional] is disqualified from representing both clients if the dual representation adversely affects either client or if the clients do not consent."). Carson betrayed his duty of confidentiality to SSC in his efforts to provide testimony to the benefit of J & J. Carson both recognized the conflict, through the conflict check, and used the precise confidential information communicated *to* SSC, *against* SSC. Carson, *regardless* of his involvement in SSC's initial consultation with J & J, had a duty to protect the proprietary information of a third party (SSC) that was provided to them in prior communications. His failure to do so is clear. As such, Carson's testimony should be stricken.

This case is analogous to *Marvin Lumber & Cedar Co. v. Norton Co.*, 113 F.R.D. 588 (D. Minn. 1986). There, the consulting expert for the defendant, Twin Cities Testing ("TCT"), was effectively providing expert services to both parties on matters relevant to the litigation between the parties. *Id.* at 590. The District Court in *Marvin Lumber*, struck TCT as an expert, concluding "TCT's prior relationship with plaintiff includes exposure to information, and exchanges regarding" the product at issue in the case. *Id.* Similarly, although on a more limited basis than the expert in *Marvin Lumber*, Carson, through his firm, was exposed to both information and exchanges regarding SSC's design. Simply because Carson was able to acquire similarly

confidential information and communications involving fewer instances of contact between J & J, and SSC, does not mean that his betrayal of SSC's confidences was any less. "A substantial relationship is present if the factual contexts of the two representations are similar or related." *Id.* at 592 (citing *Trone v. Smith*, 621 F.2d 994, 998 (9th Cir. 1980)).

In this instance, Carson's conflict arises out of the exact same subject matter -- SSC's Hopper/Silo design review. Because Carson's conflict is so fundamental to the subject matter of this case, it cannot be disgorged from his testimony. As such, SSC respectfully requests his testimony be stricken.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests the Court grant Plaintiff's Motion to Strike Expert Witness John W. Carson.

Dated this 20th day of April, 2018.

                GOODSELL QUINN, LLP

                BY: */s/ G. Verne Goodsell*
                    G. Verne Goodsell
                    Nathan R. Oviatt
                    246 Founders Park Dr., Suite 201
                    P.O. Box 9249
                    Rapid City, SD 57709-9249
                    Tel: (605) 343-3000
                    Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that he served a true and correct copy of the foregoing *Plaintiff's Reply to Defendant's Responsive Brief in Opposition to Motion to Strike* upon the persons identified below by Odyssey File and Serve System:

>Michael F. Tobin
>Mitchell W. O'Hara
>Boyce Law Firm, LLP
>300 S. Main Ave., P.O. Box 5015
>Sioux Falls, SD 57117-5015
>mftobin@boycelaw.com
>mwohara@boycelaw.com
>Attorneys for Defendant

Dated this 20th day of April, 2018.

>*/s/ G. Verne Goodsell*
>G. Verne Goodsell