UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| SIOUX STEEL COMPANY, a South Dakota corporation, | 4:15-CV-04136-KES |
| Plaintiff, | |
| vs. | ORDER DENYING MOTION TO EXCLUDE EXPERT TESTIMONY |
| KC ENGINEERING, P.C., an Iowa corporation, | |
| Defendant. | |

Plaintiff, Sioux Steel Company, moves to exclude the testimony of defendant's expert witness, John W. Carson, or in the alternative, disqualify Carson as an expert witness. Docket 34. Defendant, KC Engineering, P.C., opposes the motion. For the following reasons, the court denies the motion.

**BACKGROUND**

This is a negligence action arising out of a structure failure of an agricultural grain storage bin designed and manufactured by Sioux Steel Company. During the design process, Sioux Steel hired KC Engineering, P.C., to do the design review of the Hopper Bin. Sioux Steel alleges that KC Engineering was negligent when it failed to identify a design defect made by Sioux Steel's engineer, Chad Kramer, in the formula of the vertical seams of the Hopper Bin and when it approved the design plans with the defect. Because

neither Sioux Steel nor KC Engineering caught the error, Sioux Steel manufactured and sold the Hopper Bin. One of the Hopper Bins was sold to a company in Mexico, Agropecuaria El Avion, where it was filled with soybean meal. The Hopper Bin suffered a structural failure that killed two Agropecuaria employees. Sioux Steel filed suit again KC Engineering, alleging that KC Engineering breached its duty to exercise reasonable skill and care by failing to identify the defect in the design.

KC Engineering designated John W. Carson as an expert witness. Carson has supplied two reports. In the first, dated November 21, 2016, Carson discusses the cause of the Hopper Bin's collapse and what role, if any, KC Engineering's review of the design played in causing or contributing to the failure. Docket 36-1. Carson concluded that the Hopper Bin failed because a dynamic load formed due to either collapsing of an arch or rathole or firing of the air cannons. *Id.* at 15. Carson's overall conclusion is based on thirteen opinions. *Id.* at 7-15. Each of these opinions is listed in his report and contains explanations on how he formed each one. *Id.* In reaching these opinions and conclusions, Carson reviewed and relied on court documents from the current litigation, photos and documents obtained during discovery, three expert reports, Chad Kramer's deposition, the American Engineering standards for loads exerted by free-flowing grains on bins (ANSI/ASAE EP 433), the Australian standards for loads on bulk solid containers (AS 3774), the European standards for actions on structures (EN 1991-4, Eurocode 1), and other publications referenced in his report. *Id.* at 6.

In his second report, dated December 1, 2016, Carson focused his inquiry on the firing of the air cannons based on his review of Agropecuaria's surveillance video of the failure. Docket 36-14. He opined that the load that caused the failure was much greater than those imposed by gravity alone. *Id.* Thus, he concluded that KC Engineering's lack of review of the Hopper Bin's seams had no bearing on the failure. *Id.* Carson noted that the initial failure occurred almost directly below one of the air cannons. *Id.* at 4. He explained the firing of the air cannons "likely resulted in greatly increased (compared to gravity alone) pressure on the hopper wall." *Id.* In reaching these conclusions, Carson reviewed the surveillance video along with 200 pages of documents (many of which he already reviewed for his initial report). *Id.* at 2.

Sioux Steel moves to exclude the testimony of Carson on the ground that Carson's testimony is not reliable. Alternatively, Sioux Steel moves to disqualify Carson from testifying because he received confidential information from Sioux Steel prior to the lawsuit.

## I.      Sioux Steel's Motion to Exclude Carson's Testimony

In diversity cases, federal law controls whether expert testimony is admissible. *Unrein v. Timesavers, Inc.*, 394 F.3d 1008, 1011 (8th Cir. 2005). Federal Rule of Evidence 702 governs the admissibility of expert testimony. Fed. R. Evid. 702. Under Rule 702, the trial court acts as a "gatekeeper" by screening a party's proffered expert testimony for its reliability and relevance. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993); *Kumho Tire Co.,*

*v. Carmichael*, 526 U.S. 137, 152 (1999) ("The objective of [the gatekeeping] requirement is to ensure the reliability and relevancy of expert testimony.").

Rule 702 provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a)    the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b)    the testimony is based on sufficient facts or data;

(c)    the testimony is the product of reliable principles and methods; and

(d)    the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. "Rule 702 reflects an attempt to liberalize the rules governing the admission of expert testimony." *Lauzon v. Senco Prods., Inc.*, 270 F.3d 681, 686 (8th Cir. 2001) (quoting *Weisgram v. Marley Co.*, 169 F.3d 514, 523 (8th Cir. 1999)). "The rule clearly 'is one of admissibility rather than exclusion.' " *Id.* (quoting *Arcoren v. United States*, 929 F.2d 1235, 1239 (8th Cir. 1991)). Thus, "[t]he exclusion of an expert's opinion is proper only if it is 'so fundamentally unsupported that it can offer no assistance to the jury[.]' " *Wood v. Minn. Mining & Mfg. Co.*, 112 F.3d 306, 309 (8th Cir. 1997) (quoting *Hose v. Chicago Nw. Transp. Co.*, 70 F.3d 968, 974 (8th Cir. 1995)).

The Eighth Circuit has determined that a district court should apply a three-part test when screening expert testimony under Rule 702.

First, evidence based on scientific, technical, or other specialized knowledge must be useful to the finder of fact in deciding the ultimate issue of fact. This is the basic rule of relevancy. Second, the proposed witness must be qualified to assist the finder of fact. Third, the proposed evidence must be reliable or trustworthy in an evidentiary sense, so that, if the finder of fact accepts it as true, it provides the assistance the finder of fact requires.

*Lauzon*, 270 F.3d at 686 (internal citations and quotations omitted). With respect to relevancy, expert testimony will be relevant and helpful to the jury if it concerns matters beyond the general knowledge of average individuals. *See United States v. Shedlock*, 62 F.3d 214, 219 (8th Cir. 1995). With respect to an expert's qualifications, Rule 702 recognizes five bases for qualifying an expert, which include "knowledge, skill, experience, training, or education." Fed. R. Evid. 702. Significantly, "[g]aps in an expert witness's qualifications or knowledge generally go to the weight of the witness's testimony, not its admissibility." *Robinson v. GEICO Gen. Ins. Co.*, 447 F.3d 1096, 1100 (8th Cir. 2006).

To satisfy the reliability requirement, the party offering the expert testimony must show by a preponderance of the evidence "that the methodology underlying [the expert's] conclusions is scientifically valid." *Barrett v. Rhodia, Inc.*, 606 F.3d 975, 980 (8th Cir. 2010) (citations omitted). In making the reliability determination, the court may consider: (1) whether the theory or technique can be or has been tested; (2) whether the theory or technique has been subjected to peer review or publication; (3) whether the theory or technique has a known or potential error rate and standards controlling the technique's operations; and (4) whether the theory or technique

is generally accepted in the scientific community. *Russell v. Whirlpool Corp.*, 702 F.3d 450, 456 (8th Cir. 2012). Additional factors to consider include: " 'whether the expertise was developed for litigation or naturally flowed from the expert's research; whether the proposed expert ruled out other alternative explanations; and whether the proposed expert sufficiently connected the proposed testimony with the facts of the case.' " *Polski v. Quigley Corp.*, 538 F.3d 836, 839 (8th Cir. 2008) (quoting *Sappington v. Skyjack, Inc.*, 512 F.3d 440, 449 (8th Cir. 2008)). "This evidentiary inquiry is meant to be flexible and fact specific, and a court should use, adapt, or reject" these factors as the particular case demands. *Russell*, 702 F.3d at 456 (citation omitted).

Also when making the reliability inquiry, the court should focus on "principles and methodology, not on the conclusions that they generate." *Kuhn v. Wyeth, Inc.*, 686 F.3d 618, 625 (8th Cir. 2012) (citing *Daubert*, 509 U.S. at 595). At times, conclusions and methodology are not entirely distinct from one another, and the court " 'need not completely pretermit judicial consideration of an expert's conclusions.' " *Id.* (quoting *Milward v. Acuity Specialty Prods. Grp., Inc.*, 639 F.3d 11, 15 (1st Cir. 2011)). But "[a]s a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination." *Bonner v. ISP Techs., Inc.*, 259 F.3d 924, 929 (8th Cir. 2001) (internal quotations omitted).

District courts have discretion in determining whether to admit expert witness testimony under Rule 702. *See In re Air Crash at Little Rock Ark., on*

*June 1, 1999*, 291 F.3d 503, 509 (8th Cir. 2002). "That standard applies as much to the trial court's decisions about how to determine reliability as to its ultimate conclusion." *Kumho Tire Co.*, 526 U.S. at 152. Nonetheless, the proponent of expert testimony must prove its admissibility by a preponderance of the evidence. *Daubert*, 509 U.S. at 592 n.10.

## A. Relevancy and Qualification Requirements

As to relevance, Carson's testimony concerns matters beyond the general knowledge of average individuals. Carson explained that he would testify about the applicability of engineering codes, the loads exerted by free-flowing grains, and the storage qualities of various grains. Docket 36-1. His testimony will lend itself to the cause of the Hopper Bin's failure. Thus, Carson's testimony is relevant.

As to Carson's qualifications, he has extensive education, training, and experience in engineering principles that are relevant to the inquiry at hand. Docket 36-1 at 18 (listing Carson's education, work experience, honors and awards); Docket 36-1 at 21-30 (listing the 145 publications authored or co-authored by Carson). Additionally, Carson has demonstrated familiarity with the forces exerted on bins and investigations of storage bin failures. Docket 38 ¶¶ 14-15 (describing Carson's five decades of experience in issues relating to forces exerted on bins and his investigation of over 50 grain bin collapses). Carson is qualified to assist the trier of fact in this case.

## B. Reliability of Carson's EP 433 Testimony

Sioux Steel argues that Carson's testimony should be excluded under Federal Rule of Evidence 702 because it is not reliable. Docket 35 at 1. Sioux Steel alleges that Carson's opinion is contrary to the only recognized United States engineering standard regarding agricultural steel bin loads and therefore it is not reliable. *Id.* But the court will not preclude Carson's testimony unless his methodology is unreliable. *Berg v. Johnson & Johnson*, 940 F. Supp. 2d 983, 992 (D.S.D. 2013).

Carson's methodology is the plain reading of EP 433. Docket 39-5 at 6. Carson concluded that on its face EP 433 does not apply to non-free-flowing grains. *Id.* at 4. EP 433's title is "Loads Exerted by Free-Flowing Grain on Bins." Docket 36-11. The section's purpose further limits its applicability to "bins used to store free-flowing agricultural whole grain." *Id.*

In considering the adequacy of the method used, the court finds that Carson "is not relying for his opinions upon any new science." *Doblar v. Unverferth Mfg. Co.*, 981 F. Supp. 1284, 1287 (D.S.D. 1997). Rather, the evidence shows that Carson's method consists of reading a United States accepted code, analyzing the wording and parameters of the code, and using his experience, education, skill, and knowledge of storage structures to apply it to the facts at hand. In general, the court finds that Carson's methodology is reliable.

Sioux Steel has identified four specific concerns regarding Carson's findings. First, Sioux Steel contends that Carson's testimony pertaining to EP

433 does not meet the reliability standard because his opinion is contrary to a recognized United States engineering standard. Docket 35 at 1. Sioux Steel's argument is a mischaracterization of Carson's opinion. Carson's testimony will likely be that EP 433 is not applicable to the specific design of the Hopper Bin because soymeal is a non-free-flowing material and EP 433 does not contemplate the storage of this material. Docket 38 ¶¶ 19-21. Carson is not stating that EP 433 is never applicable, but that it is not applicable here based on the specific material the user intended to store in the bin. Sioux Steel's argument is a criticism of Carson's results, not his methodology.

Second, Sioux Steel identifies alleged inconsistencies in Carson's opinion (i.e., Carson concedes EP 433 is the only recognized United States load standard for steel bins but insists that it is deficient for non-free flowing commodities). Docket 35 at 15. Again, this is a criticism of Carson's results, not his methodology. *See Berg*, 940 F. Supp. 2d at 992 (rejecting an inconsistency argument as criticism of results, not methodology). "[Sioux Steel] will have the chance at trial during cross examination to attack [Carson's] results." *Id.*

Third, Sioux Steel argues that Carson's opinion is *ipse dixit.* Docket 35 at 16. But the court cannot find the analytical gap between the data and the opinion that existed in *Pro Service Automotive. See Pro Serv. Auto., L.L.C. v. Lenan Corp.*, 469 F.3d 1210, 1216 (8th Cir. 2006). In *Pro Service Automotive*, the court found that the expert offered only vague theorizing based upon

general principles. *Id.* at 1215. The expert made no calculations, and did no mathematical analysis or testing. *Id.*

Sioux Steel argues that Carson's statement that EP 433 is highly simplistic provided the basis for his opinions and conclusions. Docket 35 at 16. But based on the plain reading of the code, Carson concluded that EP 433 applies only to free-flowing, agricultural whole grain. Docket 38 ¶ 19. Then, Carson provided two reasons why EP 433 was not applicable to this Hopper Bin, thereby connecting his opinion and the data. *Id.* ¶ 20; Docket 36-1 at 6. First, soymeal is not an agricultural whole grain. Docket 38 ¶ 20. Second, soymeal is often non-free-flowing. *Id.* Carson noted the second reason is "something that is well known and understood in the agricultural industry." *Id.* Also, Sioux Steel's engineer, Kramer, acknowledged that soymeal is not a free-flowing grain in his deposition. Docket 36-1 at 10. Thus, Carson concluded that EP 433 does not apply because soymeal does not fit within the parameters of the code. Docket 38 ¶ 20. To support his conclusion, Carson pointed out that EP 433 is silent about what happens when grains become non-free-flowing. Docket 39-5 at 5. The code's silence on this issue shows that the standard does not apply to such material. Docket 38 ¶ 21.

Fourth, Sioux Steel argues that Carson cannot cite to other authority that states EP 433 is not applicable to non-free-flowing grains. Docket 35 at 17. "This is mostly an attack on the results and not the methodology, and as a result goes to the weight to be given to the evidence and not its admissibility." *Berg*, 940 F. Supp. 2d at 992-93 (rejecting defendant's argument that the

10

expert's findings were unreliable because they had not been tested or peer reviewed). Carson noted that he could not point to any peer reviews of his methodology in determining that EP 433 was not applicable to non-free-flowing grains. Docket 39-5 at 6. Carson's reasoning for the lack of peer review is that he is merely reading the code and applying it to the facts. *Id.* "It's obvious to anyone reading the English language by the title of EP 433 . . . that this only applies to free-flowing grains . . . I don't know that anyone has to state that any more directly in any publication to make it obvious." *Id.* And because the facts do not fit within the definition of the code, he found that the code was not applicable. *Id.* Carson's testimony should be admitted as long as his methodology is reliable, even if his conclusions are novel. *See Berg*, 940 F. Supp. 2d at 991. The court finds that Carson's plain reading and application to the facts is a reliable method.

After a careful review of the record, the court concludes that Carson's expert testimony is reliable. In making his ultimate conclusions, Carson relied on his own expertise in the field of storage structures, the collective expertise of other engineers at his firm, his past experiences of structure failures, and his educational background. Docket 36-1 at 4-5, 14. Sioux Steel can certainly attack his testimony at trial. *See Kuhn*, 686 F.3d at 625 ("Vigorous cross examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."). But his testimony will not be excluded based on the arguments put forth by Sioux Steel.

**C. Reliability of Carson's Air Cannons Testimony**

Sioux Steel argues that Carson's opinions and conclusions about air cannons should be excluded because they are not reliable. Docket 35 at 19. Sioux Steel's position is that Carson's testimony that air cannon firing could be a potential cause of the Hopper Bin's collapse is too speculative. *Id.*

Sioux Steel's attack on Carson's opinion is focused on his response during his deposition. Sioux Steel's counsel asked Carson, "So it's not likely?" ("It's" refers to a failure caused by the firing of air cannons.) Docket 39-5 at 13. Carson replied, "Yes." *Id.* But this response is taken out of context and should be read in conjunction with the other parts of Carson's opinion. Carson stated that the air cannon mechanism was "less probable than the second mechanism [rathole] . . . It's possible but not probable." *Id.* When looking at the whole exchange, the court interprets Carson's statements to mean that the more likely cause was the collapse of either an arch or a rathole, "the most probable cause," not that failure by air cannons was not possible. *See id.*

Again, the court considers Sioux Steel's argument as an attack on Carson's conclusion and not his methodology. Sioux Steel argues that expert testimony "must be stated as being at least 'probable,' in other words, more likely than not." Docket 35 at 19 (quoting *Barrett*, 606 F.3d at 984). This quotation from *Barrett* relates to proving the causation element of a plaintiff's claim, not to the reliability and admissibility of an expert's testimony. *See Barrett*, 606 F.3d at 984. For purposes of a party's motion to exclude an expert's testimony, "the court considers only whether the testimony is

admissible and does not consider whether it is sufficient to prove an element in [the plaintiff's] case." *O'Neal v. Remington Arms Co., L.L.C.*, No. 4:11-CV-04182-KES, 2016 WL 1465351, at *4 (D.S.D. Apr. 14, 2016).

Instead, the proper standard for determining the reliability of an expert's testimony is focused "solely on principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 595. "Expert testimony is inadmissible where . . . it is excessively speculative or unsupported by sufficient facts." *Barrett*, 606 F.3d at 981. But experts can express opinions "so long as there are sufficient facts already in evidence or disclosed by the witness as a result of his [or her] investigation to take such [expert opinion] testimony out of the realm of guesswork and speculation." *Hurst v. United States*, 882 F.2d 306, 311 (8th Cir. 1989) (alterations in original) (internal quotations omitted).

An examination of Carson's method is required to determine whether Sioux Steel's argument has merit. Carson analyzed the Hopper Bin's failure. His analysis indicated that the Hopper Bin's upper portion was under-designed to meet proper safety factors. Docket 38 ¶ 22. But "it was not under-designed to the point that failure would be predicted when it was loaded." *Id.* Nor did it fail when it was filled or when it remained full for the next four days. *Id.* ¶ 23. Carson opined that even if the upper portions were likely overstressed due to the gravity-induced loads, "it was not stressed to a point of failure." *Id.* Thus, Carson determined that "loads greater than those imposed by gravity must

have been present" meaning a dynamic load caused the Hopper Bin to fail. *Id.* ¶ 24.

Based on Carson's education, skill, experience, and investigation, he explained that a dynamic load can develop in a bin from two possible means: by a collapse of an arch or rathole and by the firing of air cannons. *Id.* ¶¶ 25-26. He opined that the increased pressure from the air cannons on the cylinder wall could cause a failure. Docket 39-5 at 11.

To justify his inclusion of the air cannon causation possibility, he reviewed the location of the air cannons and the sequencing of firing the air cannons. Docket 36-1 at 8-9. The upper cannons fired before the lower ones. *Id.* at 9. Carson opined that this process is contrary to "good operating practice" and cited peer publication. *Id.* He stated that lower cannons should always be fired first to have the best chance of collapsing an arch. *Id.* Instead, when the upper cannons were fired first, the soymeal became even more compacted than if the lower cannons were fired first. *Id.* And this added even more pressure to the silo's walls. *Id.* In addition to his own expertise, Carson points out that Sioux Steel's engineer, Kramer, had concerns about the air cannons on the silo structure. *See* Docket 39-7. Carson examined the emails between Kramer and another Sioux Steel employee where Kramer noted that he was concerned about the eccentric loads that non-free flowing material could place on the Hopper Bin. *See id.*; Docket 36-1 at 9. Kramer further voiced his uncertainty about the "kind of loads the cannons would place on the hopper structure." *See* Docket 39-7; Docket 36-1 at 9. Also, Carson relied on several

14

published articles as well as his own experience in storage bin structures to form his conclusions.

In *Neuharth v. NACCO Materials Handling Group., Inc.*, this court excluded part of an expert's testimony because his testimony and conclusions were guesswork and speculative. No. CIV. 01-4034-KES, 2002 WL 34700600, at *4 (D.S.D. Dec. 16, 2002). The expert, Thomas Goodney, did not rely on facts in evidence nor did he disclose a reliable investigation to support his testimony. *Id.* Goodney did not keep written records, did not compile a report, and could not prove when or where he made his observations. *Id.* at *3. His statements were never tested nor subject to peer review or publication, no one knew the potential rate of error, he did not establish standards to control his determination, and there was no evidence that his theory was generally accepted within the relevant community. *Id.*

Here, Carson's opinions are in direct contrast to Goodney's. Carson relied on facts in evidence and disclosed a reliable investigation to support his testimony. In Carson's report, he laid out the numerous materials he reviewed, all of which are in discovery. Docket 36-1 at 5. He reviewed the documents produced in discovery (photographs, emails, etc.), a video of the Hopper Bin's failure, three different expert reports (Rodney Nohr, Francisco J. Godoy, Mark R. Duckett), Kramer's deposition, EP 433, the Australian standards for loads on bulk solids containers, the European standards pertaining to actions on structures, and various other published material cited throughout his report. Docket 36-1 at 6; Docket 36-14.

Additionally, Carson's report disclosed his reliable investigation that included a viewing and analysis of Agropecuaria's surveillance video of the failure and review of Nohr's initial report of the failure. Docket 36-14. Also, Carson kept written records and compiled a report. Docket 36-1; Docket 36-14. His two reports provide evidence of when and where he made his observations and conclusions. Docket 36-1; Docket 36-14. Carson's conclusions are natural extensions of Nohr's findings, his review of the video, photographs, and other material, along with his extensive experience of investigating other silo failures.

Though his opinions have not been tested nor subject to peer review, his opinions are based on his review of other peer reviewed material and his own publications. *See* Docket 36-1 at 9-11. Carson cites several publications that discuss the use of air cannons and the pressures exerted on the structure when fired. *Id.* at 9-13. The court does not consider the potential rate of error because it is not relevant to this inquiry. *Doblar*, 981 F. Supp. at 1287. Carson has laid out three standards he used – the European, Australian, and American engineering codes for loads on containers. Docket 36-1 at 6. Finally, failure caused by air cannons is generally known and accepted within the community. Rodney Nohr noted this possible failure in his report. Docket 36-9.

Overall, in Carson's report, he states, "To a reasonable degree of engineering certainty, I am of the opinion that failure of the soybean meal silo was caused by. . ." and then lists the firing of air cannons. Docket 36-1 at 13-14. Carson's conclusions as to air cannons do not amount to guesswork or speculation. He relied on facts in evidence and disclosed a reliable investigation

to support his testimony. As a result, a jury should hear such evidence because it does meet the *Daubert* standards.

## II.    Sioux Steel's Motion to Disqualify Carson

An expert does not advocate during litigation but acts as a source of information and opinion. *English Feedlot, Inc. v. Norden Labs., Inc.*, 833 F. Supp. 1498, 1501 (D. Colo. 1993). "Courts have the inherent power to disqualify expert testimony, if necessary, to protect privileges, which would be breached if an expert were to switch sides, and to preserve public confidence in the fairness and integrity of judicial proceedings." *Chamberlain Group, Inc. v. Interlogix, Inc.*, No. 01 C 6157, 2002 WL 653893, at *2 (N.D. Ill. Apr. 19, 2002); *see also Sells v. Wamser*, 158 F.R.D. 390, 393 (S.D. Ohio 1994) (court has "inherent power to disqualify an expert witness when a conflict of interest exists."); *Paul v. Rawlings Sporting Goods Co.*, 123 F.R.D. 271, 277-78 (S.D. Ohio 1988) (court can disqualify an expert "under any set of circumstances, or based upon the application of any particular legal theory" to protect privileges or the public confidence). Nevertheless, "[d]isqualification is a drastic measure which courts should hesitate to impose except when absolutely necessary." *Owen v. Wangerin*, 985 F.2d 312, 317 (7th Cir. 1993) (internal quotation omitted).

A two-part test governs the disqualification determination. *United States v. Salamanca*, 244 F. Supp. 2d 1023, 1025 (D.S.D. 2003). First, did the party have an objectively reasonable belief that a confidential relationship existed? *Id.* Second, did that party disclose any confidential information to the expert?

*Id.* The expert need not actually have disclosed any confidential information so long as "the expert's contact with the opposing party has created a risk of improper disclosure of such communications." *Sells*, 158 F.R.D. at 394. The party seeking the disqualification bears the burden of proving confidentiality and its non-waiver. *English Feedlot*, 833 F. Supp. at 1501-02.

To satisfy the first part of the test, Sioux Steel must prove it had an objectively reasonable belief that a confidential relationship existed between it and Carson. *Salamanca*, 244 F. Supp. 2d at 1025. "Courts have found such a relationship to exist when the record supports a long-standing series of interactions, which have more likely than not coalesced to create a basic understanding of the retaining party's modus operandi, pattern of operations, decision-making process, and the like." *Larson v. Rourick*, 284 F. Supp. 2d 1155, 1156-57 (N.D. Iowa 2003) (citing *Koch Ref. Co. v. Jennifer L. Boudreau M/V*, 85 F.3d 1178, 1182 (5th Cir. 1996)). Factors courts look at include: the number of meetings between the expert and the moving party, formal retention, a request to prepare an opinion, a request to sign a confidentiality agreement, or the supplying of specific data relevant to the case. *Northbrook Digital LLC v. Vendio Servs., Inc.*, No. CIV.07-2250PJS/JJG, 2009 WL 5908005, at *2 (D. Minn. Aug. 26, 2009); *Larson*, 284 F. Supp. 2d at 1157. But in circumstances where the expert only performs an initial consultation, the party generally cannot claim a reasonable expectation of a confidential relationship. *Northbrook Digital LLC*, No. CIV.07-2250PJS/JJG, 2009 WL 5908005, at *2.

Sioux Steel requests the court to use its inherent authority to disqualify Carson. Docket 35 at 1-2. Sioux Steel argues that Carson should be barred from testifying because Carson's engineering firm, Jenike & Johanson, Inc. (J & J), received confidential information from Sioux Steel regarding the issues of this case prior to the lawsuit being filed. *Id.* at 1. Sioux Steel alleges that Carson has misused its confidential information to the detriment of Sioux Steel. *Id.*

Sioux Steel relies heavily on this court's holding in *Salamanca. Id.* at 21. But its reliance is misplaced. *Salamanca* is factually distinguishable from the present case. As noted by this court in *Salamanca,* "this case differs from other cases because it does not involve one party's discussion with an expert whom the opposing party later retains." *Salamanca*, 244 F. Supp. 2d at 1025. The present case differs from *Salamanca* because it involves one party's discussion, Sioux Steel, with an expert, Carson, whom the opposing party, KC Engineering, later retained.

Here, *Deadwood Canyon Ranch, LLP v. Fidelity Exploration & Production Co.* provides more guidance. No. 4:10-CV-081, 2013 WL 11971254, at *4 (D.N.D. July 15, 2013). The court did not disqualify the witness. *Id.* The record lacked any reasonable basis for the moving party to reasonably believe a confidential relationship existed between it and the expert. *Id.* Deadwood Canyon did not retain the expert to perform any services, did not pay the expert, and there was no confidentiality agreement. *Id.*; *see also, e.g., Mays v. Reassure Am. Life Ins. Co.*, 293 F. Supp. 2d 954, 957 (E.D. Ark. 2003) (finding

no confidential relationship existed when the moving party did not provide the expert with any specific facts about the case, did not provide confidential documents for review, and did not discuss any critical litigation strategies during the single meeting where they only discussed possible representation).

There is nothing in the record that demonstrates that Sioux Steel had an objectively reasonable belief that a confidential relationship existed between it and Carson. Though Sioux Steel may have subjectively believed such a relationship existed, that is not enough to disqualify Carson. Docket 45-1 ¶ 4. *See Northbrook Digital LLC*, No. CIV.07-2250PJS/JJG, 2009 WL 5908005, at *3 (allowing the expert to testify because aside from the subjective beliefs of the moving party, the record offers no support for the existence of a confidential relationship).

Here, there was no meeting between Sioux Steel and Carson. Docket 36-1 at 13. Instead, Sioux Steel had a brief (a total of three) email exchange with a J & J consultant and a phone conversation with a J & J engineer. *Id.* The court considers these communications equivalent to an initial consultation between Carson's firm and Sioux Steel. Additionally, there was no payment for any services nor was a confidentiality agreement discussed or signed. Docket 36-10 at 13. J & J did not draft or send a proposal to Sioux Steel. Docket 38-1. Plus, Sioux Steel did not retain J & J to review its design. *Id.*

A total of four interactions occurred. *Id.* ¶ 7. None of which personally involved Carson. *Id.* ¶ 3. Carson only became aware of Sioux Steel and his firm's brief encounter after he was contacted by KC Engineering to be retained

as an expert and ran a conflicts check. *Id.* ¶¶ 4, 11. Carson has no personal

knowledge of the documents, plan, and/or designs sent by Kramer to J & J. *Id.*

¶ 8. The only information retained by J & J are entries in the phone log that

summarize what each encounter was about. Docket 38-1. There was no other

communication between J & J and Sioux Steel after these four interactions. *Id.*

¶ 10.

Sioux Steel's allegation that a confidential relationship existed between it

and J & J would go against the very rationale this rule promotes. Kramer

stated that he reached out to more than one firm to see if there was any

interest in doing a design review. Docket 45-1 ¶ 3. Kramer stated in his

affidavit, "[A]nytime I contact an outside firm with respect to work on a new

design, I understand that the information communicated is proprietary, and

expect that it will remain confidential." *Id.* ¶ 4. If this court would disqualify

Carson because of Sioux Steel's reaching out to J & J for a potential job, the

court would likely have to disqualify every engineering expert from all firms

Sioux Steel contacted in its search for a firm to review its design based on

Kramer's subjective belief that his inquiry was considered confidential. Such a

belief is not reasonable, especially in the context of contacting several firms in

the search for a firm to do a design review.

The interactions between Sioux Steel and J & J cannot be considered a

confidential relationship. There was no personal meeting between the parties,

the communications were limited in time, the discussions were limited to the

topic of retention, and confidentiality was never mentioned. It would not have

21

been objectively reasonable for Sioux Steel to believe that a confidential relationship formed during these initial consultations. Thus, Sioux Steel has failed to meet its burden under the first prong of the test.

Because Sioux Steel has failed to satisfy the first prong of the test, the court does not need to analyze the second prong. *See Northbrook Digital LLC*, No. CIV.07-2250PJS/JJG, 2009 WL 5908005, at *3. Sioux Steel's motion to disqualify Carson is denied.

## CONCLUSION

The court concludes that Carson's proffered testimony is reliable. Therefore, his testimony will not be excluded. The court also finds that Sioux Steel did not have an objectively reasonable belief that a confidential relationship existed between it and Carson. Thus, Carson will not be disqualified as an expert under to the court's inherent authority.

Thus, it is

ORDERED that Sioux Steel's motion to exclude and disqualify KC Engineering's expert witness (Docket 34) is denied.

Dated September 19, 2018.

BY THE COURT:


/s/ *Karen E. Schreier*
KAREN E. SCHREIER
UNITED STATES DISTRICT JUDGE